J5mdtap1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

VICTOR TAPIA,

             Plaintiff,            New York, N.Y.

        v.                17 Civ. 4936(JLC)

SPACE NY 50th ST LLC, EDEN
BALLROOM LLC, ANTONIO
PIACQUADIO, CARLO SENECA and
MICHAEL GENITON,

             Defendants.

------------------------------x

                              May 22, 2019
                              9:50 a.m.

Before:

                 HON. JAMES L. COTT,

                         Magistrate Judge

                  APPEARANCES

CONNOLLY LAW
     Attorneys for Plaintiff
BY:  KERRY E. CONNOLLY

AKERMAN LLP
     Attorneys for Defendants
BY:  VINCENT AVERY
     MELISSA OVERBECK


      – also present –

Victor Tapia
Antonio Piacquadio
Michael Geniton

Karin Figueroa, Spanish Language Interpreter

J5mdtap1

| | |
|---|---|
| 1 | THE CLERK:  Tapia versus Space New York 50th Street. |
| 2 | Counsel, state your name for the record. |
| 3 | MS. CONNOLLY:  Good morning, your Honor.  Kerry |
| 4 | Connolly, from Connolly Law, for the plaintiff, Victor Tapia. |
| 5 | THE COURT:  Good morning, Ms. Connolly.  Good morning, |
| 6 | Mr. Tapia. |
| 7 | MR. AVERY:  Good morning, your Honor.  Vincent Avery |
| 8 | and Melissa Overbeck for the defendants. |
| 9 | THE COURT:  Good morning, Mr. Avery.  Good morning, |
| 10 | Ms. Overbeck. |
| 11 | Do you want to introduce your clients? |
| 12 | MR. AVERY:  This Anthony Piacquadio and Michael |
| 13 | Geniton. |
| 14 | THE COURT:  You may be seated. |
| 15 | Good morning, gentlemen. |
| 16 | OK.  A few preliminary matters before we get started |
| 17 | with Mr. Tapia's trial.  First of all, I wanted to apologize to |
| 18 | counsel and your clients for having to cancel at the last |
| 19 | minute last month.  I feel very badly about it.  I just was not |
| 20 | able to make it into court that day. |
| 21 | Ms. Connolly, my deputy tells me that you may have |
| 22 | incurred an interpreter expense as a result of that.  Is that |
| 23 | true? |
| 24 | MS. CONNOLLY:  We are working it out, your Honor. |
| 25 | THE COURT:  OK.  If you don't work it out for some |

J5mdtap1

1   reason, let me know.  I don't know that there is anything I can

2   do, but there are things I could look into.  There is a bench

3   and bar fund in the court, etc.  So, if there is an issue, I

4   want you to tell me because you are not responsible for it, I

5   am, so --

6           MS. CONNOLLY:  Your Honor, judges are human and I am

7   working that out.

8           THE COURT:  So if there is an issue, I just want to

9   let you know.  I am happy to help, if I can.

10          MS. CONNOLLY:  Thank you.

11          THE COURT:  The second issue is we have the letter

12  about Mr. Soto's settlement that was sent on May 5th and then

13  the defendants' response.  I guess my question is, at lease in

14  my reading of the settlement agreement that exists, if there is

15  a breach, what it says is that the confessions of judgment will

16  be held in escrow by plaintiff Soto's counsel and will not be

17  entered, ever filed at any time other than in the event that

18  the defendants fail to make any of the installment payments as

19  set forth above, i.e., one of the postdated checks fails to

20  clear Soto's counsel's escrow account, or defendants fail to

21  deliver the payments to plaintiff Soto's counsel within ten

22  days of the Court approving the agreement.  In the event

23  defendants breach this settlement agreement by failing to make

24  timely payment, the entire settlement amount shall

25  automatically be accelerated and plaintiff shall be allowed to

J5mdtap1

1    file the confessions of judgment, less payments already made,

2    together with all costs and attorney's fees incurred by

3    plaintiff in connection with any efforts to enforce the

4    confessed judgments.

5         So, isn't that what should happen next if there has in

6    fact been a breach, which doesn't seem to be contested?

7         MS. CONNOLLY:  Your Honor, I don't have the original

8    confessions of judgment.  I don't even know why we are having,

9    you know, this dispute, because has it ever been that a

10   plaintiff in a settlement doesn't get an original copy of the

11   settlement agreement and confessions of judgment?

12        THE COURT:  Well, that should be easy to solve.

13        Mr. Avery, if you have these original confessions, why

14   haven't they been provided to Ms. Connolly?

15        MR. AVERY:  It is not about -- two things.  One, your

16   Honor, I'm not really sure, unless I am mistaken, if in the

17   event, since I believe your Honor is retaining jurisdiction

18   over the settlement, in the settlement agreement itself, that

19   when she would be filing a confession, she would be sending it

20   to the judgment clerk, and I'm not understanding what the

21   original is.  They had scanned and emailed them to me.  I

22   emailed them to her.  They are actually color copies with blue

23   ink.  We not contesting the authenticity.

24        THE COURT:  Let me interrupt you to say -- intervene

25   to say one thing.  I don't think I have retained jurisdiction,

J5mdtap1

1    necessarily.  There is no provision that I saw in this

2    agreement that had this Court retain jurisdiction, unless I

3    missed it.  So, you say that but is there a provision to that

4    effect?  Because it is not in the agreement that I reviewed

5    yesterday.  Did I miss it?

6              MR. AVERY:  Your Honor, it's possible I am mistaken; I

7    don't have the agreement in front of me right now.  And to the

8    extent -- and I will say this:  To the extent that the

9    confessions are not -- it is opposing counsel's intention to, I

10   guess, file it in state court, then we can provide originals.

11   Again, in fact, the defendants are here.  If you have a blank

12   copy, Kerry, we can just sign it now.  It really just was a

13   logistics issue.  I didn't have the originals to give, and I

14   honestly thought that your Honor had retained jurisdiction

15   pursuant to --

16             THE COURT:  During our recess today, why don't you all

17   have a further discussion about this.

18             I gather the breach is uncontested; is that correct?

19             MR. AVERY:  That is correct.

20             THE COURT:  Had there been any payments made to

21   Mr. Soto?

22             MR. AVERY:  No.

23             THE COURT:  All right.  So, Ms. Connolly, assuming you

24   had the originals, what would your intention be with respect to

25   them?

J5mdtap1

1          MS. CONNOLLY:  Your Honor, I would seek to enforce

2     them.  I would seek to file them in the relevant state court

3     jurisdictions.

4          THE COURT:  Right, because I don't think there is any

5     retention in this court over this matter.

6          MS. CONNOLLY:  Right.

7          THE COURT:  So you need them to file them in whatever

8     state court you are going to file them in.

9          MS. CONNOLLY:  Right.

10          THE COURT:  OK.  But your view is that the confessions

11     of judgment you have would not be accepted by the state court

12     because they are considered copies and not originals?

13          MS. CONNOLLY:  That is right, your Honor, not in all

14     jurisdictions.  In some jurisdictions you file them

15     electronically and others still do not have electronic filing,

16     you have to actually walk them in and the clerk insists upon

17     the original.

18          THE COURT:  I can't recall whether the confessions

19     themselves are exhibits to what was on the docket but --

20          MS. CONNOLLY:  They were supposed to have been, not in

21     the form attached hereto, but when defendants filed the

22     stipulation of settlement, the executed copy, they did not

23     attach the confessions of judgment.

24          THE COURT:  All right.  Well, do you happen to have

25     so-called copies of them with you?

J5mdtap1

 1              MS. CONNOLLY:  No.

 2              THE COURT:  How about the defense table, do you happen

 3    to have them with you?

 4              MR. AVERY:  Not hard copies.  She has her email and we

 5    could show the Court the email and print it out.

 6              THE COURT:  Maybe you could email it to my

 7    chambers' --

 8              MR. AVERY:  OK.

 9              THE COURT:  -- mailbox and during a recess we could

10    print it out and then the individual defendants could sign

11    them, and then you will have them in hand signed.  How about

12    that?

13              MS. CONNOLLY:  They also have to be notarized.

14              THE COURT:  My deputy is a notary, so we could do

15    that.

16              So, why don't we try and tend to those ministerial

17    matters either at the recess or at the lunch break or at the

18    end of the day, or something along those lines.  But does

19    that -- if we accomplish that, Ms. Connolly, is that what you

20    need as far as that's concerned and nothing beyond that?

21              MS. CONNOLLY:  Yes, your Honor.

22              THE COURT:  OK.  So I think we can accomplish that,

23    and we'll figure out how to make that happen before you all

24    leave today.

25              All right.  Does anybody else have any other

J5mdtap1

1   preliminary matters to raise before we get started with

2   Mr. Tapia's trial?

3           MS. CONNOLLY:  No, your Honor.  I am going to forgo

4   any kind of opening because Mr. Soto is here and he would like

5   to get to work.

6           THE COURT:  OK.  So he is going to be called to

7   testify first?

8           MS. CONNOLLY:  Yes.

9           THE COURT:  And, Mr. Avery, you are willing to forgo

10  openings as well?

11          MR. AVERY:  Yes, your Honor.

12          THE COURT:  If there is a need for closings, I am more

13  than happy to have them.  That is probably more useful, anyway,

14  since I think we are all generally familiar with the contours

15  of the case.

16          So with that in mind, we will proceed, and, Ms.

17  Connolly, you can call your first witness.

18          MS. CONNOLLY:  Thank you, your Honor.

19          Mr. Soto, take the stand, please.

20          THE COURT:  Does he need an interpreter?

21          MS. CONNOLLY:  No.

22   SAUL SOTO,

23       called as a witness by the plaintiff,

24       having been duly sworn, testified as follows:

25          THE CLERK:  Please state your full name and spell your

J5mdtap1                              Soto - direct

1     full name for the record.

2                 THE WITNESS:  Saul Soto, S-a-u-l S-o-t-o.

3                 THE CLERK:  Please have a seat.

4                 THE COURT:  You may proceed, Ms. Connolly.

5                 MS. CONNOLLY:  Thank you.

6     DIRECT EXAMINATION

7     BY MS. CONNOLLY:

8     Q.  Good morning, Mr. Soto.

9                 Could you please explain to us how you came to be

10    involved in this case?

11    A.  Because I used to work with Mr. Tapia together.

12    Q.  And where were you employed?

13    A.  Space nightclub.

14    Q.  And who was your employer?

15    A.  Mr. Antonio and the other gentleman.

16    Q.  Are you referring to the gentlemen sitting at defense

17    table?

18    A.  Yes.

19    Q.  And is that the gentleman to your left of Ms. Overbeck?

20    A.  Yes.

21    Q.  Is that the same Antonio, and his last name?

22    A.  I can't --

23    Q.  Is it Piacquadio?

24    A.  Yes.

25    Q.  Do you know who the gentleman is sitting next to him?

J5mdtap1                              Soto - direct

```
1    A.   Yes.

2    Q.   Who do you understand him to be?

3    A.   The owner of the nightclub.

4    Q.   And we are talking about the man sitting next to Mr.

5    Piacquadio?

6    A.   Both.

7    Q.   Both?

8    A.   Yes.

9    Q.   Both gentlemen are owners of the nightclub, is that right?

10   A.   Yes.

11   Q.   And you are not remembering the name of the man to the

12   right of Mr. Piacquadio?

13   A.   Sorry.  Mike.  I don't know the last name.

14   Q.   Do you know what the roles of Antonio Piacquadio and Mike

15   were at Space?

16   A.   Director or manager and owners.

17   Q.   And what did they do -- what did you see them doing at

18   Space?

19   A.   I mean, how do I say, trying to -- to make a good business.

20   Q.   OK.  Did you -- what did they do -- were they there every

21   day that you worked?

22   A.   Like, I don't really understand that.

23   Q.   Did you see Mr. Piacquadio and Mike at Space every day you

24   worked at Space?

25   A.   Yeah, they were there.
```

J5mdtap1                          Soto - direct

1    Q.  OK.  And how were you paid for your work at Space?

2            MR. AVERY:  Objection.  Relevance.

3            THE COURT:  I will allow it.  Overruled.

4            You can answer the question.  How were you paid?

5            THE WITNESS:  Cash, sometimes checks, but the check

6    would bounce.

7    BY MS. CONNOLLY:

8    Q.  And what would you do with the check or checks that

9    bounced?

10   A.  Give it back to them.

11   Q.  And were Mr. Piacquadio or Mike involved in paying you?

12   A.  Yes, but usually the manager is who gives the money.

13   Q.  And did there come a time when you became involved in this

14   lawsuit?

15   A.  Yep.

16   Q.  And why was that?

17   A.  Because they owe me money.

18           MR. AVERY:  Objection.  Relevance.

19           THE COURT:  I will allow it.

20   Q.  And did you communicate your -- the fact that they owed you

21   money to Mr. Piacquadio and Mike?

22   A.  Yes.

23           MR. AVERY:  Objection.

24   Q.  And how did you do that?  And what happened when you did

25   that?

J5mdtap1                          Soto - direct

1   A.  I mean, they always tell me, like, OK, next week, next two

2   weeks.  Then after they would tell me like next week and it

3   never happened.

4             MR. AVERY:  Your Honor, I am going to object on both

5   what appears to be sort of character-based evidence and

6   relevance.

7             THE COURT:  What do you mean by character-based

8   evidence?

9             MR. AVERY:  If she is offering this testimony to

10  establish some sort of pattern or habit of nonpayment based on

11  one individual as to another, I mean, this is not his trial.

12            THE COURT:  No.  But you're going to offer evidence

13  about when he did work, and you're going to offer it in the

14  same regard for pattern evidence, because he could use a clock

15  and Mr. Tapia could use a clock, so there is that.  And there

16  is also the issue of whether he is biased or not, which goes to

17  his credibility.  So, I think this is all admissible evidence

18  for both of those reasons.

19            So, overruled.

20  BY MS. CONNOLLY:

21  Q.  And who did you communicate with, besides the managers,

22  about the money that was owed to you?

23  A.  Them.

24  Q.  Who is "them"?

25  A.  The owners.  I'm sorry.

J5mdtap1                          Soto - direct

1   Q.  And do you recall how you did that?

2   A.  By emails, text message, verbally.

3           THE COURT:  By email, text messages, and what was the

4   last thing you said?

5           THE WITNESS:  Talking.

6           THE COURT:  Conversations?

7           THE WITNESS:  Conversations.  I'm sorry.

8   BY MS. CONNOLLY:

9   Q.  And what were those conversations?

10  A.  I mean, like I would tell them like they owe me money and I

11  need it.  Because there was times I used to work like a lot, a

12  lot of hours, and that was my only job and I didn't have any

13  money to pay my rent, and I had to chase them for money.

14  That's not right.

15  Q.  Of the owners that are here, do you know if either -- who

16  was responsible for, if either of them, for collecting cash at

17  the end of the night?

18          MR. AVERY:  Objection.  Relevance.

19  A.  The manager --

20          THE COURT:  Just one second.  Don't answer until I

21  rule.

22          Yes.  Sustained.

23  Q.  Do you know whether Mr. Piacquadio and Mike hire and fire

24  people?

25  A.  It was mostly the manager, the manager used to hire people.

J5mdtap1                        Soto - direct

1    Q.  Did you ever witness either Mr. Piacquadio or Mr. Geniton

2    hiring or firing someone?

3    A.  Me?

4    Q.  OK.

5            THE COURT:  Just to be precise about that, are you

6    saying that one of those gentlemen fired you?

7            THE WITNESS:  I mean, they told the bouncer to kick me

8    out.

9            THE COURT:  They told a bouncer to kick you out?

10           THE WITNESS:  Yeah, out of the building.

11   BY MS. CONNOLLY:

12   Q.  How did that come about?  How did that incident come about?

13   A.  I'm sorry?

14   Q.  How did that happen?  What happened that the bouncer would

15   kick you out?

16   A.  Aggressively.

17   Q.  What led up to that?  Why did that happen?

18   A.  Oh, because there was this old gentleman.  They used to owe

19   him $500, to the old guy, very old guy and hard working.  So,

20   he's alone in this country.  So I came up to the office to talk

21   to them, try to talk to them, trying to get his money so he

22   could get paid.  But they were like, oh, we can't pay him right

23   now.  And I was like, but you can pay him, like it's $500.  You

24   are making a lot money right now, so why don't you pay him, you

25   know.  He is an old guy.  He needs to pay his rent.

J5mdtap1                          Soto - direct

1              And then the manager came up to me, like, kind of like

2      aggressively, and said, Saul, you're not supposed to do this.

3      Like, it's not even your money.  I'm like, yeah, but they owe

4      me money, too.  So, no, I can pay him out of my pocket and then

5      I can get the money back from them.  And then at the end they

6      pay him, right, they paid the guy, the man.  But after that

7      they told me you have to go.

8              THE COURT:  Who told you you have to go?

9              THE WITNESS:  The security.

10             THE COURT:  Why?

11             THE WITNESS:  The security left.  I don't know why.

12     They told me I had to go.

13             But I never did anything wrong.  I'm just trying to

14     get the money, you know.

15             THE COURT:  All right.  Next question, Ms. Connolly.

16     BY MS. CONNOLLY:

17     Q.  Do you know if your time was recorded in any way for the

18     work you did at Space?

19     A.  The computer, clock in.

20     Q.  OK.  Can you explain how that clocking in and clocking out

21     happened?

22     A.  We used to clock into the computer.

23     Q.  Did you clock in every day that you worked?

24     A.  Yes.  Sometimes in the morning, sometimes not, but because

25     there was different positions.  But sometimes the clock -- the

J5mdtap1                         Soto – direct

1   computer didn't work.

2   Q.  And did that happen often?

3   A.  Yeah.  Yeah, sometimes.

4   Q.  So --

5   A.  For some reason, it didn't work.

6   Q.  OK.  So if you were shown a copy of your time records from

7   the computer, you wouldn't be able to say whether or not they

8   were accurate, would you?

9   A.  I wouldn't be able to.

10  Q.  And what would happen if you were not allowed to clock in

11  for some reason?

12  A.  Oh, we used to sign a sheet -- we used to sign a sheet to

13  clock in and out.

14  Q.  OK.  Who maintained that sheet?

15  A.  Jennifer.  She used to work there.

16  Q.  Is Jennifer an Asian lady?

17  A.  Yes.

18          MS. CONNOLLY:  We finally have the identity of the

19  Asian lady.  OK.

20  Q.  Now, do you know whether everyone -- do you know whether

21  everyone at Space clocked in and out?

22  A.  I'm not sure.

23  Q.  OK.  Did everyone at Space have an employee number, to your

24  knowledge?

25  A.  They're supposed to.  I think they are supposed to, but I'm

J5mdtap1                              Soto - direct

1    not sure if everyone had a number.

2    Q.  And do you know what happened to that sheet, or what was

3    done with that sheet where you would write down your hours when

4    you were not able to clock in and out?

5    A.  I don't know what happened.

6    Q.  Do you know whether or not the time clock computer was able

7    to be accessed by managers at Space?

8    A.  I'm sorry.  Say that again.

9    Q.  Were managers able to access the computer where you were

10   supposed to punch in and out?

11   A.  Yeah.

12   Q.  Do you know whether or not the managers and anybody with

13   access to the computer would be able to change your hours?

14        MR. AVERY:  Objection, your Honor.  Leading.

15   A.  I'm sure --

16        THE COURT:  One second.

17        THE WITNESS:  Sorry.

18        THE COURT:  Just so you understand, if Mr. Avery

19   objects, I have to decide whether the question can be answered

20   or not.  So, I need to look at the question again.

21        (Pause)

22        The objection is overruled.

23        You can answer the question.  The question was do you

24   know whether or not the managers or anybody with access to the

25   computer would be able to change your hours?  Do you know one

J5mdtap1                          Soto - direct

1    way or the other?

2                THE WITNESS:  Yes.

3                THE COURT:  OK.

4                THE WITNESS:  I know they were able to change the

5    hours.

6                THE COURT:  Say that again.

7                THE WITNESS:  I know they were able to change the

8    hours.

9    BY MS. CONNOLLY:

10   Q.  What was your position or positions at Space?

11   A.  I started as a porter and then became busboy, barback, and

12   then, like, trying to maintain like the club, like little

13   construction.

14   Q.  When you worked as a porter, what were your hours?

15   A.  Eight -- eight hours during the day and then after at

16   night.

17   Q.  So eight hours during the day, but approximately what time

18   would you begin and what time would you end?

19   A.  Sometimes 12 to 8.

20   Q.  12 p.m. to 8 p.m.?

21   A.  Sometimes 1 p.m. to 9.

22   Q.  That's 1 p.m. to 9 p.m.?

23   A.  Sometimes there were, like, early events; I used to be

24   there earlier.

25   Q.  And when you worked as a busboy and barback, what did those

J5mdtap1                          Soto - direct

1   two jobs involve?

2   A.  I was supposed to get tips and the minimum wage.  Well, I

3   never got the minimum wage.

4   Q.  What were your duties and responsibilities during those two

5   positions?

6           MR. AVERY:  Objection.  Relevance.

7           THE COURT:  I don't want you to belabor this very long

8   but I will allow that question.

9           What were your duties and responsibilities?

10          THE WITNESS:  Hospitality, maintain -- try to keep the

11  guests happy and keep them -- like, the table clean and, you

12  know, trying to be -- how do I say it, try to be -- I don't

13  know how to say it.

14          THE COURT:  Next question, please.

15  BY MS. CONNOLLY:

16  Q.  Approximately how many times did you get paid by a check

17  that bounced?

18  A.  Probably it was like maybe five times.

19  Q.  And what kind of documentation, if any, did you receive

20  when you got paid?

21  A.  Well, there is a sheet that we used to sign if we get paid.

22  Q.  And were you given any documents at that time?

23  A.  If I sign any document?

24  Q.  When you got paid and you signed a document, were you given

25  a copy of the document at that time?

J5mdtap1                        Soto - cross

1    A.  No, never.  I never got a copy.

2            MS. CONNOLLY:  OK.  I have no more questions,

3    Mr. Soto.  Thank you.

4            THE COURT:  All right.  Thank you, Ms. Connolly.

5            Mr. Avery gets to ask you questions now.  You might

6    not like this as much.

7            MR. AVERY:  I will be nice.

8            Your Honor, permission to approach the witness?

9            THE COURT:  Yes.

10           MR. AVERY:  For the record, I am showing the witness

11   what's been premarked as Defense Exhibit D.

12   CROSS-EXAMINATION

13   BY MR. AVERY:

14   Q.  Mr. Soto, there is testimony --

15           MS. CONNOLLY:  Excuse me, your Honor.  I have an

16   objection to this document.  At Mr. Tapia's deposition, I

17   pointed out that the copy he showed Mr. Tapia like this, these

18   are not -- this is not one document.  This is -- one is titled

19   "Earnings Record," and the other thing purports to be, you

20   know, the punch-in, punch-out records.

21           MR. AVERY:  That's fine, your Honor.  We can make it

22   D1 and D2, if that is preferable.

23           THE COURT:  That is preferable.

24           MR. AVERY:  OK.  So let's make D1 is the top page.  D2

25   is the punch-in and punch-out records that follow.

J5mdtap1                        Soto - cross

1                    THE COURT:  OK.

2                    MR. AVERY:  So flipping to D2, that's what I want to

3        focus on for a moment.

4                    THE COURT:  That's the second page.

5        BY MR. AVERY:

6        Q.  You testified on direct that you would punch in and punch

7        out.

8                    THE COURT:  I'm sorry to interrupt you, Mr. Avery, as

9        you are starting, but one thing I don't like is lawyers saying

10       what someone said in their testimony.  Just ask the question.

11       Don't summarize what you thought he already said.

12                   MR. AVERY:  Sure.

13                   THE COURT:  Just ask your question.  OK.  The record

14       is whatever he said, not --

15                   MR. AVERY:  Sure.

16       BY MR. AVERY:

17       Q.  You punched in at the start of your shifts, right?

18       A.  Yes.

19       Q.  And you did so using an employee code?

20       A.  Employee?

21       Q.  A code.

22       A.  Yes.  I mean, at the beginning we used to click into the

23       card.

24       Q.  So initially there was a card?

25       A.  A card, a clock-in card.

J5mdtap1                         Soto - cross

1    Q.  And at some point that switched to a system in which you

2    would enter a code, you said, into a computer?

3    A.  Yes.

4    Q.  And you did that at the start of the shifts, right?

5    A.  Yes.

6    Q.  And you did that at the end of the shifts, right?

7    A.  Yes.

8    Q.  OK.  And you indicate -- sorry.

9            As you sit here today, do you have any knowledge that

10   a supervisor changed your time entries?

11   A.  I don't -- I don't know if they changed, but I know they

12   could have changed because they have access.

13           THE COURT:  You don't know that they did change but

14   you know they could change; is that what you are saying?

15           THE WITNESS:  They could change, yes.

16           THE COURT:  But you don't know if they ever did that

17   in any of your records?  Do you have any knowledge that any

18   manager ever changed any of your hours in the computer?

19           THE WITNESS:  I remember seeing Jennifer, the girl,

20   she used to work there, she used to keep track of the sign-ins

21   and sign-outs.  She could do that.

22           THE COURT:  I know she could do it.  The question is

23   did she do it with respect to your hours?

24           THE WITNESS:  Not -- I don't think my hours.

25           THE COURT:  OK.

J5mdtap1                        Soto - cross

1    BY MR. AVERY:

2    Q.  Do you have any knowledge whether that would be indicated

3    on the timecard that's marked as D2 if a change did occur?

4    A.  I don't know.

5    Q.  So you don't know one way or another whether that would be

6    recorded, is that right?

7    A.  I mean, there is some hours that are not -- I don't

8    understand these hours.  Sometimes it says one hour, two hours.

9    I don't -- I don't understand this.

10   Q.  Do you want to -- when you say you don't understand it --

11   let me take a step back.

12          As you sit here today, do you have any basis to say

13   that the hours recorded on D2 are inaccurate for you?

14   A.  They are inaccurate because I don't understand why I clock

15   in for two hours only.

16   Q.  You are pointing to D2, for the record.

17          Is there a specific date you are referring to?

18   A.  I mean, there is a lot of them.  There is not specifically

19   one that I want to refer, but there is a lot of them that is

20   not accurate.

21   Q.  Let me ask you something.

22          Let's go to page -- what is indicated as page 9 of D2.

23   At the top it says page 9.  This is actually the fourth page of

24   D2.

25          Are you there?  Let me know when you are there are.

J5mdtap1                        Soto - cross

1           THE COURT:  Are you on page 9?

2           THE WITNESS:  Page 9.

3           THE COURT:  Yes, he is.

4           MR. AVERY:  OK.  Thank you.

5    BY MR. AVERY:

6    Q.  Do you see immediately at the top, the first entry is dated

7    8/5/2016, correct?

8    A.  Yes.

9    Q.  And that entry is for 10 hours and 33 minutes, correct?

10   A.  Yes.

11   Q.  And the next entry would be presumably the one you are

12   referring to on 8/4, which is actually only for 18 minutes, is

13   that right?

14   A.  Yes.

15   Q.  So you think that entry is wrong because it is 18 minutes,

16   right?

17   A.  Yes.

18   Q.  OK.  But can you look at the entry immediately below that?

19   A.  Yes.

20   Q.  That's also for 8/4, isn't it?

21   A.  For seven hours.

22   Q.  Right.  So you punched in twice on the same day?

23           MS. CONNOLLY:  Objection.  Mr. Avery just made a

24   statement.

25           THE COURT:  Well, he is asking it as a question, I

J5mdtap1                        Soto – cross

1   think.

2            MR. AVERY:  Yes.

3            THE COURT:  So, overruled.  I mean, let's rephrase it

4   as "isn't it correct."

5   BY MR. AVERY:

6   Q.  Isn't it correct that you punched in on the same day twice?

7   A.  Yeah, it is the same day.

8   Q.  OK.

9   A.  But I don't know what -- why I am going to clock in twice.

10           THE COURT:  Next question.  You can't just talk.  He

11  has to ask you questions and then you've got to answer.

12  Q.  Isn't it true that you punched in on multiple days two

13  times a day?

14  A.  No, I don't recall that.

15  Q.  You don't recall punching in --

16  A.  No.

17  Q.  -- twice a day?

18  A.  No.

19  Q.  Ever?

20  A.  No.

21  Q.  Never?

22  A.  (Shaking head)

23  Q.  Can you look down from where you just were one, two, three

24  entries.

25  A.  OK.

J5mdtap1                          Soto - cross

1    Q.  Are there two entries dated 7/30?

2    A.  I can't find it.  Sorry.

3              MS. CONNOLLY:  Objection, your Honor.  The document

4    says what it says.

5              THE COURT:  Yes.  I mean, we don't need to belabor

6    that.

7              MR. AVERY:  I wasn't going to do it much longer.

8    A.  I don't know which one.  Sorry.

9              MR. AVERY:  OK.  I will move on.

10   Q.  Did you ever give any employees your code?

11   A.  Yes.

12   Q.  Why?

13   A.  Oh, if I had given it to my coworkers?

14   Q.  Yes, your coworkers.

15   A.  No.  Of course not.  Everybody has their own code, their

16   own number.

17   Q.  Now, you said -- strike that.

18             Your shifts were 12 to 8 or 1 to 9, generally

19   speaking?

20   A.  Because I used to work daytime and then after nighttime,

21   too.

22   Q.  When you worked daytime and nighttime, was there a break in

23   between?

24   A.  No.  I just go straight.

25   Q.  OK.  And the shift times at let's start with 12 to 8, were

J5mdtap1                        Soto - cross

1   those shifts that you would punch in a code on?

2   A.  No, those are -- yeah, I was supposed to do it sometimes,

3   yeah.  But sometimes on my shift the computer didn't work.

4            THE COURT:  Next question.

5            MR. AVERY:  Sure.

6   Q.  How many times in, let's say, 2016 did the computer not

7   work?

8   A.  I'm not sure.

9   Q.  Would it be more or less than 10?

10  A.  Probably more.

11  Q.  More or less than 20?

12  A.  Between 20, something like that.

13  Q.  OK?

14           THE COURT:  I didn't understand that answer.  You said

15  between 20?

16           THE WITNESS:  I mean --

17           THE COURT:  Between 10 and 20, is that what you meant?

18           THE WITNESS:  Probably around 20.  I'm sorry.

19           THE COURT:  Around 20?

20           THE WITNESS:  Yes.

21           THE COURT:  Around 20 is his answer.

22           THE WITNESS:  I'm not really sure.

23           THE COURT:  He's not sure.

24           MR. AVERY:  That's fine.

25  BY MR. AVERY:

J5mdtap1                        Soto - cross

1   Q.  And while we are on page 9 of D2 -- Exhibit D2, right --

2   can you look at the entry dated 7/22/2016 for me?

3           (Pause)

4   A.  OK.

5   Q.  You punched in at 2:03 that day, correct?  Yes?

6   A.  It says here but I don't remember it.

7   Q.  And you punched out at what would be 8:51, correct?

8   A.  Correct.  It says here in the paper.

9   Q.  OK.  So the clock was working on that day, right?

10  A.  Yeah.

11  Q.  Would it be safe to say that any date on which your hours

12  are represented on D2, the clock was working?

13          MS. CONNOLLY:  Objection, your Honor.

14          THE COURT:  I think I'm going to sustain that

15  objection.

16          Next question.

17  BY MR. AVERY:

18  Q.  Can you look at the entry number at 7/26/2016, the same

19  page.

20          (Pause)

21  A.  OK.

22  Q.  There are two entries.  The first one you punched in at

23  10:14, correct?

24  A.  Correct.

25  Q.  And you punched out at 11 p.m., correct?

J5mdtap1                        Soto - cross

```
 1    A.  Correct.
 2    Q.  Or 11 a.m.  Sorry.  Strike that.
 3              And then you punched back in later that same day, at
 4    4:52, correct?
 5    A.  OK.
 6    Q.  And you punched out at 5:21, correct?
 7    A.  Correct.
 8    Q.  And the clock was working on that day, correct?
 9              MS. CONNOLLY:  Objection.
10              THE COURT:  Sustained.  The same question that I
11    sustained the last time around.
12              MR. AVERY:  OK.
13    BY MR. AVERY:
14    Q.  When the clock wasn't working, you indicated -- sorry.
15    Strike that.
16              When the clock wasn't working, you would submit your
17    time manually on a signed piece of paper?
18    A.  Yes.  They had a sheet on the desk that we used to -- we
19    used to sign in.
20    Q.  And then those hours were entered into the system?
21    A.  Jennifer, she was supposed to give it to the manager.
22    Q.  And who was the manager?
23    A.  It was Dave -- it was different managers.
24    Q.  OK.  Can you flip to page 11 on your -- it is indicated as
25    page 11 on D2.
```

J5mdtap1                              Soto - cross

1              There is a column third from the left -- or third from

2      the right, sorry, that says "Edited."  Do you see that column?

3      A.  Yes.

4      Q.  And then there is a column right next to it that says

5      "Edited By."  Do you see that column?

6      A.  Yes.

7      Q.  Is there an indication that one of these entries on this

8      page was in fact edited?

9      A.  I don't know.  I don't recall that.

10     Q.  Do you see the name Morgan McLean?

11     A.  Yes.

12     Q.  Do you know why that's there?

13     A.  He used to work there.

14     Q.  Do you know one way or another why that name appears next

15     to that entry?

16     A.  Probably he was the manager during the time.

17              MR. AVERY:  And I believe I am almost finished, your

18     Honor.

19     Q.  Can you take a look through D2 real quick and tell me, are

20     there any other entries that have an indication with a name

21     that says "Edited By" and then a name in it?

22     A.  I'm sorry.  Which page?

23     Q.  The whole thing.  Just flip through it.

24     A.  I'm sorry.  What do you want me to do.

25     Q.  I want you to check if there is any other indication on D2,

J5mdtap1                    Soto - cross

1    where you said Morgan McLean was a supervisor, so a

2    supervisor's name in that column?

3    A.  Nope.

4            MR. AVERY:  If I could take one minute, your Honor?

5            THE COURT:  You may.

6            (Pause)

7            MR. AVERY:  Just a couple of more questions, your

8    Honor.

9    Q.  You indicated -- sorry.  Strike that.

10           When you were advocating for that other employee

11   towards the end of your employment, there was a manager who

12   told you not to get involved, right?

13   A.  I'm sorry, I don't really understand that.

14   Q.  When you were advocating for your coworker towards the end

15   of your employment, there was another manager who told you not

16   to get involved?

17           THE COURT:  Another manager from whom?

18           MR. AVERY:  From Eden Ballroom.

19           THE COURT:  Someone who had nothing to do with Eden

20   Ballroom?

21           MR. AVERY:  No.  I can phrase it more directly, your

22   Honor.

23   Q.  It wasn't Anthony or Mike Geniton who told you not to get

24   involved, was it?

25   A.  It was Disco David.

J5mdtap1                          Soto - cross

1    Q.  Disco David, OK.  Thank you.

2            Is that a nickname?

3    A.  I don't know.  He always said that was his name, Disco

4    David.  I mean, everybody called him that.

5    Q.  And when you were asked to leave the premise by the

6    bouncer, it was security who asked you to leave, right?

7    A.  Yes.

8    Q.  It wasn't Anthony or Mike, was it?

9    A.  No, but he said that Mike told him.

10   Q.  The security guard --

11   A.  Yes.

12   Q.  -- told you Mike told him?

13           But Mike didn't tell you?

14   A.  No.  It was Mike.

15   Q.  OK.  Wait.  Did you understand my question?

16           The security guard told you that it was Mike, correct?

17   A.  Yes.

18   Q.  But Mike didn't tell you that, didn't tell you to leave

19   himself, did he?

20   A.  He didn't tell me because I never get to see him.

21   Q.  OK.  You didn't see him at that time?

22   A.  He was in the office.

23   Q.  OK.

24           MR. AVERY:  No further questions.

25           THE COURT:  Any redirect?

1          MS. CONNOLLY:  Yes.  Very short.

2   REDIRECT EXAMINATION

3   BY MS. CONNOLLY:

4   Q.  Mr. Soto, if you would take a look at Defendants' Exhibit

5   2 --

6          THE COURT:  Do you have a page?  D2?

7          MS. CONNOLLY:  D2, yes.

8   Q.  Page 7.  Take a look at page 7, page 8, page 9, page 10,

9   page 11.  Do you see your name anywhere on those pages?

10  A.  No.

11  Q.  Do you see your employee code anywhere on those pages?

12  A.  No.

13  Q.  And was it your practice to punch in and out ever for a

14  period of 18 minutes?

15  A.  No.

16  Q.  So you have no idea whether or not this is your record of

17  time worked at Space, do you?

18  A.  Yeah.

19         THE COURT:  I'm sorry.  What was the answer to that

20  question?

21         THE WITNESS:  Yes.  I'm sorry.

22         THE COURT:  Yes what?

23         THE WITNESS:  I don't know if it's mine.

24         THE COURT:  You don't know if it's yours?

25         THE WITNESS:  Yes.

J5mdtap1                          Soto - recross

1             THE COURT:  All right.

2             MS. CONNOLLY:  Thank you, your Honor.

3             THE COURT:  All right.  Recross?

4   RECROSS-EXAMINATION

5   BY MR. AVERY:

6   Q.  Can you look at page 6 of D2?

7   A.  Yes.

8   Q.  Do you see your name on that page?

9   A.  Yes.

10  Q.  OK.  And it has your employee number as 6005?

11  A.  It says here 005.

12  Q.  Was that your employee code?

13  A.  I don't remember.

14  Q.  OK.

15  A.  I mean, I've been working so many places, so many codes, I

16  didn't keep track.

17  Q.  Can you look at page 6?

18  A.  Yes.

19  Q.  It's chronological, correct?

20  A.  I don't understand.

21  Q.  The most recent date is on the top, correct?

22  A.  Yes.

23  Q.  And the last day on page 6 is 11/29/2016, correct?

24  A.  Yes.

25  Q.  And can you flip to page 7.

J5mdtap1

1          The top entry on page 7 is 11/28/2016, correct?

2    A.   Correct.

3          MR. AVERY:  No further questions.

4          THE COURT:  Anything further, Ms. Connolly?

5          MS. CONNOLLY:  No, your Honor.

6          THE COURT:  All right.  Mr. Soto, you may step down.

7          THE WITNESS:  Thank you.

8          (Witness excused)

9          THE COURT:  You may call your next witness.

10         MS. CONNOLLY:  Mr. Victor Tapia, please take the

11   witness stand.

12    VICTOR TAPIA,

13        the plaintiff herein, having been duly sworn (through the

14        Interpreter), testified as follows:

15         THE CLERK:  Please state your full name and spell your

16   full name for the record.

17         THE WITNESS:  Victor Tapia.

18         THE COURT:  And just for the record, I gather, Madam

19   Interpreter, you are a certified interpreter?

20         THE INTERPRETER:  Yes, I am.

21         THE COURT:  All right.  That is understood by counsel?

22         MS. CONNOLLY:  Yes.

23         THE COURT:  No issue with respect to the interpreter?

24         MR. AVERY:  No issue, your Honor.

25         THE COURT:  OK.  You may proceed, Ms. Connolly.

J5mdtap1                          Tapia - direct

1    DIRECT EXAMINATION (through the Interpreter)

2    BY MS. CONNOLLY:

3    Q.   Good morning, Mr. Tapia.

4    A.   Good morning.

5    Q.   Can you tell us how you got to be involved in this case?

6    A.   Well, I -- the same thing, that they didn't pay me.

7    Q.   And who didn't pay you and what job are we talking about?

8    A.   Well, I was working with them at the disco.

9    Q.   And when you say "them," to whom are you referring?

10   A.   Well, the owners from the disco.

11   Q.   And are you referring to Mr. Piacquadio and the gentleman

12   who was identified as Mike at defense table?

13   A.   Yes.

14   Q.   Now, how did you come to get your job at Space?

15   A.   Through a friend, told me that they needed busboys.  So I

16   went to see the manager, and then, yes, he gave me the job.

17   Q.   OK.  And who was it that you spoke to at Space?

18   A.   I spoke to a lady who was the manager.  I don't remember

19   her name.

20   Q.   Do you recall if this lady was an Asian lady?

21   A.   Yes.

22   Q.   And what was that conversation that you had with her?

23   A.   Well, I told her I was looking for a job, and she said,

24   yes, there they needed busboys.  So we talked and she said,

25   When can you start?  And then I said, Any day, there is no

1  problem.

2  Q.  What did you discuss about pay, if anything?

3  A.  Well, we spoke that they were going to pay $13 an hour plus

4  tips.

5  Q.  And what paperwork, if any, did you fill out during this

6  conversation with the Asian manager?

7  A.  We just spoke and she told me that I was starting next

8  Friday.  And, no, I didn't fill out any papers.  Then I worked

9  for close to two months and then was when she gave me papers.

10 Q.  So you didn't fill out any paperwork.  And did you receive

11 any paperwork from this manager when you first met with her?

12 A.  No.  We just spoke.

13 Q.  And how were you paid?

14 A.  They would just give me the tips.

15 Q.  And what paperwork, if any, did you receive when you were

16 paid your tips?

17 A.  None.

18 Q.  Can you tell us what your job was at Space?

19 A.  Busboy.

20 Q.  And what were your duties as a busboy at Space?

21 A.  Clean the tables, bring juices to the tables, help the

22 clients to see if they are OK with the service.

23 Q.  And did you have any responsibilities -- what

24 responsibilities did you have in terms of stocking the bars?

25 A.  I didn't have any responsibility because they had a

J5mdtap1                        Tapia - direct

1   barback, but sometimes ourselves, we would help to serve

2   things.

3   Q.  Serve things.  And would you --

4   A.  Not serve things.  To tend to the bar, things like that.

5   Q.  OK.  When you say "tend to the bar," did that include

6   stocking items, moving boxes?

7   A.  Yes.

8   Q.  And what items did you move around in boxes?

9   A.  The alcohol boxes, water, Red Bulls, juices.

10  Q.  Now, what was your schedule at Space?

11  A.  I always worked from 8 to 7.

12  Q.  And that's 8 p.m. to 7 a.m.?

13  A.  Yes.

14  Q.  Did those hours vary?

15  A.  Yes, sometimes.

16  Q.  And how would you know when you would come in or when to

17  leave?

18  A.  Because one of the busboys was the one who tells.

19  Q.  I'm showing you what's been marked as Plaintiff's Exhibit

20  1.

21          MR. AVERY:  Your Honor, before there are questions on

22  this, we have an objection to this.

23          THE COURT:  What is the objection?

24          MR. AVERY:  This appears to be just counsel's

25  calculation of liability.  It is not probative of anything.

J5mdtap1                    Tapia - direct

1            MS. CONNOLLY:  I would like to be able to ask the

2    witness questions about it.  If we can find out what it is,

3    once I --

4            THE COURT:  Well, it seems to me, Mr. Avery, you can

5    cross-examine the witness about any and all of the information

6    here.  This is effectively an aid that I assume Ms. Connolly is

7    going to say is going to memorialize what the witness is

8    otherwise going to testify to, and then you can cross-examine

9    him about that.

10           MR. AVERY:  Just so I understand it, it's being used

11   to essentially refresh his recollection?

12           THE COURT:  I don't know what it is being used for

13   because I haven't heard her ask any questions.

14           MR. AVERY:  Fair enough.

15           THE COURT:  We'll have to see what she's doing.  And

16   I'm not saying you can't object depending on what she is

17   asking, but I am not going to sustain an objection to she can't

18   use Exhibit 1 to ask any questions, which I think is what you

19   have interposed for the moment.  OK?  So, that's overruled, but

20   you can object to any question that you think is objectionable.

21   BY MS. CONNOLLY:

22   Q.  Mr. Tapia, do you recognize this document?

23   A.  Yes.

24   Q.  Does it accurately reflect the dates of your employment, to

25   the best of your knowledge?

J5mdtap1                        Tapia - direct

1    A.  Yes.

2    Q.  And does it accurately reflect the days per week you worked

3    and the hours you worked?

4    A.  No.

5    Q.  No?

6    A.  No.

7    Q.  In what way is it incorrect?

8    A.  It is incorrect because it doesn't show the three days that

9    I worked per week.

10   Q.  OK.  So if you look at the second column, where it says

11   "Days," and then below it, it says "P/W" -- no, the first page.

12   The second column, it says "Days," and then below it is "P/W."

13   A.  Yes.

14   Q.  And then below that, for each week it says "three."

15   A.  Yes.

16   Q.  OK.  Now, do you know how this document was created?

17   A.  No.

18   Q.  What kind of difficulties, if any, did you ever have in

19   recording your time worked at Space?

20            MR. AVERY:  Objection.

21            THE COURT:  Sustained.

22            Rephrase the question.

23   BY MS. CONNOLLY:

24   Q.  How did you notify management of the time you worked -- the

25   hours you worked at Space?

J5mdtap1                    Tapia - direct

1    A.  Well, we -- sometimes the computer wouldn't work, it was

2    locked, so we'd let them know.  They'd always say they were

3    busy right now, put the dates, write the hours, and we're going

4    to correct it so that you have your hours correctly.  At this

5    moment I can't do it.

6    Q.  Did you ever receive a copy of the hours that were recorded

7    for your work?

8    A.  No, never.

9    Q.  And --

10          THE COURT:  I'm sorry to interrupt you, Ms. Connolly,

11   but I think there is a certain foundation that hasn't entirely

12   been laid with respect to this subject with this witness in

13   terms of how his time was recorded.  He just jumped in and

14   started talking about computers not working and the like, but

15   you haven't really had him explain how his time was kept.  So,

16   I think you need to go back and do that for the record to be

17   clear.

18   BY MS. CONNOLLY:

19   Q.  Mr. Tapia, was there a way you were told to record your

20   time that you worked at Space -- you were told by management?

21   A.  Supposedly I had to work three days a week, and from there

22   they were going to check the hours, how many hours I worked per

23   day, but they never gave me any paper where I assured myself

24   that I was registered.

25   Q.  OK.  And how was it that you were supposed to record your

J5mdtap1                     Tapia - direct

time?  Was there a time clock or some other method by which you

were supposed to record your time?

A.  They would tell us and they had a schedule, but we would

look like a week later, the following week, we wouldn't be able

to go back and see it.

Q.  OK.  And when you say you wouldn't be able to go back to

see it, you wouldn't be able to go back where to see it?

A.  What happens is that they have that in their office.

Q.  And what is it -- what was that that you are talking about?

A.  The schedule of the workers, which days that we were going

to work.

        THE COURT:  Let's try it this way, Ms. Connolly, if

you don't mind.

        Mr. Tapia, when you would arrive at work, whatever day

and whatever time, what was the first thing you did when you

arrived at work?

        THE WITNESS:  Oh, we would start to put the tables up,

clean, organize, everything so that everything would be ready.

        THE COURT:  No, I don't mean the actual tasks.  I

mean, what did you do to check in when you arrived at work, if

anything?

        THE WITNESS:  Normally what we do is punch.

        THE COURT:  Normally what we do is?

        THE WITNESS:  Normally what we do is just punch.

        THE COURT:  Punch what?

1           THE WITNESS:  Punch into the computer to work.

2           THE COURT:  All right.  When you say "normally," if

3    you didn't do that, would you do something else?

4           THE WITNESS:  No.  That's what we always did.

5           THE COURT:  All right.  Now, go from there.

6    BY MS. CONNOLLY:

7    Q.  Were you able to punch in and out every day?

8    A.  No.

9    Q.  And can you explain why that was not possible?

10   A.  Because the computer outside at the bar wasn't working,

11   wasn't turned on, and in the office the same, or they were

12   busy.

13          THE COURT:  How many different places were there where

14   you could punch in when you arrived for work?

15          THE WITNESS:  Just two places.

16          THE COURT:  One by the bar and one in the office?

17          THE WITNESS:  Yes.

18          THE COURT:  And there were times when you would arrive

19   at work that both of those were not working?

20          THE WITNESS:  The outside one was not working at the

21   bar, and the one in the office, I don't know because they

22   almost wouldn't allow me there in.

23   BY MS. CONNOLLY:

24   Q.  OK.  Now, was the machine -- to your knowledge, was the

25   machine broken or was it just turned off?

J5mdtap1                    Tapia - direct

 1   A.  Sometimes it was off, sometimes it was on.  When it was on,
 2   I would try to put my number in but it wouldn't allow me to.
 3   Q.  And did you try to punch in every day from the first day
 4   you started work at Space?
 5   A.  Yes, I tried to punch in.
 6   Q.  Did the manager, the Asian lady, did she give you an
 7   employee code?
 8   A.  Yes, a number she gave me to punch in.
 9   Q.  And when did she give you that number?
10   A.  She gave me after two months after I started working.
11   Q.  So for the first two months when you started working, you
12   did not have an employee code?
13   A.  No.
14   Q.  So --
15           THE COURT:  Hold on.  He said "no," which is not I
16   think what you asked him.
17           No, he didn't have an employee code, meaning he had
18   one?  So, you need to make sure the record is clear.
19   BY MS. CONNOLLY:
20   Q.  Mr. Tapia, for the first two months you worked at Space,
21   did you have an employee code number?
22   A.  Yes.  I don't remember.  I don't remember if she gave it to
23   me.  Yes.  I don't remember.
24   Q.  Mr. Tapia, do you remember testifying at your deposition
25   that you worked for several months and then you were given an

J5mdtap1                          Tapia - direct

1    employee code and then an employee application?

2    A.  Yes.

3    Q.  OK.  So do you know whether or not you were able to punch

4    in for the first couple of months you worked at Space?

5    A.  Yes.  Yes.

6    Q.  OK.  Did you need an employee code to access the computer

7    to punch in?

8    A.  Yes, it was needed.

9    Q.  OK.  Now, how many times was the time clock not

10   operational, not working?  How many times per week?  I'm sorry.

11   How many times per week?

12   A.  Sometimes two days it wouldn't work.

13   Q.  OK.  And do you know why you --

14   A.  No.

15          THE COURT:  Hold on.  Do you know why what?

16   Q.  Do you know why you punched in and out, why you were

17   supposed to punch in and out?

18   A.  Yes, to register the hours so they could pay me.

19   Q.  And they never did pay you for those hours, correct?

20   A.  No.  For the hours, never, just for the tips.

21   Q.  And how were you paid for the tips?

22   A.  Well, the tips were split through the night.

23   Q.  OK.  And were they paid to you --

24          THE INTERPRETER:  At the end of the night.  I'm sorry.

25   Q.  At the end of the night.

1          And were they paid to you by check?  By cash?

2     A.   In cash.

3     Q.   OK.  And were you paid by any other method?

4     A.   No.

5     Q.   Were you ever paid by check?

6     A.   No.

7     Q.   Were you given pay statements each time you were paid the

8     tips?

9     A.   No.

10    Q.   At some point, you were paid some money that was owed to

11    you by the owners, correct?

12               MR. AVERY:  Objection.  Leading.

13               THE COURT:  Sustained.

14               Please try not to lead.

15               MS. CONNOLLY:  That is right.

16               THE COURT:  It is not that difficult.

17    BY MS. CONNOLLY:

18    Q.   What monies that you say were owed were paid to you after

19    this lawsuit was started, if any, by the defendants?

20    A.   Well, they called me -- a friend of mine that worked there

21    called me that the owner wants to talk with me.  So they were

22    calling, calling often.  So then I went to the club and I

23    talked to the owner, and the owner gave me money.  But I -- I

24    got it, but it's not the money that he -- it wasn't the money

25    that they owed me.

J5mdtap1                      Tapia - direct

1    Q.  It was only some of the money that they owed you; is that

2    what you mean?

3    A.  Yes.

4    Q.  And the owner that you spoke with when you were paid that

5    money, is that gentleman in this room?

6    A.  Yes.

7    Q.  Can you point out the gentleman who paid you?

8    A.  It's the one that has the jacket with the white shirt.

9    Q.  The gentleman that Mr. Soto referred to as Mike, correct?

10   A.  Yes.

11            MS. CONNOLLY:  I don't have any further questions.

12            Thank you, Mr. Tapia.

13            MR. AVERY:  Can we just have one minute to get some

14   documents?

15            THE COURT:  Yes.

16            (Pause)

17            Anybody who wants to can stand up and stretch like I

18   am.  A mini-recess without leaving the courtroom.  We do this

19   in jury trials to keep jurors awake.

20            (Pause)

21            MS. CONNOLLY:  Oh, can I move Plaintiff's Exhibit 1

22   into evidence?

23            THE COURT:  Do you object to Exhibit 1 being in

24   evidence, Mr. Avery?

25            MR. AVERY:  Yes, your Honor.

1              THE COURT:  And the basis for the objection is?

2              MR. AVERY:  Because the extent to which it was used,

3    it was essentially just saying do you believe these numbers are

4    correct.  And he didn't know how it was created, even.

5              THE COURT:  Well, here's the problem that I have, Ms.

6    Connolly.  You just said "no further questions," and I don't

7    have in the record definitively what period of time Mr. Tapia

8    says he worked, for example.  This exhibit has weeks listed but

9    Mr. Tapia hasn't testified to that.  In other words, leaving

10   Plaintiff's Exhibit 1 aside, which to my way of thinking

11   memorializes what you've alleged in the complaint, he would

12   have to testify to all of that.  And he's testified to I'll say

13   bits and pieces of what's on this piece of paper.  He hasn't

14   testified to everything that is on this piece of paper.  So, I

15   don't see how this can be admitted as simply effectively an aid

16   to the Court memorializing what his testimony is because it

17   isn't entirely consistent with what his testimony is.

18             MS. CONNOLLY:  Mr. Tapia said that it accurately

19   reflected the dates of his employment.

20             THE COURT:  Well, let me be clear with him about that.

21             So, Mr. Tapia, looking at Plaintiff's Exhibit No. 1,

22   this document says you began working at Space the week of

23   July 1st, 2016.  Is that correct?

24             THE WITNESS:  Yes.

25             THE COURT:  And this document says you continued

J5mdtap1                         Tapia - direct

1    working there until the week of January 6th, 2017.  Is that

2    correct?

3                   THE WITNESS:  Yes.

4                   THE COURT:  And is it correct that on all of those

5    weeks you worked three days per week and 10 hours per day?

6                   THE WITNESS:  Yes.

7                   THE COURT:  So you worked 30 hours each of those

8    weeks, no more and no less, is that correct?

9                   THE WITNESS:  Yes.

10                   THE COURT:  And you testified earlier that you were

11   told when you were hired you were going to be paid $13 an hour

12   plus tips?

13                   THE WITNESS:  Yes, correct.

14                   THE COURT:  Your testimony is that you were not in

15   fact paid the $13 per hour, you were just paid tips; is that

16   correct?

17                   THE WITNESS:  Yes.

18                   THE COURT:  And there is no written record of the

19   amount of money you were paid in tips, is that correct?

20                   THE WITNESS:  Yes.

21                   THE COURT:  You were never given any pieces of paper

22   of any kind from the defendants which indicated how much you

23   were being paid in tips or otherwise, is that right?

24                   THE WITNESS:  No.

25                   THE COURT:  That's not right?

1               THE WITNESS:  Well, say that again.

2               THE COURT:  Sure.  Were you ever given any documents,

3    any pieces of paper, from your employer at Space that indicated

4    or reflected how much you were being paid in tips each week?

5               THE WITNESS:  No.

6               THE COURT:  All right.  Were you given any documents

7    when you began your employment at Space?

8               THE WITNESS:  They gave me the -- yes.

9               THE COURT:  What did they give you?

10              THE WITNESS:  Just a form.

11              THE COURT:  What kind of form?

12              THE WITNESS:  A form that was like with my name,

13   things like that.

14              THE COURT:  Was it in English or Spanish?

15              THE WITNESS:  In English.

16              THE COURT:  It was not in Spanish?

17              THE WITNESS:  No.

18              THE COURT:  All right.  I would say, Mr. Avery, on the

19   basis of the answers to these very specific questions that I've

20   just asked that I would say filled in some gaps, that for the

21   most part Plaintiff's 1 simply memorializes the testimony, and

22   it's really almost the equivalent of what an attorney would

23   submit on an inquest or in a post-trial submission, and so I

24   will admit it -- I might not admit it if it were a jury trial

25   because I think the way it was created would need to be further

J5mdtap1                      Tapia - direct

1    developed -- but I think, Ms. Connolly, you prepared this

2    document, did you not?

3             MS. CONNOLLY:  Yes, your Honor.

4             THE COURT:  So, it's really an attorney document that

5    memorializes testimony, and you are free to cross-examine him

6    about any and all the information on it -- I'm sure you will --

7    and if you think there is something that you want to submit

8    following the close of evidence related to anything here, I

9    will certainly allow you to do that, if that is necessary.

10            I think there is authority -- we've done some research

11   on this point -- that would allow an exhibit of this kind into

12   evidence for what I'll call the limited purpose that I will

13   consider it for, which is simply to memorialize what his

14   testimony otherwise was.  So, that's what it's being admitted

15   for.  But you are free to cross-examine about any of the

16   specifics in it either by using the document or simply by

17   asking questions related to the subject matter that's reflected

18   in the document, like the dates or the number of hours, or

19   anything else related to that is obviously fair game for you to

20   cross-examine about.  OK?

21            MR. AVERY:  OK.

22            THE COURT:  So, Plaintiff's Exhibit 1 is admitted for

23   the limited purpose that I just said.

24            (Plaintiff's Exhibit 1 received in evidence)

25            MR. AVERY:  OK.  Thank you, your Honor.

J5mdtap1                    Tapia - cross

1          THE COURT:  You may proceed.

2     CROSS-EXAMINATION (through the Interpreter)

3     BY MR. AVERY:

4     Q.  You believe your employment began July of 2016, correct?

5     A.  Yes.

6     Q.  And at the start of your employment, you did in fact

7     receive paperwork, correct?

8          THE INTERPRETER:  I didn't hear you.

9     Q.  You did in fact receive paperwork, correct?

10          MS. CONNOLLY:  Objection.

11    A.  Accuracy?  Repeat the question.

12    Q.  At the start of your employment, you did in fact receive

13    paperwork, correct?

14          MS. CONNOLLY:  Objection, your Honor.

15          THE COURT:  Overruled or struck.  I mean, it's

16    overruled.  He did say that.  Go ahead.

17          I thought he answered.  Did he answer?

18          THE WITNESS:  No.

19          THE COURT:  You didn't receive paperwork?  I thought

20    you just told me you received paperwork but it was in English

21    and not Spanish?  Remember, you just answered my question about

22    that?

23          THE INTERPRETER:  He is not listening to me.  He's

24    listening to the English.  Sorry.

25          Can you repeat the question, your Honor?

1            THE COURT:  Let's start over.

2            Mr. Tapia, you have to listen to the interpreter.  We

3    have an interpreter, so you are here to listen and answer in

4    Spanish.  Ignore the English.

5            All right.  Go ahead, Mr. Avery.  Let's start again.

6    BY MR. AVERY:

7    Q.  And at the start of your employment, you did in fact

8    receive paperwork, correct?

9    A.  Yes.

10   Q.  And did that paperwork include your employee code?

11   A.  No.

12   Q.  At what point did you receive your employee code?

13   A.  I missed -- like a month after I think she gave it to me.

14           THE COURT:  The "she" being the manager who has been

15   described as an Asian woman; is that accurate?

16           THE WITNESS:  Yes.  Correct.

17           MR. AVERY:  Permission to approach, your Honor?

18           THE COURT:  Yes.

19           (Pause)

20           MR. AVERY:  I am going to take off the top page of A.

21           MS. CONNOLLY:  What is it that you are showing him?

22           MR. AVERY:  Defense Exhibit A.

23           (Counsel conferred)

24           MR. AVERY:  This is what's been premarked as Defense

25   Exhibit A.  Based on the prior objection by plaintiff's

J5mdtap1                          Tapia - cross

1    counsel, I have removed the first page of that exhibit as we

2    are not relying on it right new.

3            THE COURT:  All right.  So, are you referring to what

4    says the word "Labor" at the top, and that is going to be

5    called Exhibit A?

6            MR. AVERY:  Yes, your Honor.

7            THE COURT:  That document with just one page or --

8            MR. AVERY:  Two pages.

9            THE COURT:  Two pages.  So that's Exhibit A now?

10           MR. AVERY:  Yes, your Honor.

11           THE COURT:  OK.

12   BY MR. AVERY:

13   Q.  Can you flip to the second page of that document.

14           MS. CONNOLLY:  Your Honor, I object to this document

15   as hearsay, on hearsay, especially the handwritten portion --

16           THE COURT:  Well, I'm assuming that -- Mr. Avery

17   didn't say this with Mr. Soto, but I assume these documents are

18   subject to questioning that will follow from his own clients or

19   others that will in fact enable, despite their hearsay nature,

20   to be admitted into evidence.  So I will allow him to ask

21   questions about these documents subject to connection and

22   subject to their ultimate admission.

23           I agree with you that there is hearsay within hearsay,

24   the handwritten information, and I don't know how he will

25   necessarily overcome that problem, but I'm going to let him

J5mdtap1                          Tapia - cross

1    deal with that in due course.  Obviously, neither Mr. Soto nor

2    Mr. Tapia prepared these documents so he can't offer them

3    through these witnesses.  But it's fair game and would

4    otherwise be inefficient if he couldn't ask these witnesses

5    questions.  He didn't offer the exhibit that he showed to

6    Mr. Soto into evidence because he couldn't, and he can't do

7    that here but he wants to ask questions.

8              I note your objection but I would say it is premature.

9    Let's see what questions are asked of his witnesses in order to

10   either get these into evidence or not.  All right?

11             MR. AVERY:  That is right, your Honor.  Just to

12   clarify, our first witness is actually going to be the

13   individual who managed payroll and whose handwriting that is

14   and will explain what it was about.

15             THE COURT:  I assume you had this all taken care of,

16   but it is like a movie and we can't fast-forward.  So we'll

17   continue to watch in realtime.  Go ahead.

18             MR. AVERY:  OK.

19   BY MR. AVERY:

20   Q.  Do you see the dates on that page?

21   A.  Yes.

22   Q.  Immediately beneath your name.  I just want you to look at

23   those dates and then I will ask the question.

24             The date at the very bottom is June 26, 2016, correct?

25   A.  Yes.

J5mdtap1                         Tapia - cross

1   Q.  And the date immediately above that is August 6, 2016,

2   correct?

3   A.  Yes.

4   Q.  And the date immediately above that is August 12, 2016,

5   correct?

6   A.  Yes.

7   Q.  You had an employee code by the time June 26, 2016 came

8   around, correct?

9           THE INTERPRETER:  June 6?

10          MR. AVERY:  June 26, 2016.

11  A.  Yes.

12  Q.  And you punched in on that day using that code, correct?

13  A.  Yes.  She showed me how to punch in.

14  Q.  And you punched out that day as well, correct?

15  A.  Yes.

16  Q.  And you punched in on August 6, 2016, correct?

17  A.  Yes.

18  Q.  And you punched out on August 6, 2016, correct?

19  A.  Yes.

20  Q.  And you punched in on August 12, 2016, correct?

21  A.  Yes.

22  Q.  And you punched out on August 12, 2016, correct?

23  A.  Yes.

24  Q.  OK.  June 26, 2016 is before July 1st, right?

25  A.  Yes.

J5mdtap1                      Tapia - cross

1   Q.  So you did in fact have your employee number at the start

2   of your employment, didn't you?

3   A.  No, they had not given it to me.

4   Q.  How did you punch in without your employee number?

5   A.  I don't remember.  I don't remember.  I don't remember.

6            THE COURT:  Next question, please.

7            MR. AVERY:  OK.

8   BY MR. AVERY:

9   Q.  When did your employment end?

10  A.  In January 2017.

11  Q.  And it's your testimony -- sorry.

12           And you worked three days a week?

13  A.  Yes.

14  Q.  Every week?

15  A.  Yes.

16  Q.  Was the clock broken from August 12, 2016 until

17  January 2017?

18  A.  Yes.

19  Q.  Every single day?

20  A.  I don't remember but -- I don't remember.

21  Q.  Did you punch in between I guess it would be August 13th,

22  2016 and January 2017 even once?

23  A.  I tried but the machine wouldn't allow me to enter.  And it

24  was not only me, it was several people that happened, that they

25  weren't allowed to punch in.

J5mdtap1                         Tapia - cross

1   Q.  Every day?

2   A.  Twice a week, something like that.  The other times that we

3   weren't allowed, we would write down the hours that was given

4   to the manager.  Supposedly, they had fixed it and I don't see

5   it here.

6   Q.  Let me try again.

7           Did you use the computer where you were entering your

8   code even one time between August 13, 2016 and January 2017?

9   A.  No.  After that I didn't use it.

10  Q.  OK.  You testified here before, right?

11  A.  Yes.

12  Q.  In fact, in that very chair, right?

13  A.  Yes.

14  Q.  Do you recall previously testifying that it worked one

15  day -- at least one day a week?

16          MS. CONNOLLY:  Objection.

17  A.  Yes, I remember that.

18          THE COURT:  Hold on.  We now have everybody talking at

19  the same time.

20          MR. AVERY:  I'm sorry.

21          THE COURT:  So it is a little hard to manage.  A

22  little hard for the court reporter, too.

23          So the question was, "Do you recall previously

24  testifying that it worked one day -- at least one day a week?"

25          And you are objecting to that.

1              MS. CONNOLLY:  Yes.

2              THE COURT:  What is the basis of the objection?

3              MS. CONNOLLY:  I don't think that that accurately

4    characterizes his testimony.

5              THE COURT:  Well, why don't you impeach him properly,

6    Mr. Avery.

7              MR. AVERY:  Sure.

8              THE COURT:  So I will sustain the objection with leave

9    for you to rephrase it and impeach him using the transcript of

10   the prior proceeding.

11             MR. AVERY:  If we are going to do it, your Honor,

12   actually, I would like to begin with the deposition first so I

13   will do the hearing second.

14             THE COURT:  It is your cross-examination, whatever you

15   would like.  But make it clear in your questions that you are

16   asking him questions about a deposition rather than his prior

17   testimony in a court proceeding.

18             MR. AVERY:  Sure.  Absolutely.

19   BY MR. AVERY:

20   Q.  You also were deposed in this matter, right?

21   A.  Yes.

22   Q.  And in that deposition you were under oath, right?

23   A.  Yes.

24   Q.  Do you recall being asked in your deposition whether the

25   machine was always -- strike that.

```
1              Do you recall in your deposition being asked whether
2      the machine was always off between August 13, 2016 and
3      January 2017?
4      A.  Yes, I remember.
5      Q.  OK.  And do you recall testifying that there --
6              THE COURT:  What page are we on, please?
7              MR. AVERY:  I'm sorry, your Honor.  We are going to
8      get to where -- and what I'm about to ask is 55/18.  Page 55.
9      Q.  And do you recall testifying that in fact if there were
10     entries by somebody between 8 and 9 p.m. on any of those days,
11     that the machine would in fact be working?
12     A.  Yes.
13             MS. CONNOLLY:  Your Honor, isn't that --
14             THE COURT:  Hold on a second.  This is a little
15     jumbled here.
16             What were you going to say, Ms. Connolly?
17             MS. CONNOLLY:  Isn't that not the way -- isn't the
18     question supposed to be read?
19             THE COURT:  Yes.  I don't quite understand, Mr. Avery.
20     Are you paraphrasing something?
21             MR. AVERY:  I was.  I can read it directly if you
22     want, your Honor.
23             THE COURT:  The proper way to impeach is to say,
24     "Weren't you asked this question and didn't you give this
25     answer?"
```

J5mdtap1                         Tapia - cross

 1                 MR. AVERY:  OK.

 2                 THE COURT:  Not to summarize.

 3                 MR. AVERY:  OK.

 4     BY MR. AVERY:

 5     Q.  During that deposition, you were asked:  "So would it be

 6     safe to say, just so I can skip ahead, if somebody else used

 7     the machine, let's say between 8 and 9 p.m." --

 8                 THE INTERPRETER:  You have to --

 9                 THE COURT:  You've got to go slower.  We have an

10     interpreter and a court reporter.

11                 MR. AVERY:  I'm sorry.

12     Q.  Do you recall being asked:  "So it would be safe to say,

13     just so I can skip ahead, if somebody else used the machine on

14     any given day, that was not a day on which the machine was

15     blocked or shut off?"

16                 MS. CONNOLLY:  And there is an objection.

17                 THE COURT:  And what is the objection?

18                 MS. CONNOLLY:  That it's several hypotheticals built

19     into the question, which Mr. Avery omitted the "let's say

20     between 8 and 9 p.m."

21                 THE COURT:  Yes.  You have to read the whole question.

22                 MR. AVERY:  I'm trying to do this fast, your Honor.  I

23     will read the whole sequence.

24                 THE COURT:  It is not about speed.  It is about

25     accuracy.

1          MR. AVERY:  OK.

2          THE COURT:  So, let's start again.  Let's read the

3     question again.

4          MR. AVERY:  Let's go up to actually page 54.

5          THE COURT:  We are skipping this?

6          MR. AVERY:  We will strike that question.

7          THE COURT:  Let's go to the next thing, then.

8          (Pause)

9     BY MR. AVERY:

10    Q.   OK.  Beginning on page 54, line 19, do you recall being

11    asked in your deposition:  "But, again, how many days a week

12    was it broken or off or blocked?"

13         THE COURT:  OK.  Then there was an objection.

14         The objection is overruled.

15         Read the answer.

16    BY MR. AVERY:

17    Q.   And you answered:  "Once or twice a week."

18         THE COURT:  Were you asked that question and did you

19    give that answer?

20         MS. CONNOLLY:  That's not the -- sorry.  That is not

21    the full answer.

22         MR. AVERY:  I was going to keep going.

23         THE COURT:  All right.  Go ahead.  Finish reading the

24    answer.

25    BY MR. AVERY:

J5mdtap1                          Tapia - cross

1    Q.   "I would like to add something.  We didn't start at the

2    same time -- we didn't all start at the same time.  We have

3    different starting times.  At the time we arrived, and before

4    starting work, the machine wasn't on.  I do not know if they

5    turned it on or unblocked it at midnight.  I don't mean that it

6    was off or blocked for the whole night.  Sometimes it was on

7    but we didn't punch in because we have already worked for four

8    hours, and what we did was write down the hours in a piece of

9    paper and give it to the manager."

10             Do you recall testifying to that at your deposition?

11   A.   Yes.

12   Q.   And so now, then you were asked in your deposition:  "So

13   just so I understand, are you saying that there were days on

14   which the machine was shut off or blocked for a particular

15   segment of the day?"

16             THE INTERPRETER:  A particular what?

17             MR. AVERY:  Segment of the day.

18   A.   Yes.

19             MR. AVERY:  Ms. Connolly objected.

20             THE COURT:  Overruled.  You can read the answer.

21   Q.   And your answer was:  "Yes, that's correct."

22   A.   Yes, correct.

23   Q.   And so you were asked:  "So, would it be safe to say, just

24   so I can skip ahead, if somebody else used the machine, let's

25   say between 8 and 9 p.m. on any given day, that was not a day

J5mdtap1                          Tapia - cross

1    on which the machine was blocked or shut off?"

2              THE COURT:  There was an objection.

3              I overrule the objection.

4              MR. AVERY:  And you said:  "Yes, that's correct."

5              THE COURT:  Were you asked those questions and did you

6    give those answers?

7              THE WITNESS:  Yes.

8              THE COURT:  Next.

9              MR. AVERY:  Thank you.  Permission to approach, your

10   Honor?

11             THE COURT:  Yes.

12             MR. AVERY:  Sorry, Exhibit C.  For the record, I am

13   showing the witness what has been marked as Defense Exhibit C.

14   BY MR. AVERY:

15   Q.  Do you recognize that document?

16   A.  Yes.

17   Q.  Is that your signature on that document?

18   A.  Yes.

19   Q.  Did you sign that document before retaining a lawyer?

20   A.  Yes.

21   Q.  Are you sure?

22   A.  No.  Sorry.  I already had my lawyer.

23   Q.  OK.  Do you recall being asked about this document in your

24   deposition?

25             THE COURT:  Mr. Avery, there is not a basis at this

J5mdtap1                          Tapia - cross

1    moment to impeach him with his earlier testimony.  You should

2    just ask him questions, and then if he gives you an answer that

3    is inconsistent with --

4              MR. AVERY:  He did.

5              THE COURT:  He did?

6              MR. AVERY:  He did.

7              THE COURT:  OK.  Then go ahead.

8              MR. AVERY:  Thank you, your Honor.

9    Q.  Do you recall being asked about this document at your

10   deposition?

11   A.  Yes.

12   Q.  Specifically --

13             THE COURT:  What page and line, please?

14             MR. AVERY:  -- 58, line 8, and it is going to go to

15   17.

16   Q.  You were asked:  "Tell me what happened that precipitated

17   you signing this document."

18             And your answer was:  "Well, I called from the place

19   and they gave me the amounts stated here, and it wasn't fair

20   for me to be given only this and that's the reason why I

21   retained a lawyer's services."

22             And then you were asked:  "Did you sign this before

23   you retained a lawyer's services?"

24             And you answered:  "Yes."

25             Do you recall that portion of your deposition?

J5mdtap1                        Tapia - cross

1                 THE COURT:  Do you recall specifically being asked
2       those questions and giving those answers?
3                 THE WITNESS:  Yes, I remember.
4       Q.  So that testimony was incorrect?
5                 THE COURT:  Which testimony?
6                 MR. AVERY:  The testimony that was provided in the
7       deposition, or is it your testimony at trial?  Which is
8       correct?
9       A.  The one that I'm giving here is correct.  I didn't remember
10      then.  This is correct.
11                THE COURT:  "This" meaning what you have just said
12      here in court today?
13                THE WITNESS:  Yes.
14      BY MR. AVERY:
15      Q.  So then, just to be clear, then having you sign this
16      document was not the reason you retained a lawyer?
17      A.  I think so, that's the reason, because I already had the
18      lawyer but they made me sign this.
19                MR. AVERY:  All right.  I will move on.
20      Q.  You testified -- sorry.  You worked three days a week?
21      A.  Yes.
22                MR. AVERY:  I am going to show the witness the Amended
23      Complaint that I have marked as Defense Exhibit E.
24                I am going to go to paragraph 102 of the Amended
25      Complaint.  It is page 21 of 34 of Defense Exhibit E.

1          THE COURT:  Page 21 did you say?

2          MR. AVERY:  Yes, your Honor.

3          THE COURT:  Are you directing the witness to look at

4   page 21?

5          MR. AVERY:  Yes, because I am going to ask him a

6   question about it.

7          THE COURT:  All right.  So if you could turn to page

8   21, please, Mr. Tapia.

9          MR. AVERY:  Can I ask the interpreter, can you please

10  translate for Mr. Tapia paragraph 102?

11         THE INTERPRETER:  I interpret, so you read.

12         MR. AVERY:  I will read.

13         THE COURT:  You read it and she will interpret.

14         MR. AVERY:  Paragraph 102 says:  "Plaintiff Victor

15  Tapia worked as a busboy" --

16         THE INTERPRETER:  Sorry.  You have to go slower.

17  Q.  "Plaintiff Victor Tapia worked as a busboy at Space New

18  York from July 2016 until January 2017.  He regularly worked

19  two nights a week, and his shift typically lasted from 8 p.m.

20  until 9 a.m."

21         Is that accurate as to the number of days you worked?

22  A.  No.

23  Q.  So the allegations in your complaint are wrong?

24  A.  What was that?

25  Q.  So this allegation in your complaint is wrong?

J5mdtap1                        Tapia - cross

1   A.  This over here is not correct.

2   Q.  OK.  Moving on.

3           How long did you work at Eden Ballroom?

4   A.  Like, half a year.

5   Q.  OK.  So, six months?

6   A.  Yes.

7   Q.  OK.  Do you recall in your deposition being asked about the

8   start and end dates of your employment?

9   A.  Not so well, but.

10  Q.  OK.  Specifically, I would like to go to page 9.

11          THE INTERPRETER:  Page 9?

12          MR. AVERY:  Mm-hmm.  Yes.

13          THE COURT:  No, not page 9 of that.

14          MR. AVERY:  I was telling the Judge.

15  Q.  You were asked, beginning on line 13:  "Do you recall the

16  year in which you started working --

17          THE COURT:  Slowly, please.

18          MR. AVERY:  Apologies.

19  Q.  "Do you recall the year in which you started working for

20  Eden Ballroom?"

21          THE COURT:  Just one second.  Just one second.

22          He is going to read you a question and an answer, and

23  then he's going to ask you, "Do you remember being asked that

24  question and giving that answer?"  So, let him finish, please.

25          Go again, please.

1              MR. AVERY:  Sure.

2    Q.  Do you recall being asked:  "Do you recall the year in

3    which you started working for Eden Ballroom?"

4              Just, do you recall being asked that question?

5    A.  Yes.

6    Q.  And do you recall that your answer was:  "2017, I believe."

7    A.  Yes.

8    Q.  Was that correct?

9    A.  No.

10   Q.  So that was wrong?

11             MS. CONNOLLY:  Objection, your Honor.

12             THE COURT:  Just one second.

13   A.  I told them --

14             THE COURT:  Just one second.  Just one second.

15             There is an objection to a question?

16             MS. CONNOLLY:  Yes, your Honor.

17             THE COURT:  What is the objection?

18             MS. CONNOLLY:  The objection is asked and answered.

19             THE COURT:  Sustained.

20   BY MR. AVERY:

21   Q.  And then do you recall being asked:  "Do you recall if it

22   was the summer, fall, spring, or winter?"

23             Do you recall being asked that question?

24   A.  Yes.

25   Q.  And you testified:  "It was in winter."

J5mdtap1                        Tapia - cross

1        Do you recall giving that answer?

2   A.  Yes.

3   Q.  Is July in the winter?

4   A.  No.  What happened is that I didn't remember exactly.  When

5   they asked me the question, it was which date I started

6   working, and I said 2016 or '17.  I didn't remember the year

7   exactly.  I gave that answer already.

8   Q.  I'm asking you if July is in the winter.

9        THE COURT:  Mr. Avery, with all due respect, you're

10  asking a lot of questions of the witness you don't need to ask.

11  Obviously, July is not in the winter.

12       MR. AVERY:  OK.

13       THE COURT:  When you cross-examine someone and impeach

14  them with prior testimony, all you need to do is have what

15  their answers were from the prior testimony in the record.  You

16  can then, in closing argument, make whatever arguments you want

17  to make.  You are now asking questions that are borderline

18  argumentative.  As a result, you are eliciting from the witness

19  answers that would otherwise only come out on redirect if Ms.

20  Connolly chose to pursue that, which she may or may not.  So

21  you are frankly overlitigating and overpursuing things that you

22  need not do for purposes of the record.

23       He said what he did before.  He said what he did now.

24  You're going to argue inconsistencies, and that will be

25  whatever the record shows.  So, I don't think you need to ask

J5mdtap1                        Tapia - cross

1    questions like, "Is July in the winter?"  We all know July

2    isn't in the winter.  All you are trying to do is impeach him

3    with what he said prior to today and what he said today.  You

4    don't need to belabor it, if you will.

5              MR. AVERY:  OK.

6              THE COURT:  OK?

7              MR. AVERY:  Thank you.

8    BY MR. AVERY:

9    Q.  Do you recall being asked -- strike that.

10             When did your employment with Eden end again?  And I

11   realize it was asked.

12   A.  In January '17.

13   Q.  Do you recall being asked in your deposition:  "Did your

14   employment with Eden Ballroom ultimately come to an end?"

15             Do you recall being asked that?

16   A.  Yes.

17   Q.  And you answered:  "Yes."

18   A.  Yes.

19   Q.  And then you were asked:  "When did it end?"

20             Correct?

21   A.  Yes.

22   Q.  And you answered:  "I believe it ended in 2018."

23   A.  Yes, because I didn't remember --

24             THE COURT:  No.  No.  No.  No.  I'm sorry, Mr. Tapia,

25   but he asked you a question, with all respect, somewhat

1    inartfully.  The better way is to say, "You were asked this

2    question and gave this answer, correct?"  "Yes."  Next.

3    Otherwise, he is going to want to explain because of the way

4    you are doing this.  OK?  The way you need to impeach is by

5    presenting him with the question and the answer at the same

6    time to confirm that was accurate at the time it was asked and

7    answered by him.  If he disagrees, it's Ms. Connolly's

8    responsibility to correct the record, if you will, if she

9    chooses to do that.  Don't ask it in piecemeal fashion,

10   otherwise you are going to start getting answers that go beyond

11   what you're asking.

12              MR. AVERY:  OK.

13   BY MR. AVERY:

14   Q.  Do you recall being asked:  "Do you recall the month or

15   season of 2018 in which your employment ended?" and your answer

16   was, "The month I don't remember, but it was in the summer."

17   A.  Yes.

18              THE COURT:  Do you remember that question and that

19   answer?

20              THE WITNESS:  Yes.

21   BY MR. AVERY:

22   Q.  Did you ever receive a paycheck?

23              THE COURT:  From whom?

24              MR. AVERY:  From Eden Ballroom.

25   A.  Yes, I received a check.  And when I deposited it in the

J5mdtap1                          Tapia - cross

1    bank, three days after they bounced it.

2    Q.  And just so I understand, is that separate from the check

3    you received when you signed Defense Exhibit C?

4              MS. CONNOLLY:  Objection.

5              THE COURT:  I think the record is not clear enough for

6    that question to make sense.

7              MR. AVERY:  OK.

8              THE COURT:  So, sustained.

9    BY MR. AVERY:

10   Q.  Did you receive a check when you signed Defense Exhibit C?

11   A.  Yes.

12   Q.  And the check that you are referring to that bounced, that

13   was a different check, right?

14   A.  Yes.

15   Q.  And that check that bounced was for the hours reflected on

16   Defense Exhibit A, correct?

17             MS. CONNOLLY:  Objection.

18             THE COURT:  Sustained.

19   A.  No.

20             THE COURT:  The answer is struck.  The question is an

21   improper question.  The objection is sustained.

22   Q.  Did you receive a check for the hours reflected on Defense

23   Exhibit A?

24             MS. CONNOLLY:  Objection.

25             THE COURT:  Sustained.

J5mdtap1                    Tapia - cross

 1              THE WITNESS:  No.

 2              THE COURT:  The answer is struck.

 3              Wait until I rule.  Please tell him to wait if there

 4    is an objection.

 5              MR. AVERY:  I don't understand the basis of the

 6    objection.

 7              THE COURT:  Ask your next question.

 8    Q.  Were you paid for the hours set forth on Defense Exhibit A

 9    that you testified you punched in and out for?

10              THE COURT:  That's a different question than what you

11    just asked before.

12              MR. AVERY:  I didn't understand if it was the check

13    because of the objection.  Sorry.

14    A.  (In English) No.

15              THE COURT:  Do you understand the question that's

16    pending?

17              THE INTERPRETER:  I didn't interpret the whole

18    question.

19              THE COURT:  All right.  Let's start over.

20              Ask the question again.

21    Q.  Were you paid for the hours set forth on Defense Exhibit A

22    that you testified you punched in and out for?

23    A.  No.

24    Q.  Do you recall being asked in your deposition:  "Did you

25    receive any checks during" --

1           THE COURT:  What page, please?

2           MR. AVERY:  Sorry.  40.

3           THE COURT:  40?

4           MR. AVERY:  40.

5    Q.  -- "during your employment at Eden Ballroom?"

6           And your answer was:  "I only received one."

7    A.  Yes.  Yes.

8    Q.  And then you were asked:  "And it was for the hours

9    reflected on Defense Exhibit 3A?"

10          And your answer:  "Yes."

11   A.  Yes.

12          MR. AVERY:  One second.

13          (Pause)

14          I have no further questions at this time.

15          THE COURT:  All right.  Ms. Connolly, redirect.

16          MS. CONNOLLY:  Yes, your Honor.

17   REDIRECT EXAMINATION

18   BY MS. CONNOLLY:

19   Q.  Mr. Tapia, you didn't --

20          THE COURT:  Watch.  You are leading.  You are already

21   leading.  In three words you are leading.  You can't lead.

22   BY MR. AVERY:

23   Q.  Mr. Tapia, Defense Exhibit D, the Amended Complaint --

24          THE COURT:  That's E.

25   Q.  E.  Sorry.  Defense Exhibit E, the Amended Complaint, what

J5mdtap1                        Tapia - redirect

1    role, if any, did you have in creating this document?

2    A.  I don't understand.

3          THE COURT:  Ask it a different way.

4    Q.  Were you involved in the creation of Defense Exhibit E?

5    A.  Yes.

6    Q.  OK.  Were you the author?  Did you write this document?

7    A.  No.

8    Q.  And Defense Exhibit A, did you create that document?

9    A.  No.

10   Q.  Have you ever seen this document before -- did you ever see

11   this document before your deposition and your prior testimony

12   here in this courtroom?

13   A.  No.

14   Q.  Does page 12 of Defense Exhibit A accurately reflect all

15   the dates and hours you worked at Space?

16         THE COURT:  Directing you to the bottom of page 12,

17   where there are three dates listed.

18   A.  Yes.

19   Q.  Mr. Tapia, does that reflect every single day and every

20   single hour you worked at Space?

21   A.  No.

22   Q.  You worked -- how many days, approximately, did you work at

23   Space for the entire period of your employment?

24   A.  Three days a week.

25   Q.  And was that number of days per week ever varied?

J5mdtap1                    Tapia - redirect

1   A.  No.  It was always the same.

2   Q.  What about when there were special events?

3   A.  When there were special events, then, yes, there would be

4   like a fourth day.

5   Q.  OK.  What special events, if any, did you work at Space?

6   A.  Like Halloween, Christmas, New Year.

7   Q.  And how did your employment at Space come to an end?

8   A.  Well, the same.  Since they didn't pay me the hours, I had

9   to pay my rent and things like that so I had to find another

10  job.

11  Q.  And when was it that your employment ended?

12  A.  In January 2017.

13  Q.  And do you remember -- do you remember going to your

14  deposition -- do you remember what date your deposition was

15  taken on?

16          THE COURT:  I'm sure he doesn't.  I'm sure I wouldn't

17  and I'm sure you wouldn't.  Why don't you just say that this

18  deposition was taken on January 9th of this year?

19  Q.  Do you recall that your deposition was taken on

20  January 9th of 2019?

21  A.  Yes.

22  Q.  And Mr. Avery asked you about your testimony in that

23  deposition.  Can you explain why you said that your employment

24  at Space began in the winter of 2017 at your deposition?

25  A.  Well, what happened is that I didn't remember the year, so

1    I told them I think it was 2016 or '17.  I don't remember the

2    year.

3    Q.  And had you done anything to prepare yourself for your

4    deposition in terms of the dates of your employment prior to

5    your deposition?

6    A.  No.

7    Q.  Do you have any paper records at home that reflect the

8    dates of your employment at Space?

9    A.  No.

10   Q.  Did you mean to give inaccurate testimony at your

11   deposition by misreporting the dates of your employment?

12   A.  Yes -- I don't understand.  Can you repeat it?

13   Q.  Yes.  Did you intend to lie at your deposition?

14   A.  No.  No.

15   Q.  How is it that you continued with this lawsuit after you

16   signed Exhibit D?

17             THE COURT:  You don't mean D.  You mean C.

18             MS. CONNOLLY:  I'm sorry.

19   Q.  Defense Exhibit C?

20             THE COURT:  The document that had your signature on

21   it.

22             MS. CONNOLLY:  Yes, Exhibit C.

23   Q.  How is it you continued with the lawsuit after that?

24   A.  Well, yes, I had to continue working.  I didn't have work

25   at that time.

J5mdtap1                    Tapia - redirect

1   Q.  OK.

2           THE COURT:  I don't think he understood your question.

3   Q.  Why did you continue with this lawsuit after you signed

4   Exhibit -- or Defense Exhibit C?

5   A.  Oh, because -- because they didn't pay me the hours, just

6   were giving us the tips, and, yes, I need to be paid what I

7   worked for.

8   Q.  The paperwork you said that you were given when you met the

9   manager who we've described as the Asian lady, was that

10  paperwork that you filled out and returned or paperwork that

11  was physically given to you to keep?

12  A.  No, I filled it out and they kept it.  They didn't give me

13  copies or anything.

14  Q.  OK.  Now, Mr. Tapia, directing your attention again to

15  Defense Exhibit A.

16          Do you know whether or not the dates on page 12 and

17  what is shown as the time in and time out, do you know whether

18  or not those are correct?

19  A.  No, they're not correct.

20  Q.  OK.  But --

21  A.  No, they're not.

22  Q.  So you don't know whether or not you punched in or out on

23  these dates, is that right?

24  A.  Yes, correct.  I don't know.

25  Q.  OK.  Mr. Tapia, you didn't work at the same time -- at the

1   same time as Mr. Soto, correct?

2   A.  No.

3          MS. CONNOLLY:  OK.  I have no further questions.

4   Thank you.

5          THE COURT:  Any recross?

6          MR. AVERY:  Yes, your Honor, just briefly.

7          THE COURT:  We are going to take a recess once this

8   witness is concluded.

9          MR. AVERY:  I may just have one question, your Honor,

10  and it is for clarification.

11  RECROSS-EXAMINATION

12  BY MR. AVERY:

13  Q.  Are you saying the times indicated on Defense Exhibit A are

14  incorrect?

15  A.  Yes.  For me, yes.

16  Q.  So you're saying you -- why do you say that?

17          MS. CONNOLLY:  Objection.  Form.

18          THE COURT:  I'm sorry?

19          MS. CONNOLLY:  Objection to form.

20          THE COURT:  It's not the most artful question but I

21  will allow it if he can answer it.

22          MR. AVERY:  I can rephrase it.

23  Q.  Why do you believe they are incorrect?

24  A.  Because I worked three days per week, and here you see that

25  since three days are not there per week.  And a question, why

1       2015 is here?

2                   THE COURT:  2015 is not there.  He is looking at the

3       wrong thing.

4                   Does he see his name?  Do you see your name,

5       Mr. Tapia, down at the bottom?  Do you see the three dates?

6       And they are all 2016 dates, correct?

7                   THE WITNESS:  Correct.

8                   THE COURT:  That's what Mr. Avery is asking you about,

9       just those three dates.

10                  And do you see, with respect to those three dates,

11      there are hours associated with each of those three dates?  And

12      we have been through this before.  Do you see that?

13                  THE WITNESS:  Yes.

14                  THE COURT:  Time in and time out for each of those

15      three dates.

16                  And what they're asking you is for those three

17      dates -- never mind anything else -- but for those three dates,

18      are those time in and out accurate or not accurate?

19                  THE WITNESS:  Yes.

20                  THE COURT:  They are accurate for those three dates;

21      is that your testimony?

22                  THE WITNESS:  Yes.

23                  MR. AVERY:  No further questions.

24                  THE COURT:  Anything else?

25                  MS. CONNOLLY:  Yes, your Honor, just very quickly.

J5mdtap1                    Tapia - further redirect

1    FURTHER REDIRECT EXAMINATION

2    BY MS. CONNOLLY:

3    Q.  Mr. Tapia, you previously said that you did not create

4    Defense Exhibit --

5                THE COURT:  No.  No.  No.  No.  No.

6                MS. CONNOLLY:  OK.

7                THE COURT:  That is improper.

8                MS. CONNOLLY:  OK.

9                THE COURT:  Just ask a question.

10   BY MS. CONNOLLY:

11   Q.  Mr. Tapia, what reason do you have to believe that this

12   document is accurate?

13               THE COURT:  Let me -- you mean the hours that are set

14   forth in the document are accurate?

15               MS. CONNOLLY:  Yes.

16               THE INTERPRETER:  Do you want to rephrase it?

17               MS. CONNOLLY:  OK.

18   Q.  Mr. Tapia, what reason do you have to believe that the

19   hours shown on Defense Exhibit A for you on the three dates

20   listed are accurate?

21   A.  It's in the papers what it says.

22   Q.  So you had --

23               THE COURT:  No.  No.  No. I don't like where that is

24   going.  Ask the question.  Don't say you had no idea or

25   whatever, that's not a proper question.

J5mdtap1                        Tapia - further redirect

1    BY MS. CONNOLLY:

2    Q.  Is there any other reason that you have to believe that

3    this is accurate, that the hours set forth are accurate?

4              THE COURT:  Any other reason besides that that is on

5    the paper?

6    Q.  Mr. Tapia, do you have any reason other than besides the

7    hours shown on the paper to believe that these hours are

8    accurate?

9    A.  I think it's not correct.  It's not correct, but.

10             THE COURT:  Hold on a minute, Mr. Tapia.

11             You just answered my question, less than two minutes

12   ago, when I asked you very specifically about the hours for

13   these dates, and you said they were accurate.  Ms. Connolly is

14   now asking you what's your basis for that, and you said because

15   it's on the paper.  And she said do you have any other reasons.

16   And now you say it's not accurate.  So, you have to make up

17   your mind.  Is it either accurate or not accurate?

18             THE WITNESS:  Yes, it is correct.

19             THE COURT:  And are you saying that because you

20   remember that on those particular days those were the hours you

21   worked, or something else?

22             THE WITNESS:  No, no.  Yes, those are the hours I

23   worked.

24   BY MS. CONNOLLY:

25   Q.  And your basis for saying that it's not correct includes

J5mdtap1                    Tapia - further redirect

1   the fact that it doesn't have all of the days that you worked,

2   right?

3              MR. AVERY:  I object.

4              THE COURT:  Sustained.  That's an improper question.

5              You could ask something along those lines but not the

6   way you just asked it.

7   BY MS. CONNOLLY:

8   Q.  What, if anything -- what hours, if any, are missing from

9   this document?

10              THE COURT:  Well, we've been over this.  We have

11   Exhibit 1.  You are advocating that he worked not just these

12   days but other days.  That is already in evidence.  So what

13   beyond that do you want from him at this moment that hasn't

14   already been asked?

15              MS. CONNOLLY:  Well, just to sort of rehabilitate the

16   witness, your Honor, because it's been a little confusing.

17              THE COURT:  That's an understatement.

18              What is your question?

19              MS. CONNOLLY:  I asked the question.  Is that --

20              THE COURT:  What, if anything -- what hours, if any,

21   are missing from this document?  That's the question,

22   Mr. Tapia.

23              Do you want to translate it for him.  What hours, if

24   any, are missing from this document?

25              THE WITNESS:  Yes.  More hours are missing.

J5mdtap1                        Tapia – further redirect

1          MS. CONNOLLY:  OK, Mr. Tapia.  That's all I have.

2          THE COURT:  All right.  I have a few questions,

3   Mr. Tapia.

4          Did you have any other jobs besides when you worked at

5   Eden Ballroom during the period you say you worked there?  Were

6   you employed elsewhere as well?

7          THE WITNESS:  No.

8          THE COURT:  That was your only job?

9          THE WITNESS:  Yes.

10          THE COURT:  And just, can I ask counsel, you have been

11   referring to "Eden Ballroom" and "Space" interchangeably.  Is

12   it agreed that they are one and the same, or are they something

13   different than one and the same?  Because sometimes there are

14   questions about Eden Ballroom and sometimes there are questions

15   about Space.

16          MS. CONNOLLY:  Space is the name of the club and Eden

17   Ballroom is the owner.

18          THE COURT:  Is that accurate?

19          MR. AVERY:  Yes.

20          THE COURT:  So you understood you worked for Space, is

21   that correct?

22          THE WITNESS:  Yes.

23          THE COURT:  The two gentlemen that are sitting at the

24   back table, Mr. Tapia, have you ever seen them before?

25          THE WITNESS:  Yes, all the time there.

J5mdtap1                          Tapia - further redirect

1          THE COURT:  Yes?  Did you ever meet them?

2          THE WITNESS:  Yes.

3          THE COURT:  You have had conversations with them?

4          THE WITNESS:  No, but except when they call me to sign

5     the paper.

6          THE COURT:  Other than that, that's the only time?

7          THE WITNESS:  Yes.

8          THE COURT:  All right.  And you say you worked three

9     days each week, correct?

10          THE WITNESS:  Yes.

11          THE COURT:  And you were working 10 hours each day

12     that you worked, is that right?

13          THE WITNESS:  Yes.

14          THE COURT:  Not less than 10 and not more than 10 but

15     10, is that correct?

16          THE WITNESS:  Yes.

17          THE COURT:  All right.  Do you know how many other

18     employees there were at Space when you worked there?

19          THE WITNESS:  Yes, there were several workers.  There

20     were like -- like -- sorry, like nine, maybe.  Nine of the ones

21     that we worked with that were doing almost the same that I was

22     doing, but there were more people working.

23          THE COURT:  Were there more than 15 employees in

24     total?

25          THE WITNESS:  I think more.

J5mdtap1

1              THE COURT:  All right.

2              All right.  Anybody else have any follow-up questions

3        in light of anything I may have just asked the witness?  Ms.

4        Connolly or Mr. Avery?

5              MR. AVERY:  No, your Honor.

6              THE COURT:  So shall we excuse the witness at this

7        point?  Yes?

8              MS. CONNOLLY:  Yes, your Honor.

9              THE COURT:  All right.  I hear nothing further from

10       counsel.

11             Mr. Tapia, you are excused.

12             (Witness excused)

13             THE COURT:  We will take a recess.

14             THE CLERK:  All rise.

15             THE COURT:  Before we do, Ms. Connolly, let me ask

16       you, what is next?

17             MS. CONNOLLY:  The plaintiff --

18             THE COURT:  Any other witnesses?

19             MS. CONNOLLY:  No.

20             THE COURT:  You are going to rest?

21             MS. CONNOLLY:  Yes.

22             THE COURT:  So, Mr. Avery, who are we going to hear

23       after the break?

24             MR. AVERY:  Devlyn is going to be our first witness.

25             THE COURT:  Who is this?  I'm sorry.

J5mdtap1

1            MR. AVERY:  Devlyn.  She is on the list.  She is the
2    payroll supervisor.
3            THE COURT:  OK.  And she is present?
4            MR. AVERY:  Yes.  She went downstairs.
5            THE COURT:  I see.  So you are going to get her during
6    the recess?
7            MR. AVERY:  I am.
8            THE COURT:  So you should plan to have that witness
9    ready to go if that is your next witness, because we are going
10   to start at 12:10, 12:15.
11           MR. AVERY:  We can have no lunch?
12           THE COURT:  No.  We are going to have a lunch break at
13   1 o'clock.
14           MR. AVERY:  Oh, OK.  I am sorry.
15           THE COURT:  I assume that we will at least get one
16   other witness done before lunch.  Maybe more.  I don't know how
17   long your witnesses are going to be.
18           MR. AVERY:  I don't think it is going to be long at
19   all, your Honor.
20           The only other thing I wanted to ask was, if she is
21   resting, there were some things that I wanted to request your
22   Honor to take judicial notice of, just dates on the calendar
23   and what day they corresponded to, June 22nd --
24           THE COURT:  All right.  Is any of this contested?
25   Have you discussed this with Ms. Connolly?

J5mdtap1

1          MS. CONNOLLY:  No.

2          THE COURT:  Why don't you discuss this with her over

3   the break, and maybe you all can stipulate to things like is

4   January 12th a Tuesday kind of thing.  I am not sure that is

5   something that is going to be necessary for judicial notice.

6   It may be the parties agree to that, if you have calendars or

7   what have you.

8          So, we will start up at 12:15.  Talk to Ms. Connolly

9   if there are any judicial notice issues, and have your next

10  witness ready to go.

11         MR. AVERY:  OK.

12         THE COURT:  OK.

13         (Recess)

14         THE COURT:  Everyone may be seated.

15         OK.  So just to be clear, Ms. Connolly, you are

16  resting, is that correct?

17         MS. CONNOLLY:  Yes, your Honor.

18         THE COURT:  OK.  Now, Mr. Avery, you are on the air.

19         MR. AVERY:  Thank you, your Honor.

20         The defense calls its first witness, Devlyn Storino.

21         THE COURT:  All right, Ms. Storino.

22         And did you want to -- is there any stipulation or

23  anything or do it at lunch?

24         MR. AVERY:  We will do it at lunch because she has to

25  check the dates that I am asking for.

J5mdtap1                          Storino - direct

1          THE COURT:  I see.  OK.  I don't understand why this

2     wasn't done before today, but, in any event, we will have the

3     witness proceed.

4      DEVLYN STORINO,

5          called as a witness by the defendants,

6          having been duly sworn, testified as follows:

7          THE CLERK:  Please state your full name and spell your

8     full name for the record.

9          THE WITNESS:  Devlyn Storino.  D-e-v-l-y-n

10     S-t-o-r-i-n-o.

11          THE COURT:  Go right ahead, Mr. Avery.

12          MR. AVERY:  Thank you, your Honor.

13     DIRECT EXAMINATION

14     BY MR. AVERY:

15     Q.  Ms. Storino, by whom were you employed in 2016?

16     A.  Eden Ballroom.

17     Q.  And what was your position?

18     A.  I was the office manager.  I did the payroll as well.

19     Q.  And in your capacity as office manager, what job functions

20     did you perform?

21     A.  Payroll, financial reports, stuff like that, bookkeeping

22     mostly.

23     Q.  And that was, just to be clear, the payroll of the

24     employees?

25     A.  I did the employees payroll, yes.

J5mdtap1                          Storino - direct

1   Q.  I am going to show you what's been marked as Defense

2   Exhibit D2.  Defense Exhibit D2.

3            Do you recognize that document?

4   A.  Yes, I do.

5   Q.  What is it?

6   A.  It's a labor report.

7   Q.  And what does that consist of?

8   A.  These are accurate like punch-in times and punch-out times

9   of each employee.

10  Q.  And is there an employee listed on there?

11  A.  This one in particular is Saul Soto.

12  Q.  OK.  Did you handle those reports?

13  A.  Yes.

14  Q.  And then so can you explain to me sort of how they get

15  generated?

16  A.  Yes.  The employee has to come into work and punch in in

17  our POS system, point of sale, into Aloha.  It is a POS system.

18  It is a computer screen that they punch in a number that they

19  are assigned to, so it is their ID number, and that tells us

20  what time they came into work.

21  Q.  And those are reports are generate by whom?

22  A.  I generate them.

23  Q.  So, did you generate that report?

24  A.  I did, yes.

25            MR. AVERY:  We move Defense Exhibit D2 into evidence.

J5mdtap1                      Storino - direct

1              THE COURT:  Any objection?

2              MS. CONNOLLY:  Objection, your Honor.  The witness

3    just said this was Saul Soto's report.

4              THE COURT:  I'm sorry?

5              THE WITNESS:  Yes.

6              MS. CONNOLLY:  And there is also handwriting on here

7    which would be hearsay within hearsay.

8              THE WITNESS:  That is mine.

9              THE COURT:  I don't think a proper foundation has yet

10   been laid for this document, so I am not admitting it, with

11   leave to ask further questions to see whether it can be

12   admitted.

13             Where is the handwriting on this particular document?

14   I don't see any handwriting on D2.  I think you are thinking of

15   the other one.  There is no handwriting on this.  Is there, or

16   am I not seeing it?

17             MS. CONNOLLY:  The copy that I have is --

18             THE COURT:  The Saul Soto record document has

19   handwriting on it?

20             MS. CONNOLLY:  Yes, page 12.

21             THE COURT:  I don't have a page 12, I don't think.

22             MS. CONNOLLY:  OK.

23             THE COURT:  Page -- no, I don't have a page 12.  In

24   D2?  The last page of D2 has 9/11/2014 to 10/05/2017 at the

25   top, is that right?

J5mdtap1                       Storino - direct

1        MS. CONNOLLY:  10/5/2017, yes.  But the witness just

2   said that the handwriting was hers.

3        THE COURT:  What handwriting?  Where is there

4   handwriting in this exhibit?  I don't see it.  Is there?

5        MS. CONNOLLY:  Your Honor, I'm sorry.  I think I was

6   referring to the other one but I --

7        THE COURT:  Right.  Exactly.

8        MS. CONNOLLY:  I don't understand why the witness said

9   the handwriting was hers, though.

10        THE COURT:  Did you see handwriting somewhere?

11        THE WITNESS:  No, there is no handwriting on this

12   document.  If there were handwriting, it would be mine, but

13   there isn't any on this document.

14        THE COURT:  I don't want you to speculate.  We will

15   ask you if any handwriting is actually your handwriting.

16        THE WITNESS:  But there is nothing on here.

17        THE COURT:  But in any event, a proper foundation for

18   admission of this hearsay document has not yet been laid, so I

19   am not going to admit it unless and until that is done

20   properly.

21        MR. AVERY:  OK.

22   BY MR. AVERY:

23   Q.  First, when you said this was Saul Soto's record, what did

24   you mean by that?

25   A.  It's his name and employee ID on the report.

J5mdtap1                    Storino - direct

1    Q.   So this is a record of his punch-in times?

2    A.   Yes.

3    Q.   OK.

4    A.   This is a record of Saul Soto's punch-in times for I don't

5    know if it is -- from the dates of 3/9/2017 through whatever

6    date it goes until, 3/14/2015.  So, that's what this is showing

7    here.

8    Q.   Does this document belong to the company?

9    A.   It comes from the company's computer system, I mean, Aloha

10   system.

11   Q.   And what do you do with this document?  What do you use it

12   for?

13   A.   To verify hours to pay people for payroll.

14   Q.   And do you do that on a weekly basis?

15   A.   Mm-hmm, yes.

16   Q.   Every week?

17   A.   Yes.

18            MR. AVERY:  At this point I think we have satisfied

19   the business record exception.

20            THE COURT:  I don't think so.  You haven't asked what

21   I'll call the magic questions about these documents.  There are

22   certain questions that are always asked with respect to

23   business records.  Do you know what I am referring to?

24            MR. AVERY:  I can keep going, your Honor.

25            THE COURT:  I mean, look, this is a bench trial, and I

J5mdtap1                          Storino - direct

1    don't want to, you know, take undue time here.  But, I mean,

2    the first question is:  Is this document kept in the regular

3    course of Eden Ballroom's business?

4              MR. AVERY:  I thought that would be leading.  That's

5    why I didn't --

6              THE COURT:  That's not leading.  That is the explicit

7    question that needs to be asked.  And not only is it kept in

8    the regular course of business, but is it the regularly

9    accepted practice that it is kept in that fashion?  And is this

10   part of -- it is regularly conducted business activity?  Those

11   are the questions you need to be asking.  There is nothing

12   leading about any of those questions.  And if you want to get

13   this in under the business records exception, that's what you

14   need to be asking.  OK?

15   BY MR. AVERY:

16   Q.  Was this regularly maintained in the ordinary course of

17   business?

18   A.  Yes, it was.

19   Q.  And was this regularly kept for business purposes?

20   A.  Yes.

21   Q.  By the company?

22   A.  Yes.

23             THE COURT:  And it was the regular practice of Eden

24   Ballroom to keep records like this of its employees?

25             THE WITNESS:  Yes.

J5mdtap1                          Storino - direct

1      MR. AVERY:  I move to admit the exhibit.

2      MS. CONNOLLY:  I still object to its admission, your

3   Honor.  There has been no testimony that this is -- that these

4   punch-in and punch-out dates are accurate and who created this

5   document, and Ms. --

6      THE COURT:  She said she created this document.  She

7   testified exactly to that, within the last five minutes.

8      THE WITNESS:  Mm-hmm.

9      THE COURT:  You can cross-examine her about the hours.

10     Your objection is overruled.  Exhibit D2 is admitted

11  into evidence.

12     (Defendants' Exhibit D2 received in evidence)

13     MR. AVERY:  I would like to show the witness Defense

14  Exhibit A, as we took that page off.

15  Q.  There are two pages on Defense Exhibit A.  Let's start with

16  page 2.  Can you flip to page 2.

17     Do you recognize this document?

18  A.  Yes.

19  Q.  What is this document?

20  A.  This is a labor report again, but it's for Victor Tapia.

21  Q.  OK.  And was this also maintained in the ordinary course of

22  business?

23  A.  Yes.

24  Q.  Was this also preserved by the company on a regular basis?

25  A.  Yes.

J5mdtap1                          Storino - direct

1   Q.   And your testimony with respect to Exhibit D, would that

2   apply equally to Exhibit A --

3   A.   Yes.

4   Q.   -- insofar as how they are generated?

5   A.   Yes.

6   Q.   Now, on this document there is some handwriting.  Do you

7   see it?

8   A.   I do.

9   Q.   Is that yours?

10  A.   Yes.

11  Q.   And, by the way, who generated this document?

12  A.   I generated it.

13  Q.   OK.  And what -- tell me, why did you write on this?

14  A.   Because I used this document to run payroll, and one of the

15  punch-in -- punch-out times is -- says 11 o'clock, and he did

16  not punch out at 11 o'clock, so I wrote an explanation as to

17  why I was changing the hour from 11 to the time that I changed

18  it to.  So, I was just writing an explanation.  So I go over

19  these thoroughly and to make sure they are accurate, and so

20  there was just one time for the punch out that was not -- it

21  just means he didn't clock out, basically, for that day.

22  Q.   And do you see the "6/26 Tips," that line?  Can you read

23  that?

24  A.   I'm sorry, 6/26?

25  Q.   It says, "6/26."

J5mdtap1                      Storino - direct

1    A.  Oh, that.  OK.  "Tips paid" -- OK, so tips paid, owed for

2    hours, 17.55 times 7.50 equals $131.63.  So, basically saying

3    that we paid him that amount.

4    Q.  OK.

5              MR. AVERY:  Move to admit Defendant's Exhibit A.

6              THE COURT:  What about the handwriting on the next

7    page?

8              MR. AVERY:  I apologize, your Honor.  I forgot we have

9    both pages.

10   Q.  Can you turn the page back, actually.  It is the first

11   page.

12   A.  Mm-hmm.  OK.

13   Q.  Is that your handwriting?

14   A.  Yes, this is.

15   Q.  OK.  And what is this explaining, if you can go ahead and

16   read it?

17   A.  It says he worked three days total, which I got from the

18   three dates that are on the report, that he was paid by

19   paycheck, so by a payroll company for these dates that I

20   listed, 8/12 and 8/6, and he was paid his tips 6/26, and that

21   he was owed $289.67.

22   Q.  Which included?

23   A.  Everything.

24   Q.  Right.  But the handwriting from the prior page?

25   A.  Yes.  Yes.  So this is a summary of everything.

J5mdtap1                          Storino - direct

1   Q.  This was your analysis of what he was paid and what he was

2   owed?

3   A.  Exactly.  So that he would have, you know, a record of --

4   clearly stating what he was paid and if he was owed anything.

5               MR. AVERY:  I move to admit Defendants' Exhibit A.

6               MS. CONNOLLY:  Your Honor, this is again two

7   documents.

8               MR. AVERY:  She can call it A1 and A2.

9               THE COURT:  When you are saying it is two documents,

10  you are saying the one at the bottom where it says "Default

11  clock out" is a separate document from the one on the next page

12  that says "Worked 3 Days," is that what you are saying, Ms.

13  Connolly?

14              MS. CONNOLLY:  The first page is the Employee Guidance

15  record.

16              THE COURT:  No.  He separated that out already.  That

17  is not what we are looking at.

18              MS. CONNOLLY:  No.  No.  No.  Then I don't have that

19  objection.

20              THE COURT:  So you are not objecting to this?

21              MS. CONNOLLY:  I do object to the admission of this

22  document.  I don't think that a sufficient foundation has been

23  made and I object to its admission.

24              THE COURT:  Ms. Storino.

25              THE WITNESS:  Yes.

J5mdtap1                        Storino - direct

1          THE COURT:  When was this document first printed?

2          THE WITNESS:  It says here October 5, 2017, at

3     7:03 p.m.

4          THE COURT:  Where is that?

5          THE WITNESS:  The upper right-hand corner.

6          THE COURT:  OK.  And when did you put these

7     handwritten notes on the document, if you recall?

8          THE WITNESS:  The same day that I generated the

9     report.

10         THE COURT:  And what would have prompted you to

11    generate this report on October 5th?

12         THE WITNESS:  I believe because it was requested.

13         THE COURT:  OK, it was requested.

14         THE WITNESS:  Yeah, it was requested of me to do so.

15         THE COURT:  And this report, like the one for

16    Mr. Soto, is one that is kept in the regular course of Eden

17    Ballroom or Space's business, is that correct?

18         THE WITNESS:  Oh, yes.

19         THE COURT:  And it is the regular practice of Eden

20    Ballroom or Space to keep time records for its employees, is

21    that correct?

22         THE WITNESS:  Yes.

23         THE COURT:  And these documents memorialize that,

24    consistent with those practice, is that correct?

25         THE WITNESS:  Yes.

1              THE COURT:  And the notes you wrote here you wrote at

2    the time to explain why the hours were what they were?

3              THE WITNESS:  Exactly.

4              THE COURT:  All right.  Objection overruled.  It is

5    admitted into evidence, Exhibit A.

6              (Defendants' Exhibit A received in evidence)

7    BY MR. AVERY:

8    Q.  And at the very top -- it is actually on both pages but you

9    can go ahead and turn to the second page of the exhibit because

10   that is the one that has the dates on it.  At the very top

11   under "Labor," there is a time period.  What does that time

12   period refer to?

13   A.  That is the time period of when the business opened.  So I

14   just wanted from the very start until the current date that I

15   generated the report.  So, I wanted all the dates that he

16   clocked in for that he worked for the entirety of the business

17   being open.

18   Q.  So dates set forth on this document are the entirety of his

19   clock-in and clock-out times?

20   A.  Yes.  Yes.

21   Q.  There are no other records for a different time period

22   or --

23   A.  No.  The business -- the start date here is 9/10/2014.

24   That would have been the first date anyone could have worked.

25   That is the first day of business.  And 10/5/2017 is the date

J5mdtap1                        Storino - cross

1    that I generated the report, so it was up to the current date.

2    Q.  OK.  And just real quick, on these reports, the time in and

3    time outs -- I will take a for instance.  On this page, if you

4    actually look at the first entry -- it is actually the last

5    chronologically, but the first entry on the page for Mr. Tapia,

6    the time in says 21:31.  Is that military time?

7    A.  It is, yes.

8    Q.  So that would be 9:31 p.m., right?

9    A.  Yes.

10   Q.  OK.  And then 6:43 would then be a.m.  Am I understanding

11   that right?

12   A.  Yes, that is correct.

13   Q.  Did Mr. Tapia ever give you -- himself ever give you a

14   handwritten signed time sheet where he wrote his hours?

15   A.  I don't believe so, no.  That's not really general

16   practice.

17             MR. AVERY:  OK.  No further questions.

18             THE COURT:  Ms. Connolly.

19   CROSS-EXAMINATION

20   BY MS. CONNOLLY:

21   Q.  Ms. Storino, you no longer work for Eden Ballroom, correct?

22   A.  Correct.

23   Q.  And your employment ended when?

24             MS. CONNOLLY:  Sorry, Mr. Avery, you asked her that

25   but I didn't hear the answer.

J5mdtap1                           Storino - cross

1              THE COURT:  I don't think he did.

2    A.  December 2018.

3    Q.  And you began working at Eden Ballroom when?

4    A.  I'm trying to think back.  2015, in March.  Yeah,

5    March 2015.

6    Q.  And did you have a specific shift that you worked there?

7    A.  Daytime.

8    Q.  And what were your hours?

9    A.  11 to 7.  11 a.m. to 7 p.m.

10   Q.  Did you punch in and punch out?

11   A.  No, I did not.  I was on salary so it is different.

12   Q.  Did you have any duties and responsibilities with respect

13   to the serving staff, the bussers and the bartenders?

14   A.  I did their payroll.

15   Q.  Did you have any supervisory responsibilities over the wait

16   staff and the service staff?

17   A.  I -- no.

18   Q.  OK.  You had the ability to enter the POS system to change

19   the hours in the records, correct?

20   A.  No.

21   Q.  Well, you've testified that you changed the hours on the

22   written report to correct them, correct?

23             MR. AVERY:  Objection.

24   A.  No.

25             THE COURT:  Hold on one second.

J5mdtap1                         Storino - cross

1              That objection is sustained.

2              And as I admonished Mr. Avery, I'll admonish you.

3    Please don't ask questions where you say you testified on

4    direct X.  Whatever she did testify to on direct, we have in

5    the record.  So you just need to ask the question however you

6    wish to, but don't incorporate your memory of what she said.

7    Just ask your question.

8    BY MS. CONNOLLY:

9    Q.  You crossed out the punch-out hour on Mr. Tapia's time

10   sheet that showed 11 a.m., correct?

11   A.  Correct.

12   Q.  So you did have the ability to change the hours that were

13   generated on this Aloha report, correct?

14   A.  No, I did not, because if I could change the hours, it

15   would be changed on this report, but I had to cross it off with

16   a pencil.  I couldn't change what's printed in the reports.  I

17   don't have access to do that.

18   Q.  Oh, OK.

19   A.  That's why I crossed it off with a pencil and just crossed

20   off 11 a.m.  I wasn't able to change it.

21   Q.  So your access was limited to generating payroll reports

22   and labor reports, correct?

23   A.  Exactly, yes.

24   Q.  And there were others -- there were people at Space or Eden

25   Ballroom who had the ability to access the software to change

J5mdtap1                          Storino - cross

```
 1   the hours to your knowledge, correct?

 2   A.  No, not to my knowledge.

 3   Q.  OK.  Who requested you to run this report?

 4   A.  I don't recall.  It was two years ago.  I don't know.

 5   Q.  Were you regularly requested to run labor reports and

 6   payroll reports?

 7   A.  Yes, I was.

 8   Q.  And who typically would be the person or persons to ask you

 9   to run these reports?

10   A.  I would run them on a regular basis to do the payroll, and

11   otherwise an employee would ask me to do one or a manager if

12   they needed it, but I always, you know, ran them regularly

13   anyways.

14   Q.  Were you asked to generate this report in connection with

15   this litigation?

16   A.  No.  It was already generated.

17   Q.  Do you know when this litigation was filed?

18   A.  No, I don't.

19   Q.  So your answer that this was already generated then has

20   nothing to do -- you don't know whether or not it was asked to

21   be run in connection with this litigation, correct?

22               MR. AVERY:  Objection.

23               THE COURT:  Sustained.

24               Next question.

25   BY MS. CONNOLLY:
```

J5mdtap1                      Storino - cross

1    Q.  You don't know who asked you to run this report and you

2    don't know why this report was run, is that right?

3    A.  Yeah.  I mean, I suppose I don't recall who asked me to do

4    it but, you know, no.

5    Q.  DX A2, the Victor Tapia labor report --

6    A.  Mm-hmm.

7    Q.  -- do you see what you said is your handwriting on page 13?

8    A.  Yes.

9    Q.  So as of -- does that then reflect that as of October 5,

10   2017, $289.67 was owed to Mr. Tapia?

11   A.  Let me just read it.

12           (Pause)

13           Yes.  I believe so.

14   Q.  Now, you say that Mr. Tapia was paid for his hours by

15   paychecks, is that right?

16   A.  Mm-hmm, yes.

17   Q.  Well -- but the 6 -- what you have written here as the

18   June 26 hours, tips paid, the rest of the money that's owed is

19   for hours that were worked, right?

20           MR. AVERY:  Objection.

21           THE COURT:  I don't think I understand the question.

22   Q.  Your calculation on page 13 says 158.04 owed, is that

23   right?

24   A.  Yes, .04.

25   Q.  Plus 131.63, $289.67 total owed.  Is that for hours or for

1    tips?

2    A.   It's for hours.

3    Q.   Well, if --

4    A.   It says 6/26 hours and then dash tips paid, meaning the

5    tips were paid.

6    Q.   OK.  If it was your job to run payroll as hours were

7    punched in and punched out for -- well, did you run payroll

8    every week or every two weeks?

9    A.   Every week.

10   Q.   Every week?

11   A.   Mm-hmm.

12   Q.   So how is it then that as of October 5, 2017, $289.67 for

13   hours were still owed to Mr. Tapia?

14   A.   Because his check was not cashed.  It says it above.  So if

15   we give him a check and he didn't cash it, so...

16   Q.   And is there any record that you have that reflects that

17   that check was issued but not paid -- but not cashed?

18   A.   I don't have that on me but, yes, that's how I got the

19   information.

20   Q.   What record is that?

21   A.   It must have been from our banking records and from

22   Paychex.

23   Q.   So that payroll check, you're saying, would have been

24   whatever week -- whatever week payroll was paid for, the 6/26

25   hours, correct?

J5mdtap1                          Storino - cross

1   A.  I believe so, yes.

2   Q.  You didn't oversee the service staff punching in and

3   punching out on a daily basis, did you?

4   A.  Yes.  I mean, I was there because --

5   Q.  Well, it wasn't your responsibility to see that they

6   punched in and punched out, correct?

7   A.  I don't know how to answer that.  It was my responsibility

8   to run the payroll, so I had to make sure that I received

9   everyone's hours on the labor report, that they had to clock in

10  and out.

11  Q.  Did you stand there and as employees came in each day, you

12  made sure that each employee checked in and checked out; is

13  that what you're saying?

14  A.  It was their responsibility to clock in when they got to

15  work.

16  Q.  So the answer is no, is that right?

17  A.  I don't understand what you're trying to say.  I didn't

18  stand there next to the Aloha system for every single employee.

19  Q.  So the answer is no?

20  A.  I suppose so, yes.  I did not.

21  Q.  OK.  Thank you.

22          In fact, you weren't there beyond 7 on most days,

23  correct?  Is that what you said?

24  A.  I said that my general hours were 11 to 7, but I was

25  there -- you know, I can't say that I left every day at

1    7 o'clock.  I mean, this report I generated says 7:03, so

2    obviously sometimes I was there past 7.  I don't know what you

3    are asking me.

4    Q.  OK.  Do you know -- do you have any personal knowledge as

5    to whether or not Mr. Tapia worked days that are not reflected

6    in this labor report?

7    A.  Everyone -- all the employees knew --

8    Q.  No.  No.  No.  Ms. Storino --

9         THE COURT:  Hold on one second. you are doing my job

10    now.  OK?  Let's hear what her answer is.  If you think it is

11    nonresponsive, then you move to strike the answer.  OK?

12         MS. CONNOLLY:  Yes.

13         THE COURT:  Don't interrupt her while she is

14    answering.  Let's see what the answer is.

15         OK.  So now that we've had that colloquy, you probably

16    don't remember the question.  So, I will read you the question

17    now.

18         THE WITNESS:  Thank you.

19         THE COURT:  All right.  "Do you have any personal

20    knowledge as to whether or not Mr. Tapia worked days that are

21    not reflected in this labor report?"  That's the question.

22         Do you have any knowledge?  That is a yes-or-no

23    question.  Do you have any knowledge one way or the other about

24    whether he worked any hours other than what is on the report?

25    Yes or no?  Or if you can't answer yes or no, say why you

1      can't.

2                  THE WITNESS:  I'm still not understanding.  Do I have

3      any knowledge whether or not he worked days that are not on

4      this report?  Is that pretty much what you want to know?

5                  THE COURT:  That's the question.

6                  THE WITNESS:  I don't have that.  I mean, I don't

7      believe that he could have worked any other days besides what's

8      on this report.

9                  THE COURT:  OK.  That's your answer.

10                 She doesn't think he could have worked any other days

11     besides what is on this report.

12                 Next question.

13     BY MS. CONNOLLY:

14     Q.  To your knowledge, was any employee, managerial or one of

15     the owners, responsible for and did check in each employee as

16     they arrived for work to ensure that they punched in?

17     A.  It was -- if someone didn't clock in or out, they would

18     have told the manager who would then tell me.  The manager

19     would communicate to me if someone did not clock in or out so

20     that they would be paid.  If an employee didn't clock in or

21     out, they would tell someone so that they could get paid.  No

22     one came to me ever and said that Victor Tapia was here and did

23     not clock in or out.

24                 MS. CONNOLLY:  I move to strike the answer as

25     nonresponsive.

J5mdtap1                          Storino - cross

 1              THE COURT:  That motion is denied.

 2       BY MS. CONNOLLY:

 3       Q.  To your knowledge, did anyone -- did any person stand watch

 4       over the POS system in the morning to ensure that each employee

 5       clocked out before they left Space?

 6       A.  Not to my knowledge someone would stand there in the

 7       morning.  If they don't clock out, it shows up on the labor

 8       report as an 11 a.m.  I wrote that down here, a default clock

 9       out, 11 a.m.  That's is how someone would know.

10       Q.  But it wouldn't show up as an 11 a.m. clock out if they

11       didn't punch in, correct?

12              If an employee did not punch in when they arrived at

13       work, there would be no 11 a.m. default clock out, correct?

14       A.  Correct.  If they did not punch in, then they can't punch

15       out.  I don't understand.  No.  I mean, how is it going to

16       punch them out if they are not punched in?

17       Q.  Right.  OK.  Thank you.

18       A.  Sorry.

19       Q.  There are other people who work on this POS Aloha program,

20       correct?

21       A.  Correct.

22       Q.  And who are those people?

23       A.  The manager, I suppose.

24       Q.  And what about the owners?

25       A.  I've never seen them using it.

J5mdtap1                    Storino - cross

1   Q.  Do all managers have access to the software program?

2   A.  I don't know.  I didn't -- I wasn't responsible for handing

3   out access to people, so I don't know.

4   Q.  Who was?

5   A.  I don't know.  I just went and did my job.  I generated

6   labor report for payroll.

7   Q.  And who did you report to?

8   A.  The owners.

9   Q.  In particular whom?  To both Mr. Geniton and

10  Mr. Piacquadio?

11  A.  Yes.

12  Q.  And you are aware that this lawsuit alleges unpaid wages,

13  correct?

14  A.  Correct, yes.

15  Q.  And you are aware that Space and the owners have been sued

16  at least twice before for --

17          MR. AVERY:  Objection.

18  Q.  -- similar claims, correct?

19          THE COURT:  Just one second.

20          First of all, you can't object until the question is

21  finish.  OK?

22          MR. AVERY:  Sorry.

23          THE COURT:  So, now the question is finished.

24          MR. AVERY:  Objection.

25          THE COURT:  Sustained.

1              (Pause)

2     BY MS. CONNOLLY:

3     Q.   The POS machine, at times it was blocked from allowing

4     people to punch in, correct?

5     A.   No, not that I'm aware of.

6     Q.   And there were times when the POS machine was not working,

7     correct?

8     A.   No, that's not correct.

9     Q.   Ms. Storino, you are being paid for your testimony here

10    today, correct?

11    A.   No, that's not correct.

12    Q.   Are you being paid for your time --

13    A.   No.

14    Q.   -- here today?

15    A.   No, I'm not.

16    Q.   Were you served with a subpoena?

17    A.   No.

18    Q.   Do you still work for any of the defendants?

19    A.   No.

20    Q.   Do you work for any companies associated with the

21    defendants?

22    A.   No.

23    Q.   Who contacted you to request your testimony here today?

24    A.   I'm sorry, I don't know his name, the attorney.

25              THE COURT:  It's not Mr. Avery or Ms. Overbeck, one of

J5mdtap1                        Storino - cross

1    the two lawyers who are here?

2              MR. AVERY:  It was me.

3              THE COURT:  I'm sorry?

4              MR. AVERY:  It was me.

5              THE WITNESS:  Yes.  I didn't know his name.

6              MR. AVERY:  She didn't know my name.

7              THE COURT:  Oh, she didn't know your name?

8              THE WITNESS:  Yes.

9              THE COURT:  But it was Mr. Avery?

10             THE WITNESS:  Right.  He said it was.  Yes, it was

11   him.

12             THE COURT:  All right.

13   BY MS. CONNOLLY:

14   Q.  I'm sorry, I asked you this question.

15             Do you know who has -- who has the ability to grant

16   access to the software program -- those administrative

17   privileges to access the software program?

18   A.  No.

19   Q.  And who is -- was there a manager named Jennifer?

20   A.  There was an employee named Jennifer.

21   Q.  OK.  Was she an Asian lady?  Is she an Asian lady?

22   A.  I believe so, something like that, yes.

23   Q.  OK.  OK.  Did Mr. Geniton and Mr. Piacquadio ever direct

24   you to draw checks outside of the normal course of running

25   payroll -- checks to employees outside of the normal course of

J5mdtap1                         Storino - cross

1   running payroll?

2   A.  I don't understand what --

3   Q.  As a bookkeeper, you wrote checks to pay various expenses

4   of the business?

5   A.  Yeah.

6   Q.  Did Mr. Geniton and/or Mr. Piacquadio direct you to draw

7   checks to employees outside of the normal running of payroll?

8   A.  Not outside the normal running of payroll, no.

9   Q.  So you never wrote checks to any employees; those were all

10  done through Paychex, is that right?

11  A.  No, that's not right.  I've written checks to employees but

12  only when it's for payroll purposes, not outside of the general

13  practice of payroll, not just for any old reason.

14  Q.  So it's not correct that all payroll is run through

15  Paychex?

16          THE COURT:  Well, what circumstances would there be

17  where you would write a check, as opposed to the check to the

18  employee coming from Paychex?

19          THE WITNESS:  I'm trying to think of a certain

20  situation if and when that would happen.  I suppose if an

21  employee didn't -- no longer worked at the company and if they

22  didn't receive their last check and say for, you know, if they

23  didn't come to us for, you know, maybe they weren't in payroll

24  anymore because I terminate them when they are no longer an

25  employee, but if they, you know, still had one check left, we

J5mdtap1                         Storino - cross

```
1    would write something like that for them, a final wages kind of
2    a check, something like that, you know.
3    BY MS. CONNOLLY:
4    Q.  If you look at DX -- Defendants' A1, the Victor Tapia
5    earnings report.
6              (Counsel conferred)
7              MR. AVERY:  She doesn't have it.
8              MS. CONNOLLY:  The marked one?
9              MR. AVERY:  Yes.
10             THE COURT:  Call it A1.
11             MR. AVERY:  A1A.
12             MS. CONNOLLY:  I will write in 1 on here.
13             THE WITNESS:  Thank you.
14   BY MS. CONNOLLY:
15   Q.  Ms. Storino, do you recognize this document?
16   A.  Yes.
17   Q.  Can you tell me what it is?
18   A.  An employee earning record.
19   Q.  And who generates this record?
20   A.  Paychex.
21   Q.  Paychex?
22   A.  Yes.
23   Q.  And when do you get -- when do you receive these records?
24   When does Space receive these records?
25   A.  They are available on our online account and they can be
```

J5mdtap1                         Storino - cross

1    generated anytime.

2    Q.   And how does Paychex get this information that's in here?

3    A.   It's showing the checks that were issued through payroll.

4    Q.   Well, where do they get the input from, the Victor Tapia,

5    the --

6    A.   That's from -- he's entered into the payroll system by

7    myself.

8    Q.   OK.  And those reports are sent by what?  Someone sends

9    those reports to Paychex, or that information to Paychex?

10   A.   I put that into Paychex when someone -- a new person that's

11   going into payroll, I type in their name, social, address, and

12   then the payroll, the hours, and then checks are generated.

13   And they keep records of everyone, Paychex, that they generate.

14   Q.   Do you see also here a hire date?

15   A.   Yes.

16   Q.   And what does that date show to be?

17   A.   Well, I don't know if that is a 6 or an 8.

18   Q.   Is it month and day?

19   A.   Yes.

20   Q.   August 25, 2016, correct?

21   A.   I believe so, yes.

22   Q.   And if you look back to, well, Tapia labor report.

23   A.   Mm-hmm.

24   Q.   You see that the three dates of employment that are listed

25   on page 12 are August 12, 2016; August 6, 2016, and June 26,

J5mdtap1                         Storino - cross

1   2016?

2   A.  Mm-hmm, yes.

3   Q.  Well, Mr. Tapia wasn't working at Space, according to the

4   earnings record, until August 25, 2016, correct?

5          THE COURT:  I'm sorry.  I didn't follow that question.

6          MS. CONNOLLY:  D2, page 12, shows three dates that

7   Mr. Tapia allegedly worked.

8          THE COURT:  The first one of which is June 26, right?

9          MS. CONNOLLY:  June 26, August 6, and then August 12,

10  2016.

11         THE COURT:  Right.

12         MS. CONNOLLY:  And the earnings report, A1 --

13         THE COURT:  Right.

14         MS. CONNOLLY:  -- the hire date says August 25, 2016.

15         THE COURT:  I thought it was 26th, but, anyway,

16  August 26th --

17         MS. CONNOLLY:  August 26th or 27th.

18         THE COURT:  OK.

19  BY MS. CONNOLLY:

20  Q.  So the labor report -- either the labor report or the

21  earnings report is incorrect about the dates of Mr. Tapia's

22  employment, correct?

23  A.  So the employee earning record for the hire date is most

24  likely -- the default date is when I would have entered him

25  into Paychex.

J5mdtap1                          Storino - cross

1    Q.  So he wasn't paid before August 25, 2016?

2    A.  It shows the dates that he was paid for on the employee

3    earning record.

4    Q.  Well, if he was -- why would he have --

5    A.  It is automatically -- it is a default date for hire date.

6    When I enter someone into Paychex, the date I enter it, it is

7    the hire date unless I, you know, correct it, unless I change

8    it.  But it still shows the correct dates that he was paid for

9    at the top.

10             THE COURT:  Can I ask this question?

11             THE WITNESS:  Sure.

12             THE COURT:  If we look at the labor report for

13   August 6, 2016, that's for 9.57 hours.  Do you see that?

14             THE WITNESS:  Aha, yes.

15             THE COURT:  OK.  So he worked August 6 9.57 hours, and

16   then the employee earnings record shows that on September 9th,

17   which covers the 9.57 hours, he was paid.  Are you saying there

18   is a correspondence between the August 6th and the

19   September 9th dates?

20             THE WITNESS:  Yes.  That is a check date.  So the

21   check date of September 9th, he was paid for the week of 8th --

22   or the date of August 6th.

23             THE COURT:  And the same would be true with respect to

24   the August 12th date that is listed, the hours being 9.2 hours,

25   and on August 26th, the 9.2 hours are reflected there.  So,

J5mdtap1                         Storino - cross

1    they were paid then?

2              THE WITNESS:  Correct, right.  So the check date of

3    this -- these two check dates is when he was paid for those two

4    dates that he actually worked.

5              THE COURT:  OK.  But there is no employee earnings

6    record with respect to the June 26th date?

7              THE WITNESS:  Correct, which is the amount that I had

8    written he was owed on the next page.

9              THE COURT:  OK.

10   BY MS. CONNOLLY:

11   Q.  Why would it take you -- why would there be a lag between

12   the time a person starts working and the time you enter him

13   into Paychex?

14   A.  Well, I mean, from my past experience, you don't get paid

15   the same week that you work at a company.  There is always, you

16   know, at least a week or so until you get paid for the previous

17   weeks that you worked.  So it could have also been that -- I

18   don't know.  I don't want to speculate.  I don't know.  It

19   could be different reasons.  It could be that I was missing,

20   you know, a document of his for something, you know, as part of

21   the payroll application that he has to fill out in the

22   paperwork.  It could have been just been something like that, I

23   don't know.  But there are different reasons.

24   Q.  Did you have any responsibility or duties to pay out petty

25   cash to any employees?

1    A.   I didn't do that.

2    Q.   Were you ever directed to make a cash payment to Saul Soto?

3    A.   I may have -- yeah, I don't -- I may have paid him cash

4    through a manager's, you know, asking me to do that, coming

5    from a manager, but not me directly.

6    Q.   No, not you directly.

7         And you are aware that Saul Soto wasn't paid for all

8    the hours he worked, correct?

9              MR. AVERY:   Objection.

10   A.   No.

11             THE COURT:   Just hold on.

12             Sustained.

13             MS. CONNOLLY:   I have no further questions.

14             THE COURT:   Any redirect?

15             MS. CONNOLLY:   I would like to move the first page,

16   A1, into evidence.

17             THE COURT:   Any objection to A1 coming into evidence.

18             MR. AVERY:   No, your Honor.

19             THE COURT:   A1 is received into evidence.

20             (Defendants' Exhibit A1 received in evidence)

21             THE COURT:   Mr. Avery.

22             MR. AVERY:   Yes.   I will be very brief, your Honor.

23   REDIRECT EXAMINATION

24   BY MR. AVERY:

25   Q.   Defense Exhibit A, the labor report for Tapia, could you

J5mdtap1

1   take a look at that real quick?

2   A.  Yes.

3   Q.  Do you see the entry that you were talking about, the

4   1:17 a.m. default clock out, how many hours are recorded in the

5   system with that default clock out on that day?  Do you see

6   right under --

7   A.  OK, 17.55.

8   Q.  Right.  And then in your handwritten calculations you were

9   discussing, how many hours did you use?

10  A.  Yes.  In my calculation I was using the entire amount, the

11  17.55, even though he did not clock out.  So we are still

12  paying him for that 17.55 is what I included that he was owed

13  for.

14          MR. AVERY:  No further questions.

15          THE COURT:  Anything else?

16          MS. CONNOLLY:  No, your Honor.

17          THE COURT:  All right.  Ms. Storino, thank you very

18  much.  You are excused.

19          THE WITNESS:  Thank you, your Honor.

20          THE COURT:  Have a good afternoon.

21          THE WITNESS:  Thank you.  You, too.

22          (Witness excused)

23          THE COURT:  We will take a lunch break, but before we

24  do, why don't you tell me what is going to happen after lunch?

25          MR. AVERY:  I think we are going to discuss it, your

J5mdtap1

1    Honor.

2              THE COURT:  You think you are going to discuss it?

3              MR. AVERY:  Yes.

4              THE COURT:  Meaning there is some possibility you are

5    not going to have further witnesses?

6              MR. AVERY:  It is possible.

7              THE COURT:  And there is a possibility you may call

8    one or more of your clients?

9              MR. AVERY:  That is right.

10             THE COURT:  Just trying to understand what is

11   happening.

12             MR. AVERY:  Absolutely.

13             The one thing I do want to do after is -- Kerry and I

14   can do this over lunch, the days, just this was a Friday, this

15   was a Saturday, and then we will discuss over the break whether

16   one more witness is needed.

17             THE COURT:  OK.  All right.  So we will reconvene at

18   2:15.  That should give you enough time to talk and eat, and it

19   is important to eat so make sure you do that.  OK?

20             All right.  We'll see you at 2:15.

21             THE CLERK:  All rise.

22             (Luncheon recess)

23

24

25

J5mdtap2

**A F T E R N O O N   S E S S I O N**

2:30 p.m.

THE COURT:  OK.  What's next?

MR. AVERY:  Your Honor, at this point, opposing counsel and I were able to agree on a stipulation as to the dates.

THE COURT:  OK.  Do you want to read it into the record?

MR. AVERY:  Yes, please.

THE COURT:  Go right ahead.

MR. AVERY:  OK.  July 22, 2016 was a Friday.  July 30, 2016 was a Saturday.  August 5, 2016 was a Friday.  August 6, 2016 was a Saturday.  August 12, 2016 was a Friday.  August 13, 2016 was a Saturday.  August 14, 2016 was a Sunday. September 2, 2016 was a Friday.  September 13 -- or September 3rd, sorry, 2016 was a Saturday.  September 4, 2016 was a Sunday.  September 10, 2016 was a Saturday. September 23, 2016 was a Friday.  October 9, 2016 was a Sunday. October 21, 2016 was a Friday.  October 22, 2016 was a Saturday.  October 29, 2016 was a Saturday.  November 4, 2016 was a Friday.  November 5, 2016 was a Saturday.  November 11, 2016 was a Friday.  November 12, 2016 was a Saturday. December 18, 2016 was a Sunday.  That's it.

THE COURT:  OK.  What's next?

MR. AVERY:  And at this time the defense rests, your

J5mdtap2                    Summation - Ms. Connolly

1    Honor.

2           THE COURT:  So there are no further exhibits that

3    either side wants the Court to be received in evidence?

4           MR. AVERY:  I apologize.  There was just one.  We, the

5    defense, moves in Defense Exhibit C.

6           THE COURT:  Right.  Is there an objection?

7           MS. CONNOLLY:  No, your Honor.

8           THE COURT:  All right.  Exhibit C is received.

9           (Defendants' Exhibit C received in evidence)

10          THE COURT:  All right.  So shall we have closing

11   arguments, then?  Would you like to be heard, Ms. Connolly?

12          MS. CONNOLLY:  Yes, your Honor.

13          I think that the evidence has established that

14   Mr. Tapia worked for Eden Ballroom, Defendant Eden Ballroom

15   LLC, at Space for the period July 1, 2016 through January 4,

16   2017.  The defendants' records of three dates of punching in

17   and punching out have not been demonstrated to be accurate or

18   thorough.  Mr. Tapia testified that he was oftentimes prevented

19   from punching in and punching out, and defendants' own records,

20   such as they are, show that the start -- his start date was

21   August 25th, when defendants have stipulated in a Pretrial

22   Order that Mr. Tapia's start date at Space was July 1, 2016.

23          THE COURT:  Wait.  When you say --

24          MS. CONNOLLY:  August 25th, 2016.  Sorry.

25          THE COURT:  I don't quite understand why you say that

J5mdtap2                    Summation - Ms. Connolly

1    because their records say he worked on June 26th.  So they

2    would say that was the first date that he worked.  So what do

3    you mean by August 25th being the start date?  I don't follow

4    that.

5              MS. CONNOLLY:  On Defendants' A1, the hire date is --

6    Ms. Storino testified that that was the date she put in as his

7    start date.

8              THE COURT:  You are talking about the August 26th date

9    there.  That was discussed in terms of when payment was made,

10   not when he started employment.

11             MS. CONNOLLY:  Well, but she testified that that was

12   when she just put him on.  She didn't say she knew when he

13   started.  She said that was a default date.  She didn't --

14             THE COURT:  No.  My understanding -- and I was asking

15   her questions about this -- if you look at A and then A1, on A,

16   for the August 12th date, that corresponds to the hours where

17   he worked 9.2 hours, right?  And that corresponds on A1 with

18   the first date, right?  There is a relationship between what

19   they say the labor information is, the timesheets, and the

20   payment.  From what her testimony was, this is when there was

21   payments.

22             Although, as I understood what she was saying -- and

23   some of this was not entirely explained, but she said that he

24   didn't cash one of the checks.  He didn't cash the second

25   check, the 155.04 check.  She didn't really explain the first

1   check.  So it seems to me that what this document shows is

2   there is $227.65 that are owed to him because this was not

3   cashed and this was not explained.  That's what this would mean

4   to me, because they say he worked on these three dates.

5          MR. CONNOLLY:  Right.

6          THE COURT:  They say he only worked on these three

7   dates.

8          MS. CONNOLLY:  Right.

9          THE COURT:  So the way I read the evidence to date --

10  and the record is now closed -- is that that money, the

11  $227.85, is owed to Mr. Tapia.  That goes in the what he's owed

12  column.  Tell me why that's wrong.

13         MS. CONNOLLY:  My point that I was making, your Honor,

14  is that on A1, the hire date is stated to be -- and I read it

15  as August 25, 2016, but maybe it is August 26, 2016.  And Ms.

16  Storino said, you know, that was just the date she put him on

17  payroll.

18         My point is that that is not accurate even according

19  to her own accounting because -- or her -- these records

20  because it says that he punched in on 6/26/2016, and if he was

21  hired on August 25th, 2016, he couldn't have punched in on

22  June 26.

23         And I hear what you are saying but that's not what she

24  said.  She said that that was just when he was put on -- she

25  put his start date in to be put on payroll.

1          THE COURT:  You are using the phrase "start date to be

2     put on payroll," and I don't know that that's what Ms. Storino

3     said A1 represents.  This is when Paychex cut checks to

4     Mr. Tapia.  That's what I understood this to mean.

5          MS. CONNOLLY:  Yes.  But the information that was

6     provided to Paychex was provided by Ms. Storino.

7          THE COURT:  Right.  Let's be clear.  As I understand

8     the record, the June 26th date wasn't paid for --

9          MS. CONNOLLY:  Right.

10          THE COURT:  -- at all.  That doesn't mean -- their

11     position can't be that he started on that date but it was only

12     one of three dates that he worked on, because that's what the

13     labor form or record, or however we're characterizing this,

14     reflects.  That's their position.  That's what they have argued

15     through the witnesses today.  Right?  And you're arguing that

16     their records of the three dates is inaccurate because they

17     don't correspond to what's been received as A1.  And all I'm

18     saying is what is in A1 corresponds to two of the three dates

19     from what I understood Ms. Storino to have said.

20          MS. CONNOLLY:  Right.

21          THE COURT:  Tell me why you think that's wrong, if it

22     is.

23          MS. CONNOLLY:  Well, the point is, your Honor, that it

24     demonstrates that their records do not accurately reflect the

25     dates of Mr. Tapia's employment, and it also reflects that the

1    dates are -- it brings to mind the phrase "garbage in/garbage

2    out."  The defendants had control of these records.  Mr. Soto

3    testified that he oftentimes was not able to punch in and punch

4    out and that his employment -- the labor reports that related

5    to him were not accurate.  There were many entries that made no

6    sense to him for the punching in for periods of 18 minutes,

7    etc.

8              So, Mr. Soto, who worked a much longer period of time

9    and was supposed to be paid -- he was paid on occasion for his

10   work as a porter, and he was only paid tips when he worked as a

11   barback and busboy.  So, even Mr. Soto said the records were

12   unreliable.  And Mr. Tapia then testified that he was not able

13   to punch in and punch out.

14             THE COURT:  But to be clear, although this was not

15   really brought out in the testimony and it surprised me that it

16   was not brought out since you called Mr. Soto, Mr. Soto worked

17   during the same period of time, not necessarily the same shift,

18   but the same period of time, at least in part, that Mr. Tapia

19   did, and there are clock entries for all of these dates that

20   you claim Mr. Tapia worked.  So, why wouldn't that then be

21   reflected in their records if in fact he worked those days?

22             MS. CONNOLLY:  Well, because the defendants have

23   control of their records.  As Mr. Avery elicited from Mr. Soto,

24   the managers, in his -- in Mr. Soto's labor history, the

25   managers had access to -- and Ms. Storino confirmed that the

1  managers had access to the software processing system.  So,

2  only in one of the entries of Mr. Soto's labor report is Morgan

3  McLean --

4           THE COURT:  Yes, I saw that.  But are you then arguing

5  effectively that even though Mr. Tapia worked from June to

6  January, that some manager interposed him or herself into these

7  labor reports on every time he worked except for three?  That's

8  effectively what I think you are arguing, isn't it?

9           MS. CONNOLLY:  Your Honor, there are records here that

10  have been testified to as being inaccurate.  What the

11  defendants did or did not do I am not in personal knowledge of.

12           THE COURT:  They were testified to as being inaccurate

13  by your client who says that they don't include days that he

14  worked.  Is that what you mean by that?

15           MS. CONNOLLY:  Yes, your Honor.  And the evidence does

16  show that there were managers -- not manager but managers, and

17  perhaps the owners, you know, that have administrative

18  privileges who could go in and change the dates.

19           THE COURT:  But we have in the Soto labor report one

20  instance of that one manager's name being listed.  That's the

21  evidence you are talking about in that regard, right?  We don't

22  have a labor report for Mr. Tapia where there is any equivalent

23  of that.

24           MS. CONNOLLY:  No, your Honor, because there are three

25  dates, which Mr. Tapia testified he worked six months, and he

1    worked New Year's Eve and he worked Halloween.  So for

2    defendants to claim that these reports, which were generated

3    after this litigation was filed --

4            THE COURT:  Right.  You are effectively arguing that

5    the labor report that the defendant has provided with respect

6    to Mr. Tapia is a fraud in some way, effectively; that's what

7    you're arguing.

8            MS. CONNOLLY:  Your Honor, I am not using the word

9    "fraud."  I'm saying that Mr. Tapia testified that they are

10   inaccurate, the same way that Mr. Soto testified that his

11   records were inaccurate.  And if both parties testified that

12   the POS system was blocked or not working on numerous occasions

13   and they were told -- the employees were told to write down

14   their time and give it to the office, and Mr. Soto said he

15   doesn't -- he didn't see any evidence of that happening.

16           THE COURT:  He didn't see any evidence of what

17   happening?

18           MS. CONNOLLY:  Of the time that he had written down --

19           THE COURT:  Well, again, while it is not entirely

20   explained because the record lacks a lot of clarity in this

21   case, with respect to the June 26 date, there is an annotation

22   by Ms. Storino about him having worked less than what the clock

23   credited him, although my understanding is the defendant paid

24   him for the longer period of time for that date.  That's what I

25   think they have argued.  Is that not right?

1          MS. CONNOLLY:  That they --

2          THE COURT:  Let's go back to first principles.  Your

3     client is allowed to come in here and testify "This is when I

4     think I worked," and that's all he has to do to meet his

5     initial burden.  Nothing beyond that.

6          So far you agree with me, right?

7          MS. CONNOLLY:  Yes.

8          THE COURT:  Then the defendant, in responding to that,

9     and meeting, I'll say, its shifting burden, with the ultimate

10    burden always remaining on the plaintiff, can, if it has

11    documents or other evidence, rebut what the witness' best

12    recollection of when he worked is with documentary evidence.

13    In many of these cases, as I know you know because you are

14    experienced in this area, the defendant has no records.  OK?

15    In this case, this defendant has records, proffered records.

16    Those records reflect that their records show Mr. Tapia worked

17    on three dates for them and not more than three dates.

18         So, you're essentially saying the Court should

19    entirely discount these labor reports even though we have labor

20    reports from another former employee, who you called, which

21    reflect a much longer period of time, including many of the

22    weeks that Mr. Tapia says he worked, when he would presumably

23    have said, although the record is a little imprecise, that he

24    wasn't able to punch in during those days or during those

25    weeks -- the very days or weeks that we have records in

J5mdtap2                         Summation - Ms. Connolly

evidence that Mr. Soto worked.  So, how do I reconcile that,

then?  Why should I entirely discount the records proffered by

the defendants in those circumstances?

          MS. CONNOLLY:  Because, your Honor, these reports can

be generated in any way, shape or form.  If you instruct the

system to generate a report for three days, it can do so.  It

can --

          THE COURT:  But you didn't ask -- I'm sorry to

interrupt you, but you didn't ask Ms. Storino any questions

about that.  In other words, you didn't pursue whether she

somehow limited, other than the period of time is from when

Eden Ballroom first opened in 2014 until October 5, '17, when

she ran the report -- that was the period.  So my understanding

of her testimony was she was told to query the system to find

every date that Mr. Tapia worked, and what came out was the

labor report that is in evidence as A1, which shows the three

dates.  That's what she did.  That's what her testimony was.

Not that she somehow limited it in some way to make it less

than what he really did and that their records show.

          How are you meeting your ultimate burden to prove

otherwise?

          MS. CONNOLLY:  By showing that the record, the

earnings record, does not match the labor record, and Mr. Tapia

specifically testified that this record does not reflect all of

the days that he worked --

1          THE COURT:  But the earnings record only has two dates

2     on it.  It doesn't have anything other than those two dates.

3     So what am I supposed to make of that, then?  Why should I draw

4     from that inference that he worked six months?

5          MS. CONNOLLY:  Well, the earnings record --

6          THE COURT:  Especially, if you will, when his

7     testimony in his deposition was completely inconsistent with

8     his testimony today and his Amended Complaint.  So there are a

9     lot of inconsistencies in Mr. Tapia's own version of when he

10    worked.  Sometimes it's 2016 and sometimes it's 2017.

11    Sometimes it's two days a week, sometimes it's three days a

12    week.  That undermines his credibility if he can't get his

13    story straight.  His answer was constantly three days, 10

14    hours; three days, 10 hours.  I don't really remember when I

15    started and when I ended.  That was really what he was saying,

16    as I heard him.

17         MS. CONNOLLY:  Your Honor, that is what he testified

18    to in his deposition.  And even at his deposition he said, you

19    know, I don't really remember.  He explained that he hadn't

20    remembered and that it was two years between the time he left

21    the position and the start of his deposition.

22         THE COURT:  So why is what he says today any more

23    believable than what he said in January?

24         MR. CONNOLLY:  Because he refreshed his recollection.

25         THE COURT:  By doing what?

1              MS. CONNOLLY:  By reviewing the records he had

2      provided to me.

3              THE COURT:  What records were those?  Nothing that is

4      in evidence in this trial.  He didn't, like, have a diary or

5      something that he kept at home.

6              MS. CONNOLLY:  No, he didn't have a diary.

7              THE COURT:  What are we taking about?  What records

8      did he review that are before the Court that I can consider to

9      assess the period of time that he worked?  What are we talking

10     about?

11             MS. CONNOLLY:  Well, his initial interview, the

12     interview notes with me, that were used in crafting the

13     Complaint.

14             THE COURT:  OK.  Well, the Complaint says he worked

15     two days a week.

16             MS. CONNOLLY:  And that's --

17             THE COURT:  Exhibit 1 that you offered and was

18     received in evidence says he worked three days a week.  So for

19     inconsistencies like that, why don't that disfavor your

20     position?  Inconsistencies undermine credibility.

21             MS. CONNOLLY:  Well, your Honor, I asked Mr. Tapia if

22     he drafted the Complaint and he --

23             THE COURT:  Obviously, he didn't draft the Complaint.

24             MS. CONNOLLY:  Obviously, he didn't draft the

25     Complaint.

1          THE COURT:  It is as obvious that he didn't draft the

2     complaint as it is that July is not in the winter, my favorite

3     line in today's trial.

4          MS. CONNOLLY:  I kind of, like, you know, December 26

5     was a Monday, you know.

6          THE COURT:  Well, I don't frankly know why we just had

7     a recitation of when all of those days were, but I'm sure

8     Mr. Avery will enlighten me at some point.

9          MS. CONNOLLY:  Mr. Tapia explained that he didn't --

10    you know, he was paid cash for his tips.  He finished working

11    at Space in January 2017.  It was two years before his

12    deposition.  He testified he wasn't refreshed before his

13    deposition as to the dates of his employment.

14         THE COURT:  He should have been.

15         MS. CONNOLLY:  In the Pretrial Order, defendants have

16    stipulated that Mr. Tapia started working on July 1st, and yet

17    they have him -- they have on his labor report that he punched

18    in on June 26.  That doesn't match either.  Why did they

19    stipulate to the fact that he started --

20         THE COURT:  The Pretrial Order is not admissible

21    evidence at a trial unless it is a stipulated fact.

22         MS. CONNOLLY:  It is a stipulated fact.

23         THE COURT:  What number are you talking about?  What

24    page?

25         MS. CONNOLLY:  Little Roman numeral 12 at page 6.

1          THE COURT:  OK.  I have to see what Mr. Avery says in

2     that regard.

3          MS. CONNOLLY:  Now, at the December 4th hearing,

4     Mr. Avery represented that he was going to update -- he had to

5     update their Rule 26 -- Defendants' Rule 26 disclosures by

6     identifying the Asian woman who hired Mr. Tapia, and defendants

7     never did that, preventing us from obtaining discovery about

8     the date of Mr. Tapia's hire.

9          THE COURT:  You never made a motion to compel.

10         MS. CONNOLLY:  No, you are correct.

11         THE COURT:  I mean, I don't know what to do about that

12    at this moment in time.  I feel like that ship has sailed.

13         MS. CONNOLLY:  Well, but they were still under an

14    obligation.  Mr. Avery represented to the Court and to counsel

15    that that was what he was going to do and he didn't do it.

16         THE COURT:  But you have to seek relief if you are not

17    getting something you feel you need.  Obviously, if that's

18    something you felt you needed for trial, that's relief you

19    should have sought from the Court.  I would have obviously

20    considered an application at any point during the discovery

21    period, which we extended after we were unable to see whether

22    this matter could get resolved, so.

23         MS. CONNOLLY:  Umm --

24         THE COURT:  And in any event, even if he had

25    identified this woman prior to trial, tell me what bearing that

1    would have on the trial today.

2            MS. CONNOLLY:  I can't say everything, but we would --

3    it would have been confirmed that there was -- in addition to

4    Mr. Tapia's testimony, that he never received any initial

5    notice about his rate of pay and he never received any

6    paystubs.

7            THE COURT:  Well, I don't think there is anything in

8    the record and I don't know how defendants can challenge the

9    fact that Mr. Tapia either got a wage notice or got wage

10   statements because there is nothing in front of me, so I think

11   on those particular claims you will prevail because they are

12   uncontested, unless I missed something, but I heard nothing nor

13   is there any documentary evidence otherwise.

14           But I think what their position is is if I find in

15   their favor, what that then means is that he worked for three

16   days and so there is a certain penalty both with respect to not

17   having gotten a wage notice and not having gotten a wage

18   statement, that, combined with what else he is owed, still

19   either is less than or close to the $1,020 that he acknowledged

20   he received.  So when all of the math is done, if their version

21   of events is accepted, Mr. Tapia either has been fully paid or

22   will be owed a few hundred dollars, as opposed to your version

23   of events which is, if I accept your version, he worked six

24   months and then he's owed in the thousands of dollars, and

25   that's where the disparity is.  But in any event, either way,

J5mdtap2                      Summation - Ms. Connolly

1  he's going to get penalties for wage notice and wage statement

2  violations because that was uncontested at this trial.

3         MS. CONNOLLY:  OK.  Your Honor, so with respect to the

4  records, I don't think that defendants meet their burden of

5  demonstrating that their records are accurate, particularly

6  because -- and the Court is aware of this already, but

7  particularly because the defendants are serial violators of the

8  wage-and-hour laws.  There have been at least two other

9  wage-and-hour cases filed in this district against them.  So,

10 in generating these reports that were generated after this case

11 was filed, they could have generated whatever they wanted to.

12 They --

13        THE COURT:  Hold on a second.  I am a little confused

14 by this argument.

15        Is this sort of some kind of, like, prior-bad-act-type

16 argument now?  Because they have been sued twice, about which I

17 know nothing of the underlying facts other than there have been

18 other lawsuits, I am supposed to draw certain inferences?  That

19 might make sense from a "are you entitled to liquidated damages

20 because they have acted in bad faith because they have been

21 sued twice before," but I don't know what I am supposed to do

22 with that for purposes of deciding whether the documents

23 proffered in this case lack credibility.

24        Do you understand the distinction I am making?

25        MS. CONNOLLY:  I understand the distinction you are

1    making, your Honor.  But what I'm saying is that they are well

2    versed in knowing what they need to produce in order to

3    withstand -- or at trial they wanted to come up with records

4    and they came up with records.

5              THE COURT:  Well, but not to deviate too far from

6    Mr. Tapia's case, but Mr. Soto, unlike Mr. Tapia, they

7    recognized they had a significant record when they generated

8    their labor report with respect to Mr. Soto of the length of

9    time he worked, according to their own records and their own

10   system, which -- and while I am not in their head and they

11   haven't paid, apparently, but that would lead them to be more

12   inclined to try and settle a case brought by Mr. Soto, where

13   their records show that he worked all of these weeks based on

14   all of the computer entries, even if they were inaccurate in

15   part, as Mr. Soto said, relative to Mr. Tapia, where his

16   records don't demonstrate nearly that sort of work history.

17   That's why presumably they decided to take this particular

18   claim to trial, because the records that they generated didn't

19   show that he worked the period of time he claims that he did.

20   Ultimately, I have to figure out whether I should accept

21   Mr. Tapia's testimony that he worked this period of time and

22   entirely discount their records, or the opposite, which is that

23   their records show, in a way that you can't overcome, that he

24   only worked these three days.  That's what the Court ultimately

25   has to decide on the record in front of it.

1          MS. CONNOLLY:  Your Honor, Mr. Soto had a much longer

2     record of employment there.  So, presumably --

3          THE COURT:  You see, part of your argument is that the

4     computer system didn't work for Mr. Tapia.  Well, this question

5     was not entirely answered by the testimony, but one question I

6     have is, well, why did it mostly work for Mr. Soto if it didn't

7     work mostly for Mr. Tapia?  Can you explain that?

8          MR. CONNOLLY:  Your Honor, I don't think it has been

9     demonstrated that it worked mostly for Mr. Soto --

10         THE COURT:  Well, if we look at the labor report,

11    though, there are a lot of days that are listed there, right?

12    And he was quibbling with why did I punch in twice and why did

13    it say zero hours, or whatever, and that wasn't entirely

14    explained.  But I am not here to calculate Mr. Soto's damages.

15         But what I'm here to evaluate is whether Mr. Tapia's

16    testimony that the computer system basically never worked

17    cohered with records from Mr. Soto where it looked like it

18    worked and Ms. Storino's testimony where she said, as far as

19    she knew when she managed the system, it worked basically all

20    the time except perhaps nothing is perfect.  I'm paraphrasing,

21    but her testimony was that the system worked.  And if it

22    didn't, she would know about it because managers would have to

23    report things to her.

24         MS. CONNOLLY:  Well, your Honor, I beg to differ.  She

25    did not say that she managed the system.  She said that she did

1    not --

2              THE COURT:  I don't mean managed the system in a

3    technological sense, but her responsibility was to generate

4    these reports and to make sure people were getting paid what

5    they were owed.  That she did testify to.

6              She was in charge of payroll, right?

7              MS. CONNOLLY:  Yes, your Honor.  But in the case of

8    Mr. Tapia, when someone isn't being paid for the hours they

9    work, what's the relevance of these records anyway?  They have

10   no --

11             THE COURT:  Where are their records of Mr. Tapia

12   complaining to anybody about him not getting paid?  Where are

13   their records about him complaining about the computer system

14   not reflecting his hours?  Where is there any testimony from

15   him or anyone to corroborate that he in fact worked there at

16   the same time as someone else?  There is nothing in the record

17   about that.  So, it is entirely on Mr. Tapia and whatever he

18   testified to, and that's all that's in the record, his

19   testimony and what he remembered.  That's it.

20             MS. CONNOLLY:  Well, where in the defendants' records

21   are any complaints or any other records?  Defendants produced

22   nothing along those lines.

23             THE COURT:  I mean, they are not going to produce

24   records that don't exist.  Like, if an employee doesn't

25   complain about not getting paid, and many employees do complain

1      about not getting paid, they often put it in writing or they

2      often talk to managers, or whatever, but I don't have any

3      information like that in this case in this record.

4              MS. CONNOLLY:  Well, I'm sure the Court has seen

5      plenty of cases where employees don't complain about not

6      getting paid, for a number of reasons.

7              THE COURT:  Of course.  They don't want to be

8      retaliated against.  I understand that.  But, again, the record

9      here is sort of surprisingly bare, in both directions, frankly.

10             MR. CONNOLLY:  Your Honor, but what is a person like

11     Mr. Tapia to do who was paid in cash and has no records?  He

12     only has his testimony.  And defendant comes forth generating

13     reports that are created after the litigation was started just

14     to say, oh, no, no, no, we only have three days for this guy.

15     That doesn't seem to meet the burden --

16             THE COURT:  Why should I doubt their system?  How do I

17     have any evidence in the record to suggest the system was

18     manipulated in some way?

19             MS. CONNOLLY:  Well, there is the record of Mr. Soto's

20     labor report that showed that the one entry that shows that it

21     was editable and was edited by Morgan McClain.

22             THE COURT:  OK.  But what shows that anything with

23     respect to Mr. Tapia was edited or deleted?

24             MS. CONNOLLY:  Mr. Tapia's testimony.

25             THE COURT:  Well, he didn't testify that his labor

1    report was modified in some way or --

2            MR. CONNOLLY:  But he doesn't have that knowledge.  He

3    just said that it didn't reflect --

4            THE COURT:  I'm not blaming him.  There is no way that

5    he could know one way or the other.

6            But I don't understand why I should entirely discount

7    this labor report for Mr. Tapia.  What basis do I have to

8    discount it?

9            MS. CONNOLLY:  Your Honor, as I said, I have the

10   testimony of Mr. Soto and the testimony of Mr. Tapia.  And Ms.

11   Storino, the fact is she said that -- I mean, the start date

12   does not line up.  I know you're saying that he wasn't paid for

13   6/26.  But if they can't accurately account for when their

14   employees were hired, they did not produce -- they did not have

15   Jennifer, we think is the name of the Asian lady, testify.

16           THE COURT:  What would she be testifying to?

17           MS. CONNOLLY:  Well, that the start date was or was

18   not August 25th that they had --

19           THE COURT:  She would have to ask Ms. Storino to find

20   out when the start date was.  I wouldn't think she would have

21   something like that committed to memory or have any records

22   other than getting payroll records to reflect that.  No?

23           MS. CONNOLLY:  Mr. Tapia testified that he filled out

24   a form the day he was hired, that he put down his name and --

25           THE COURT:  Right.  We don't have that in the record,

 1   right?

 2          MS. CONNOLLY:  No, it wasn't produced.

 3          THE COURT:  Right, which is why you will prevail on

 4   the wage notice and the wage statement claim.  The question is

 5   do you prevail on it for three dates or for six months?

 6          MS. CONNOLLY:  Your Honor, I don't want to engage in

 7   unattenuated argument with you on this --

 8          THE COURT:  That's what we are doing.  That's what we

 9   should be doing.

10          MS. CONNOLLY:  Well, I don't think that these

11   employer's records are sufficient to rebut the testimony of

12   Mr. Tapia.

13          THE COURT:  OK.

14          MS. CONNOLLY:  And Mr. Soto.

15          THE COURT:  OK.  Can I ask you, on your

16   spread-of-hours claim, your Exhibit 1 that has been received in

17   evidence says that Mr. Tapia worked 10 hours a day three days a

18   week, correct?

19          MS. CONNOLLY:  Yes.

20          THE COURT:  Why is he entitled to spread of hours,

21   then?  Because spread of hours is in excess of 10 hours, as a

22   matter of law, and I have researched it.

23          MS. CONNOLLY:  Your Honor, if you have researched it,

24   I --

25          THE COURT:  It is not 10 hours; it's more than 10

1    hours.

2             MS. CONNOLLY:  Your Honor.

3             THE COURT:  By your own admission, he worked 10 hours.

4    So even if I credit that, I don't think you have a

5    spread-of-hours claim.  Tell me if that's wrong.

6             MS. CONNOLLY:  Your Honor, I would not have included

7    it if I knew it to be 10.01 hours.  It was my understanding --

8    and if I am incorrect, I apologize -- I thought that it was --

9    10 hours was the cutoff point on that.

10             THE COURT:  All right.

11             MS. CONNOLLY:  And just give me a moment.

12             (Pause)

13             I think that between the Pretrial Order stipulations

14    of fact, we've established coverage under the FLSA.  I think

15    that the testimony has established that -- and the Court taking

16    judicial notice of the two prior wage-and-hour cases, if the

17    Court needs the citations, I have them.

18             THE COURT:  You are asking me to take judicial notice

19    of the prior lawsuits?

20             MS. CONNOLLY:  Yes, your Honor, on the basis of --

21             THE COURT:  Is that in any of the pretrial

22    submissions?

23             MS. CONNOLLY:  Yes.

24             THE COURT:  For me to do that?

25             MS. CONNOLLY:  Yes.  In the proposed Findings of Fact

J5mdtap2                          Summation – Ms. Connolly

1    and Conclusions of Law.

2               THE COURT:  That you requested the Court to take

3    judicial notice of the prior lawsuits?

4               MS. CONNOLLY:  Sorry, not that you take judicial

5    notice, just that there was a finding -- on the proposed

6    Findings of Fact and Conclusions of Law, on paragraph 13.

7               THE COURT:  This is of your submission?

8               MS. CONNOLLY:  Yes.

9               (Pause)

10              THE COURT:  OK.  And to what end?

11              MS. CONNOLLY:  To demonstrate that the violations of

12   the wage-and-hour laws were not made in good faith.

13              THE COURT:  OK.  By the way, what evidence is there in

14   the record at trial that any of the three individually named

15   defendants should be held liable here?

16              MS. CONNOLLY:  Just that they ran the business.  They

17   were at Space.  They were at the Space space when it was open

18   and operating, and they had the power to hire and fire people.

19              THE COURT:  Who testified to that?

20              MS. CONNOLLY:  That -- Mr. Soto testified to that.

21              THE COURT:  That what?

22              MS. CONNOLLY:  That the owners could hire and fire --

23              THE COURT:  The way I remember his testimony is that

24   when he went to bat for this older employee who eventually got

25   paid, a bouncer told Mr. Soto, because one of the individual

1   defendants told the bouncer to tell Mr. Soto, he shouldn't come

2   back to work.  That's what he testified to, isn't that right?

3   He didn't testify that he interacted directly with either of

4   the individual defendants who are present here today.

5          MS. CONNOLLY:  Not in that context, but he said that

6   he interacted with them all the time --

7          THE COURT:  Yes.  But he didn't testify that they

8   hired him.  He didn't testify that they set his employment

9   terms.  He didn't testify that he negotiated with either of

10  them, or anything along those lines.  Nor did Mr. Tapia.  And

11  forget Mr. Soto, because we're talking about Mr. Tapia's

12  claims.

13         What did Mr. Tapia testify to with respect to

14  Mr. Geniton, Mr. Seneca, Mr. Mundo and Mr. Piacquadio?

15         MS. CONNOLLY:  Mr. Mundo is no longer a defendant.

16         THE COURT:  I'm just reading the caption.  I didn't

17  mean to say it.  Mr. Geniton and the other two, Mr. Seneca and

18  Mr. Piacquadio.

19         MS. CONNOLLY:  We are speaking about Mr. Tapia's

20  claims, but I just want to refer back to Mr. Soto's testimony

21  because he did say that he interacted a lot with Mr. Piacquadio

22  and with Mr. Geniton on not getting paid and wanting to get

23  paid.

24         THE COURT:  OK.  What does that have to do with

25  Mr. Tapia?

1          MS. CONNOLLY:  It demonstrates that those two owners

2     had the power to control the purse strings and determine

3     whether or not someone was going to get paid and when they were

4     going to get paid.  And Mr. Tapia testified that he met with

5     Mr. Geniton in connection with the $1,020 payment that was

6     made.

7          THE COURT:  Right.  I think he said that is the only

8     time he ever met him.

9          MS. CONNOLLY:  No.  Mr. Tapia said that he knew who

10    they were, but even Mr. Tapia said he didn't interact with

11    them, it was mostly the managers.

12         THE COURT:  Right.  OK.

13         MS. CONNOLLY:  OK.  Just in terms of the time records,

14    both Mr. Soto and Mr. Tapia testified that when they were not

15    able to punch in, they were told to write out their hours on a

16    handwritten piece of paper.  Ms. Storino -- Mr. Soto said that

17    there was a sheet that was maintained for that purpose, and

18    Mr. Tapia said that they were told to put it on a piece of

19    paper.  No records of that were ever produced.  So, the records

20    that defendants did produce are not complete.

21         THE COURT:  What should have been produced that wasn't

22    produced in that regard?

23         MS. CONNOLLY:  Any handwritten notations made by

24    Mr. Soto or Mr. Tapia about the hours that they worked.

25         THE COURT:  Well, you are assuming they exist, which

1   assumes that what they say is truthful about preparing such

2   documents, right?

3        MS. CONNOLLY:  Well, there was no -- that evidence has

4   not been rebutted.

5        THE COURT:  Well, it's been rebutted to the extent

6   that the labor reports with respect to Mr. Tapia reflect that

7   he worked three days.  And if he worked three days and they

8   have that in their system, what other notes would he have

9   written?  You're saying he would have written notes for the

10  other five months and three weeks other than the three days he

11  worked, or whatever?  I'm not following you.

12       MS. CONNOLLY:  Both Mr. Soto and Mr. Tapia testified

13  that they were told to write down their hours when they were

14  not able to punch in and out and that they gave this

15  information to management.  They don't have a record of it.

16  Defendants haven't produced it.  Defendants' records are

17  incomplete.

18       THE COURT:  I have an odd question that just came to

19  me and it is not in the record, but does your client go by any

20  name other than Victor Tapia?

21       MS. CONNOLLY:  No, I don't believe so, because we've

22  looked at that other Tapia --

23       THE COURT:  Because I am trying to understand why

24  these labor reports wouldn't have generated more information

25  about Mr. Tapia.  I don't understand why they wouldn't have

1     done that.

2                 MS. CONNOLLY:  Well, your Honor, they didn't pay him.

3     They didn't pay him for the hours he worked.  They only paid

4     him in tips.  So, they could put whatever they want in those

5     records.  They didn't provide a copy of these records to

6     Mr. Tapia on a weekly basis in which he could say, no, this

7     isn't correct, no, this isn't correct.

8                 THE COURT:  So he worked for six month without getting

9     paid?

10                MS. CONNOLLY:  Yes, as did Mr. Soto.

11                THE COURT:  Why would anybody do that?

12                MR. CONNOLLY:  Because --

13                THE COURT:  You would go to work somewhere else if you

14    are not getting paid, and you might go to a lawyer and try and

15    get your money for what you are owed.  But why would you not

16    get paid for six months?  That is a long time.

17                MS. CONNOLLY:  Because you get paid tips and because

18    you maybe don't understand your recourse, and once you do

19    understand your recourse you file suit.

20                THE COURT:  So your position is he was getting paid

21    throughout this period but only tips?

22                MS. CONNOLLY:  Yes.

23                THE COURT:  So he did get tips throughout the entire

24    period?

25                MS. CONNOLLY:  Yes.

1          THE COURT:  OK.  We don't know how much.

2          MS. CONNOLLY:  No.

3          THE COURT:  OK.

4          MS. CONNOLLY:  And defendants, if they acted as good

5     employers should, if they wanted to, you know, take advantage

6     of the tip credit, they needed to record the amount of tips.

7          THE COURT:  Absolutely.  They did not comply with the

8     tip credit rules and they violated New York Labor Law.  There

9     is no question about that.  But I don't know what the

10    consequences of that are for this case, because we then still

11    go back to how many hours did he work and how many days did he

12    work.

13         MS. CONNOLLY:  Well, but, your Honor, so the

14    cumulative effect of defendants' failure to keep any records

15    about the tips, any records about -- tax records, they didn't

16    pay, you know, taxes on anything.  We don't know what they did

17    as far as taxes are concerned.  So, it doesn't seem to me, with

18    their cumulative failures, why their labor reports, which they

19    can manipulate, should be able to overcome Mr. Tapia and

20    Mr. Soto's testimony that the machine just didn't work.

21         THE COURT:  But when you say they can manipulate, what

22    is the evidence in the record to suggest that they did

23    manipulate, the records with respect to Mr. Tapia?  That's what

24    I'm struggling with.

25         I'm not suggesting that he didn't work the period of

1    time you are saying he did, but we're not operating under, you

2    know, on a blank slate here.  It is not like there is nothing

3    responding to this on the other side.  What you're suggesting

4    is what the defendants have proffered is inaccurate at best, or

5    deceptive at worst, because it was manipulated.  But as to the

6    latter, you didn't cross-examine Ms. Storino in a way to

7    suggest that those documents that she herself generated were

8    "manipulated," to use that pejorative word.

9            What did she testify to to suggest that they were

10   manipulated?  She said -- she testified that she was asked to

11   run a labor report for Victor Tapia to see what days he worked,

12   and this is what was produced as a result of that inquiry.

13   That was her testimony, right?  So what basis does the Court

14   have to question that testimony?  Because, effectively, you're

15   suggesting Ms. Storino was not telling the truth.  She doesn't

16   work for them anymore.  So, it is not like she has an incentive

17   to tell the truth for them, necessarily.

18           Give me some reason why I should doubt her testimony.

19           MS. CONNOLLY:  Well, your Honor, this report was not

20   something that was generated at the end of Mr. Tapia's

21   employment in January 2017.  It was generated well after this

22   litigation and well after the two other cases were filed

23   against the defendants.

24           THE COURT:  Right.  Because any defendant would want

25   to understand what their exposure is, right, and what their

J5mdtap2                    Summation - Ms. Connolly

1    defense is going to be able to be.  So when they looked at

2    Mr. Soto and they say give us the labor report for Mr. Soto,

3    they get this lengthy sheet.  And they think, oh, well, this

4    guy worked here a lot, let's figure out the math, what is his

5    settlement demand, whatever, does it make economic sense to try

6    and work it out.  They decided that it did, for whatever

7    reason, although apparently they are in breach of the

8    agreement, but we're dealing with that separately.

9           With respect to Mr. Tapia, after they are sued and he

10   is the named plaintiff, they asked the person in charge of

11   payroll tell us how many days he worked, and they get the

12   report.  And it is three days, and they think, oh, well, three

13   days, plus we had this deal with him where we paid a thousand

14   dollars, and you would want that to look like they were trying

15   to pay him off.  But even if they were trying to pay him off

16   doesn't prevent him from pursuing this claim.  And we had

17   discussion in a telephone conference a few weeks ago, and all

18   essentially Mr. Avery said in that regard -- and I have heard

19   nothing different today -- is effectively they should get

20   credit for that but it don't foreclose his claim.  So, that is

21   where that is in that regard.

22          So, I'm just struggling.  Believe me, I'm sympathetic

23   to anyone who comes in and says I think I worked this period of

24   time and I disagree with what their records show, but I have to

25   have more than that, I think, just to completely discount the

J5mdtap2                    Summation - Ms. Connolly

1    records that have been produced.  They count for something

2    unless there is something infirm about them.

3          MS. CONNOLLY:  Well, your Honor, I think that with

4    Mr. Soto's testimony and with Mr. Tapia's testimony saying that

5    they are not correct and the discrepancy on the start date and

6    the fact that they were generated well after this litigation

7    was filed and with the defendants' very clever little end run

8    trying to pay off -- pick off the plaintiffs, which they picked

9    off -- two of them, apparently, the ones who are in the wind,

10   it's very clear -- and the fact that they signed a settlement

11   agreement and never even -- they were supposed to deliver a

12   post-dated check, they never even did that -- I think that

13   there can be an inference of dishonesty and bad faith and

14   fraud.

15         Ms. Storino, we don't know -- she said that the

16   managers had access -- administrative privileges to access the

17   labor records.  We don't know about the owners, but the owners

18   could have directed any of the managers to change the records.

19   So, Ms. Storino goes in and runs a labor report that has only

20   three days because everything else has been deleted.  We don't

21   know that.  But we do know that there is testimony that they

22   are not accurate records.  And that we do know.  And I think

23   that is sufficient to not shift the burden back to plaintiff on

24   the days of his employment.

25         You were here.  You know what we had to do to bring

1   Mr. Tapia back.  He did not understand exactly what he was

2   owed.  And once he realized that, he came here, he testified in

3   front of the Court about his dates of employment.  He testified

4   that he wanted to go on with the case.

5           We haven't heard testimony from defendants.  It is not

6   likely that someone is going to perjure himself in front of a

7   federal judge.

8           THE COURT:  Anything else?

9           MS. CONNOLLY:  No, your Honor.

10          THE COURT:  OK.  Thank you.

11          Mr. Avery.

12          MR. AVERY:  Thank you, your Honor.  I will try to be

13  brief.

14          THE COURT:  You don't have to be brief.  Ms. Connolly

15  wasn't in part because I kept her up there for a long time.

16          MR. AVERY:  No, I understand.  I wanted to --

17          THE COURT:  You want to get off as soon as you can so

18  I don't ask you one question?

19          MR. AVERY:  No.  No, no, no.  I actually wanted to

20  answer the question I think everyone was curious about why I

21  read that list of dates.  And the reason why it is important is

22  because your Honor's understanding of the evidence and

23  testimony as to the machines not working after the first three

24  days of employment, and that's really the only basis for why

25  there are no punches that he offered in his testimony, those

1    dates, according to his testimony that he worked Fridays,

2    Saturdays and Sundays, are not only during the same time period

3    but they are actually on the same day that he claimed to be

4    working and there is no entry for him.

5          In fact, the record will show -- and I am not going to

6    go through each one of them, just a few right away -- that at

7    the same time he claims to be working, the machine was actually

8    working for Mr. Soto on the same day at the same time.  So, for

9    instance, Mr. Soto punched in on 7/22/2016 at 2:03 p.m. and

10   then punched out at 8:51.  Plaintiff testified that his shift

11   started at 8 p.m.  So, I'm not sure how the machine would have

12   shut off, shut on, and shut back off again just to count

13   Mr. Soto's time.

14          THE COURT:  I think what Ms. Connolly is arguing is

15   that at one point the labor report might have reflected that on

16   7/22 Mr. Tapia punched in and it was in some fashion deleted or

17   manipulated, or something along those lines, because the report

18   wasn't generated until after the lawsuit was filed and it would

19   have been the third lawsuit the defendants were facing.  So, an

20   adverse inference effectively should be drawn against them for

21   their bad faith.  And why should I doubt that they wouldn't do

22   that, especially the same defendants who are trying to pick off

23   plaintiffs by paying them outside the process.  That's in part

24   what she is arguing.

25          MR. AVERY:  Absolutely.  And I was going to get to

1    that next.  I just wanted to do the first part.

2              THE COURT:  OK.  Because your point is the dates that

3    you just listed correspond to dates we know Mr. Soto worked in

4    which the system worked.  So, if Mr. Tapia was working those

5    same dates which he says he was, the system was plainly working

6    because there is a record for Mr. Soto.

7              MR. AVERY:  Exactly, your Honor, and the list was

8    numerous.

9              THE COURT:  OK.

10             MR. AVERY:  And as to sort of the latter argument, I

11   think a couple of things need to be drawn out here.  One, there

12   actually is no evidence, or testimony, that any of Mr. Tapia's

13   records were manipulated.  In fact, I actually think the point

14   that opposing counsel has made with respect to the notation on

15   Mr. Soto's support defendants' position and here's why.  The

16   only inference that can be drawn from what has been submitted

17   is that when there is a change made, there is a notation under

18   where it specifically says "edited by."  There is no "edit by"

19   on Mr. Tapia's record anywhere.  It's not as though there are

20   three dates listed and then a series of blank columns with

21   "edited by" and go what happened on these dates.  There is also

22   no testimony or evidence that anybody actually went into the

23   system for him at all.

24             The only evidence regarding any type of change by

25   somebody other than the individual using the time system is

1    Mr. Soto on a single occasion, and it is in fact displayed

2    prominently on the records that we produced.  If we were trying

3    to hide that fact, why would defendants produce that evidence?

4            And I actually think, more importantly, her suggestion

5    that we ran the report after the lawsuit was filed so therefore

6    it must have been changed, it's nonsensical, and the reason is

7    because the other report that was run after the lawsuit was

8    filed was Mr. Soto's.  We produced, as your Honor noted,

9    records that were also generated on the same day after the

10   lawsuit was filed showing how extensively he worked, and that

11   was before Mr. Soto had resolved his case.

12           So when we were looking -- when the defendants are

13   sued and asked their payroll -- office manager, I apologize, to

14   run a report, she testified she provided the report and she has

15   two reports, and that's what happened.  And she gave them and

16   then we produced them.  There is actually no evidence or

17   testimony that anything happened.

18           What we are talking about is speculation largely based

19   on the fact that they have been sued on previous occasions, and

20   there is no evidence or testimony in the record that there was

21   any sort of adverse finding in those matters.  So the fact that

22   they were litigants in other matters isn't sufficient to just

23   throw away the standards of evidence, throw away the payroll

24   records, and then rely solely on plaintiff's testimony in this

25   case, which was riddled with inconsistencies and

1    inconsistencies on not small things.

2              So, for instance, one of the things that plaintiff's

3    counsel has said was he was confused in his deposition as to

4    when he started and when he ended, the year.  Assuming that's

5    true, she is saying that that was a minor mistake and that he

6    didn't intend to mislead anybody, really just got the years

7    mixed up.  One thing that's notable is the difference between

8    the winter of 2017 and the summer of 2018 is three times the

9    length of his employment that he just testified to today and

10   that was in his Amended Complaint.  That duration of employment

11   is significantly longer than he even testified today.

12             THE COURT:  What do you mean, summer of 2018?  You

13   didn't mean 2018.

14             MR. AVERY:  No, I did.  That's what he testified.

15   Winter of 2017 to summer of 2018, a year and a half.

16             THE COURT:  He testified to that when?

17             MR. AVERY:  In his deposition, right, and that was the

18   point that I was going through.

19             THE COURT:  All right.  Yes.

20             MR. AVERY:  Additionally, so not just the length of

21   his employment, the days he worked, and as your Honor noted, he

22   initially said it was two.  Then by the time it got to trial,

23   it was three days a week.

24             Even the hours he worked, he's given three different

25   answers.  In one, he alleged in the Complaint -- let me just

1     bring it up -- he alleges that he worked from 8 p.m. to 9 a.m.,

2     which is 13 hours.  And then he testified today that he worked

3     from 8 p.m. to 7 a.m., which is actually 11 hours.  And then he

4     submitted a document which he then said was accurate as to his

5     hours, which said he worked exactly 10 hours.  So far, that

6     means the hours he's working, the days he's working and the

7     duration of his employment he's given inconsistent testimony on

8     on multiple occasions.

9              THE COURT:  Do you agree with me that your clients

10    have failed to produce any evidence to show they provided

11    either a wage notice or a wage statement?

12             MR. AVERY:  I agree 100 percent on the wage notice.

13    On the wage statement, there actually is a defense that says if

14    he was paid correctly, then there is no wage statement

15    violation.  But I believe that would be -- I am just trying to

16    think of it.  We are talking about a $750 maximum fine on that,

17    in any event.

18             THE COURT:  But, also, there is a provision of law

19    that Ms. Connolly cites which talks about the timing of one's

20    payment, and by your witness' own account he was paid weeks

21    after he worked, which is not what New York Labor Law

22    sanctions.  So, that would be a problem even in the

23    circumstance, wouldn't it?

24             MR. AVERY:  Yes.  Actually -- and this is just because

25    I have a number of these cases -- the frequency-of-pay

1   provision, which is New York Labor Law 196.1, is enforced by

2   the Commissioner.  In fact, the text of that statute says that

3   in the event that the Commissioner finds that they were not

4   paid on a weakly basis for employees that Mr. Tapia would

5   qualify as, so nonclerical employees, then there could be a

6   fine assessed by the Commissioner.  It would be our position

7   that two things:  One, that that's not a civil -- there is not

8   a civil remedy for that, because the fines don't go to the

9   plaintiff, they actually go to the Department of Labor.  To the

10  extent there is actually a claim for a frequency-of-pay

11  violation, the claim would essentially be the interest owed on

12  the late payment when it is actually paid.

13          THE COURT:  All right.  Another question I have for

14  you is the $1,020 that was paid, how was that amount calculated

15  and what is that based on?  Is it random or something else?

16          MR. AVERY:  No, I don't think it was random.  I think

17  it was plaintiff has filed a suit.  How much is he owed?  It

18  looks like he's owed roughly I think $300 or, if that's

19  rounding up, double it.  That's liquidated.  Now, just to be

20  safe, if our -- if there is interest or there is a

21  notice-of-pay violation, add a couple of hundred.  It was just

22  to ensure that there was a maximum amount of relief, that he

23  wasn't owed anything else.

24          THE COURT:  What about the amount of the check that

25  was never cashed, how was that calculated?

1             MR. AVERY:  Which check, your Honor?

2             (Pause)

3             Right.  So that's for the roughly 10 hours, the 9.57

4      hours.

5             THE COURT:  OK.

6             MR. AVERY:  That's how that was calculated.

7             THE COURT:  Well, the June 26 date, right, if you pay

8      him for the 17.55 hours by going past when he should have

9      clocked out but didn't --

10             MR. AVERY:  Right.

11             THE COURT:  -- so that -- if we add the 17.5 hours

12      plus the 9.2 plus the 9.5, the three days you say he worked --

13             Right?

14             MR. AVERY:  Right.

15             THE COURT:  -- that's 36.32 hours is what you say he

16      should have been paid for, right?

17             MR. AVERY:  Right.  I think that is on there.

18             THE COURT:  And I am going to not give you credit for

19      the tip credit because there is nothing in writing and nothing

20      in the record to suggest that he was given written notice of

21      that, which means he should get a full $9 per hour, right?

22             MR. AVERY:  Correct.

23             THE COURT:  Under New York Labor Law.  So that would

24      be $9 times the 36 hours, which would be $327, rounded up.  OK.

25      And on that particular day, he would get a spread-of-hours

1    claim because it was more than 10 hours, so that is another $9.

2    Right?

3              Then we have the statutory violations.  So we have

4    notice of $150, which is 50 times three days -- this is

5    assuming you are right, OK -- and unless you are right about

6    the law you just said, which I am unfamiliar with, he would get

7    $750 for not getting a wage statement.  So, that total would

8    be $1,235, right?

9              Now, you, I think, would argue that there should be a

10   deduction from that of 1,020, right?  Should there be some

11   other deduction?  I don't know what there should be if the

12   record shows that the $227 was never paid.  Right?

13             MR. AVERY:  The one thing I will say is -- and perhaps

14   this is because the way I answered the question on the wage

15   statement and saying sort of the amount we are talking about is

16   small, I believe, unless I am mistaken, that the penalty for

17   the wage statement is it's the same -- it mirrors the notice.

18             THE COURT:  It doesn't.

19             MR. AVERY:  It is 250?

20             THE COURT:  It is 250 a day, not 150 a day.

21             MR. AVERY:  All right.

22             THE COURT:  So that's how I'm doing the math if I see

23   this case your way.  So, but there is no evidence that the

24   227.65, your Exhibit A number, Ms. Storino said that was not

25   cash, so he didn't receive that.  So, even by your analysis, he

1   is still owed some money.  Am I wrong?

2              MR. AVERY:  Yeah.  There is one check he did not cash

3   but the other one he did cash.

4              THE COURT:  What is the evidence of that?  Where is

5   the check?

6              MR. AVERY:  The check date --

7              THE COURT:  What are we looking at now?

8              MR. AVERY:  Sorry.  A1.  There are two separate

9   checks, 8/26 and 9/9.  The 9/9 is the 957, because that is the

10  one that actually your Honor was asking about to match up to

11  the 957 check that wasn't cashed.

12             THE COURT:  Right.

13             MR. AVERY:  The other check --

14             THE COURT:  The other one wasn't explained.

15             MR. AVERY:  Right.  There is also no evidence or

16  testimony that it bounced or wasn't cashed.  In fact, your

17  Honor, what plaintiff did testify to, although he initially

18  said he did not receive a paycheck, he actually testified that

19  he received -- on impeachment, he had in fact received a

20  paycheck for the hours reflected on this exhibit.  What I

21  suspect he was saying was I received one check for those hours,

22  and in reality there should have been actually two more checks.

23  One was sent but wasn't cashed.

24             THE COURT:  So it shouldn't be the 227, we should

25  subtract the 69, or whatever it is.

1          MR. AVERY:  Right.  I am just trying to get the exact

2     amount.  Let me find that.  It's 69 -- so, 69 plus 679, total

3     earnings 7579.  That would be subtracted.

4          THE COURT:  OK.  All right.  Go ahead.

5          (Pause)

6          MR. AVERY:  OK.  And, actually, because we just sort

7     of touched upon one of the other inconsistencies, which is

8     essentially whether or not he received a check, in addition

9     there were other inconsistencies that weren't explained away by

10    simple yes-or-no questions to a different answer.  For

11    instance, for the very reason he brought this lawsuit, in his

12    deposition he actually gave a long answer that he felt that it

13    was unfair for those guys to give him that money and basically

14    hoodwink him because he was owed more, and so then he retained

15    a lawyer and then he filed suit.  Except after that, when he

16    realized that he had filed suit six months before that even

17    occurred, he changed his testimony today to the reason that

18    that actually didn't happen.  That whole thing was wrong.  That

19    whole narrative was wrong.

20         That's not a simple mix-up.  That is just a story that

21    he told.  There is no evidence, at all, that the clock wasn't

22    working.

23         THE COURT:  The evidence is his testimony and

24    Mr. Soto's that it didn't work some or most of the time is what

25    they said in varying degrees.

1          MR. AVERY:  And first I will start with Mr. Soto

2     because I think it is more significant.  Mr. Soto's time

3     records, and which are in evidence and your Honor can evaluate,

4     are not limited to a certain period of time with giant breaks

5     of employment.  There are months where he just punches in and

6     out every day except for maybe one.  So, he is working six days

7     a week.  That's why his time records show there are weeks when

8     he was working 60/70 hours.  So I'm not even sure when in

9     theory the time clock would be off.

10          If he punched in and out on Saturday and Sunday and

11    Monday and Tuesday, Wednesday, Thursday, and presumably what

12    the suggestion would be is the time clock wasn't working the

13    one day he did punch in, or he just only worked that many days,

14    there is no evidence that it actually wasn't working at all,

15    especially during that time period.

16          And the other thing that I think is important, had

17    Mr. Soto or had Mr. Tapia -- let's stick with Soto first

18    because of the time clock not working -- had he said, look, I

19    know exactly when it stopped working, or about when it stopped

20    working, it was around Halloween of that year it stopped

21    working and it went out for two months and I submitted a bunch

22    of slips and I don't think I was ever paid, then we could match

23    up and say, oh, there is a gap of time on your employment

24    records.  He looks at his employment records, which show him

25    clocking in and out virtually every day of the year, and then

1    goes I don't think they are right because I think I -- I don't

2    understand the punch times.  In fact, some of the punch times

3    are more advantageous to him than he testified his shift was.

4    They show him working until 11 a.m. at one point or 10:30 at

5    one point or 7:30 at one point in the morning and starting at

6    11 a.m.  There would be no reason for us to fraudulently, like,

7    inflate his records after he sued us to show that we have more

8    liability.  It makes no sense.

9            And I understand that the plaintiff has testified the

10   machine wasn't working, but he also didn't testify -- for

11   instance, had he testified there was something specific to me

12   that they said you can't use the machine, you're off the books,

13   that would be different.  That's not what he said.  What he

14   said was the machine was not functional on the very days which

15   the records show it was functional.

16           So, his testimony just simply isn't credible in light

17   of the evidence.  And I think that your Honor's understanding

18   of the defendants' position is accurate.  He's owed the money

19   essentially which is what's set forth in his letter, and then

20   if you add in this sort of notice-and-wage statement fees on

21   top of that, he was paid more than he was entitled to or

22   within, let's say, a hundred dollars, because, to be honest, I

23   didn't do the math after the last 75 just while we are up here,

24   and at that point there is no viable cause of action anymore.

25   At best, it is a "you were paid late," and he was.

1          In fact, that claim hasn't even been pled.  There is

2     no claim right now under New York Labor Law 196 for interest

3     between I guess when it would be due, which would be

4     September 9th, 2016 until November of 2017, or when he said he

5     signed it, which is December of 2017.  That's what we are

6     talking about, not that he worked six months for three days a

7     week.

8          And then I think, lastly, your Honor -- actually, two

9     more points.  One is Ms. Connolly said during her closing that

10    we have never produced any of these slips for Tapia.  Except

11    one thing Devlyn did testify to was that she did not receive a

12    slip from Tapia.  I didn't ask her about Soto and nobody else

13    did.  But that evidence and testimony is in the record, that

14    she had not received any slips for him.  There was nothing to

15    produce.  We are not hiding anything.

16         And then, finally, I think that there has been

17    virtually no evidence that any of the individuals qualified as

18    Mr. Tapia's employer under the law, and so the claims against

19    them should be dismissed.  In fact, Mr. Tapia said he was hired

20    by a woman who was Asian and whose first name was revealed

21    today for the first time, Jennifer, and because he couldn't

22    state her name during her deposition and couldn't explain

23    anything else about that, we had no idea who he was talking

24    about.

25         And he said he was hired by an individual, Jennifer,

1    who is not an individual defendant.  He said that a busboy set

2    his schedules, who is not an individual defendant.  And he

3    offered no evidence or testimony that any of the individual

4    defendants actually had anything to do with his employment

5    except for a post-employment what I would call attempt to

6    resolve the litigation in which they are named individual

7    defendants.  If that were enough to trigger employer liability,

8    that would mean that everybody that essentially offers a

9    settlement offer after being sued individually is now an

10   employer because they've offered compensation.  There is no law

11   to suggest that.

12            And with that I rest.

13            THE COURT:  Ms. Connolly, you get the last word.

14            MS. CONNOLLY:  Your Honor, Mr. Avery mischaracterized

15   Mr. Tapia's testimony in several ways.  Most importantly, he

16   said that Mr. Tapia testified at his deposition that he worked

17   from 2000 -- one-and-a-half years.  No, he didn't.  No, he

18   didn't.  He said that he -- he first said that he believed he

19   was hired in the fall of -- the winter of 2017, and then it was

20   Mr. Avery who said, on page 36, "Would you like to correct your

21   prior testimony as to the years in which you were employed?"

22            "Yes, because I worked in 2017."

23            Then Mr. Avery said:  "When I asked you before when

24   you started employment, you said the winter of 2017 and it

25   continued until 2018.  Was it actually 2016 to 2017?"

1          Mr. Tapia said:  "I think so.  I don't remember but I
2     believe so."
3          There is no testimony by Mr. Tapia that it continued
4     until 2018.
5          THE COURT:  In any event, none of that was in the
6     record of the trial today.  The section you are reading from
7     now I don't believe was in the record today.
8          MS. CONNOLLY:  All right.  Mr. Avery is just
9     continually saying that Mr. Tapia's testimony was inconsistent.
10    Mr. Tapia testified that, you know, he was mistaken, he didn't
11    remember.  And he's testified consistently as to when he was
12    employed.
13         Defendants' entire case now is resting --
14         THE COURT:  I'm sorry to interrupt you, but what was
15    in the record was on page 9, I believe, where he says -- he's
16    asked:  "Do you recall the year in which you started working
17    for Eden Ballroom?"
18         He says, "2017, I believe."
19         "Do you recall if it was the summer, fall, spring,
20    winter?
21         "It was in winter.
22         "Do you recall the month?
23         "Not exactly.
24         "Did your employment with Eden Ballroom ultimately
25    come top an end?

J5mdtap2                          Rebuttal – Ms. Connolly

1              "Yes.

2              "When did it end?

3              I believe it ended in 2018."

4              That's what he testified to.

5              And then he said on the top of the next page:

6              "Do you recall the month or season of 2018?

7              "The month I don't remember, but it was in the

8     summer."

9              So, Mr. Avery's point is what he testified in his

10    deposition is he started in 2017, not 2016, and he says he

11    ended in the summer of 2018, when he now says he ended in the

12    winter of 2017.  So the difference between the winter of 2017

13    and the summer of 2018 is, as he said in his closing remarks, a

14    year and a half, and that is consistent with what Mr. Tapia

15    said, albeit that he tried to renege that in his testimony at

16    trial by saying he didn't remember and that wasn't accurate.

17             MS. CONNOLLY:  Well, your Honor, actually, he never

18    said that he worked one-and-a-half years.  I can see that that

19    would be the conclusion.  One would say if that were the case,

20    that he ended in the summer of --

21             THE COURT:  He was wildly inconsistent in his

22    deposition testimony vis-a-vis what was pled in his Complaint,

23    which, as a matter of law, can be considered an admission.

24    Combined with his trial testimony, they were inconsistent.

25    There is no two ways around that.

1          MS. CONNOLLY:  But Mr. Avery himself later in

2     Mr. Tapia's deposition elicited testimony that:  Yes.  Oh, you

3     know what, you're right.  Those were the dates of my

4     employment.  I was wrong.  I did not remember.

5          THE COURT:  That is not in the record of the trial.

6     So it doesn't matter what happened in a deposition.  I look at

7     a trial record and only a trial record.

8          MS. CONNOLLY:  Well --

9          THE COURT:  His testimony that you are talking about

10    was not offered, and you couldn't offer it because it would be

11    hearsay.

12         MS. CONNOLLY:  OK.  Defendants have nothing to say

13    about their stipulation that Mr. Tapia's employment in the

14    pretrial record -- Pretrial Order, that his employment began in

15    July of 2017.  They rest their entire defense on a comparison

16    of Mr. Soto's records to Mr. Tapia's records.  Mr. Soto

17    himself --

18         THE COURT:  Mr. Tapia testified that the records, the

19    labor reports, don't reflect when he worked.  He says he worked

20    on the days that Mr. Soto worked, for which there is a computer

21    entry.  The record doesn't explain why there would be a

22    computer entry for Mr. Soto and not one for Mr. Tapia unless

23    the inference to be drawn is the logical one, which is that

24    Mr. Tapia didn't work that day.  That's the argument.

25         MS. CONNOLLY:  Well, there was also --

1          THE COURT:  You have to tell me why I shouldn't draw

2     that inference and why that would be illogical to draw that

3     inference.

4          MS. CONNOLLY:  Well, your Honor, there are a couple of

5     things here.  One is that the testimony is that there were

6     times -- at different times of the day the machine was blocked

7     from allowing people to sign in.

8          THE COURT:  So I should draw from the record that at

9     the time Mr. Soto commenced work he could enter his employee ID

10    number into the system but by the time Mr. Tapia was arriving

11    at work to enter, he could not, and the record supports that

12    inference?  Is that what I should draw?

13         MR. CONNOLLY:  That's --

14         THE COURT:  What is the basis for that?

15         MS. CONNOLLY:  Well, your Honor, Mr. Soto worked

16    different shifts than Mr. Tapia.  When he worked as a porter,

17    he worked -- he worked different hours.  So, if he punched

18    in --

19         THE COURT:  The same days, though.  We've just -- are

20    you quibbling with the dates that Mr. Avery just identified

21    that are in both records, your Exhibit 1 and their Exhibit D?

22         MS. CONNOLLY:  Your Honor, there has been no testimony

23    that the records of Mr. Soto are accurate with respect to the

24    dates that he worked.  All we know is that Mr. Soto said that

25    these are not accurate.  So they're trying to show, well, he

J5mdtap2                    Rebuttal - Ms. Connolly

1    worked on the same dates that Mr. Tapia claimed that he worked,

2    but there is no testimony about that.

3         THE COURT:  Ms. Storino's testimony, it seems to me,

4    confirms the accuracy of the records from her understanding of

5    having generated them.

6         MS. CONNOLLY:  Yes, your Honor, but she did not input

7    that data.

8         THE COURT:  Right.

9         MS. CONNOLLY:  There is no testimony by anybody as to

10   the accuracy of the base data.  So if there is no --

11        THE COURT:  In other words, your position is that

12   unless the defendants had called the actual person who inputted

13   the time periods into the computer system, the accuracy of

14   those records should be questioned?

15        MS. CONNOLLY:  Yes, because the defendant -- sorry,

16   Mr. Soto testified that they were inaccurate.  If they wanted

17   those records -- if they wanted proof that those records were

18   accurate, they should have asked Mr. Soto if he punched in that

19   day at that time and punched out at that time.  Somebody

20   else -- who knows --

21        THE COURT:  How could someone possibly remember that?

22        MS. CONNOLLY:  Well, maybe he has records.

23        THE COURT:  What time did you go to work last week on

24   Tuesday?  Do you remember what time you got there -- last

25   Tuesday?

J5mdtap2                        Rebuttal - Ms. Connolly

 1              MS. CONNOLLY:  10 o'clock.

 2              THE COURT:  Exactly?

 3              MS. CONNOLLY:  No.  I'm estimating, your Honor.

 4              THE COURT:  Right.  Exactly.  I mean, if you asked me

 5    a week ago what time did I get to the courthouse, I'm not sure

 6    I could tell you with precision.  I could give you an estimate.

 7              MS. CONNOLLY:  But the same thing is true with

 8    Mr. Soto.  Mr. Soto knows the days that he worked.  He

 9    worked -- he could have testified, yes, well, for this period

10    of time, this is what I did.  I was in and I was out.  So maybe

11    this is right, maybe this 18-minute --

12              THE COURT:  I am worried less about Mr. Soto.

13              MS. CONNOLLY:  Right.

14              THE COURT:  I'm really concerned about Mr. Tapia,

15    whose claim we're dealing with.

16              Mr. Tapia, who said reflexively three days, three

17    days, three days, when his Complaint says two days, when his

18    deposition testimony is inconsistent, these are the problems

19    that his testimony has.

20              MS. CONNOLLY:  Well, your Honor, things do change as a

21    lawsuit goes on.  The questioning -- recollections change,

22    recollections are refreshed.  And Mr. Tapia, one of the things

23    that he -- three days, three days, three days, except we only

24    have included two weeks where he worked four days because he

25    remembered that he worked Halloween and he worked --

1          THE COURT:  Remember, too, that cuts a little both

2     ways because by I think I'll say his current testimony, his

3     employment ended, by his account, in January of 2017.  This

4     Complaint was filed in 2017.  So one could argue that its

5     accuracy is much more reliable than what he might be saying

6     today in 2019 since it is much farther afield from when all of

7     the events in question occurred.  So whatever he's reporting to

8     you in the summer or fall of 2017 is much more likely to be

9     accurate than what he might remember now two years later.

10    Isn't that true?

11         MS. CONNOLLY:  Your Honor, I can't attribute any fault

12    to Mr. Tapia, who I find to have been consistent and helpful

13    ever since he came back to the fold.  So I think that it's my

14    fault if there are any factual inaccuracies in the Complaint.

15    And you can move to conform the pleadings to the proof and I

16    maybe should do that.

17         THE COURT:  And you so move?

18         MS. CONNOLLY:  And I so move.

19         THE COURT:  Yes.

20         MS. CONNOLLY:  I hear you saying that the inference

21    that you should draw -- maybe one should drawn from Soto's

22    punch in/punch out on all of those days means that Mr. Tapia

23    didn't, and that is just completely unfair in my view, because

24    Mr. Soto testified -- there is no testimony that those punch-in

25    and punch-out dates and times are accurate.  In fact, the only

1    testimony we have as to the accuracy of the punch-in and

2    punch-out times is that they are not accurate from the person

3    who input, you know, his time into the POS system, and that's

4    Mr. Soto.

5         THE COURT:  And why should that testimony be accepted

6    as credible?  Why should I accept that his assessment is

7    accurate?  Because his time he would know even though we are

8    talking about three years ago?

9         MR. CONNOLLY:  Yes, your Honor.

10        THE COURT:  He could sit in a federal courtroom in May

11   of 2019 and tell me that in October of 2016, on a particular

12   date, an entry isn't accurate?  That strains credulity, as a

13   lawyer would say.  The honest answer would be "I have no idea,"

14   not "It's wrong."

15        MS. CONNOLLY:  Your Honor, I don't think that that is

16   fair to say, "a more honest answer," because Mr. -- we don't

17   know exactly what his problem -- the inaccuracy was that he

18   identified.

19        THE COURT:  We know this is a witness who had a

20   settlement with the defendants that isn't getting paid, so we

21   know that he has an ax to grind against the defendants.  So,

22   why should he necessarily have testimony that should be fully

23   accepted as truthful in that regard when he is simply saying

24   "it's wrong" rather than saying "I don't remember"?

25        MS. CONNOLLY:  Well, he wasn't asked "Is this

1    correct," "Is this correct" in specific detail.

2              THE COURT:  Yes, he was, actually, as I recall.  You

3    can go back and look at the transcript, but I think there were

4    questions about the records and the hours, and he said they

5    were wrong.  He didn't equivocate.

6              MS. CONNOLLY:  No, I understand that, but that's what

7    I'm saying.  He was not asked about each particular entry, but

8    there were -- what I see in some of those records are punch in

9    and punch out for 18 minutes.  You know, there are some things

10   that just look crazy.

11             THE COURT:  There are a lot of questions that should

12   have been asked at this trial by both sides that were not

13   asked, and I only tried to ask questions of a clarifying

14   nature.  My job is not to advance either your claims or their

15   defenses.  My job was to make sure the record had enough

16   clarity from my standpoint so I could at least understand it,

17   and I'm frankly not sure it does have enough clarity to

18   understand all of the points we're talking about.  But, look,

19   he said what he said.  We'll have to live with what his

20   testimony is.

21             MS. CONNOLLY:  Your Honor, that's just my point, that

22   the fact that these records -- we don't have any testimony

23   about the underlying data, we only have Ms. Storino's testimony

24   that --

25             THE COURT:  I understand that.  You don't need to

J5mdtap2

1      repeat that point.  I get that point.

2              You want the data entry person here.  Short of that,

3      we have to question the records.  That's your position.

4              Anything else?

5              MS. CONNOLLY:  No, your Honor.

6              THE COURT:  Mr. Avery, why does the Pretrial Order say

7      July 1st?  I meant to ask you that before.

8              MR. AVERY:  Sure, your Honor.

9              Your Honor, to explain that, we would have to sort of

10     go back and forth over the way that it was drafted.  It was

11     drafted initially proposing a broader July -- I forget what it

12     was.  January we took out the end date.  There was a precise

13     date in July, and then it was left as just in July 2016.

14             To be honest with you, not to -- to try to get some

15     sense of the start time of his employment, not to play tricks

16     with June 26th because it is only four days earlier, but

17     because in his deposition he had said it was one year in the

18     winter, and so when she said it was essentially July of 2016,

19     we realized in July of 2016, in which case, to be honest with

20     you, if we were to take that at its face, which she is

21     suggesting is that he actually didn't work June 26, 2016, and

22     I'm not even suggesting that's true.  In fact, what I said here

23     is we actually owe him for that money.  I'm not saying he

24     didn't work, and she's actually not suggesting that he didn't

25     work on that day.

J5mdtap2

1          THE COURT:  Why should -- to Ms. Connolly's point, why

2     should the accuracy of the Soto or the Tapia labor reports not

3     be questioned based on the record that exist in this case at

4     trial?

5          MR. AVERY:  Sure.  So her -- I want to answer the

6     question but I want to take the issue head on.  Her position is

7     essentially because Mr. Soto and Mr. Tapia were the people that

8     entered their time, it is sufficient for them to overcome their

9     burden to say it's not right, the record is wrong.  Except

10    that's not the law.  That is actually not the law at all.  In

11    fact what the law is -- and it is more true for Mr. Tapia

12    because he was being called as a fact witness, but the law is

13    that they have the burden initially, as your Honor suggested.

14    Once we produced specific records, they have the burden of

15    attacking the accuracy of those records by identifying specific

16    dates and times that were omitted.  Mr. Soto couldn't do that.

17    In fact, that was outright asked of him by his own counsel in

18    advance of my questioning, because she knew that's what was

19    going to be asked, that he couldn't identify anything actually

20    wrong with it specifically other than the fact that he just

21    thought it was wrong.

22          He had an opportunity on both direct and cross to say

23    what was wrong with the record, what specific date does he

24    think was omitted.  And in fact, the continued reference to the

25    18 minutes, what it omits is the fact that there is a huge

1    block of time on that same date, meaning he punched in and out

2    for 18 minutes, and then like 20 minutes later punched in for

3    nine hours.  That's not that uncommon to just punch in early

4    and then be like, never mind, I'm going to go get a cup of

5    coffee or something.  I mean, on its face it is not suspicious

6    that somebody punched in twice in one day for two different

7    times periods, especially when Mr. Soto claims -- and this

8    isn't -- this isn't -- to an extent actually it is, because of

9    what he testified to, is that he had two different positions;

10   one is a porter and one is this other sort of handyman

11   position.  And so I'm not sure what she's actually suggesting.

12            THE COURT:  All right.

13            MR. AVERY:  I just want to say one sentence.

14            THE COURT:  Yes.

15            MR. AVERY:  If it is sufficient for an employee to

16   simply say the records are inaccurate because I don't think

17   they are accurate, then basically there would be no burden

18   shifting at all in the FLSA context.  That would mean they can

19   just say the records are inaccurate because it serves their

20   purpose.

21            That's it.

22            THE COURT:  All right.  Anything else, Ms. Connolly?

23            I was just trying to tie up the loose ends about the

24   July 1st date, and then we spilled out into something else.  Is

25   there anything else you want to address?

J5mdtap2

1              MR. CONNOLLY:  Nothing in closing, your Honor.

2              THE COURT:  All right.  Let's take a recess and during

3      the recess why don't you all work with Mr. Tam to get the

4      confession of judgment reprinted out, the blank pages, so the

5      defendants can sign them.  And he is a notary and he can

6      notarize them, and then you will have originals and then that

7      will resolve that issue.

8              MS. CONNOLLY:  I would like to point out that there is

9      an issue regarding the -- I will just have to pursue it later.

10     The issue is, of course, the interest money but never mind.

11             THE COURT:  Well, I don't know that there is anything

12     that we can do about that issue at this moment.  You have to do

13     what you need to do with respect to the confessions of

14     judgment, and then following that it seems to me you will deal

15     with the interest issue.  There is nothing we can do about that

16     at this moment in time.

17             MS. CONNOLLY:  Right.

18             THE COURT:  Right?

19             MS. CONNOLLY:  Right.

20             THE COURT:  OK.

21             MS. CONNOLLY:  Thank you, your Honor.

22             THE CLERK:  All rise.

23             MR. AVERY:  Your Honor, how long are we in recess?

24             THE COURT:  I can't answer that question yet.  What

25     I'm trying to decide is am I going to be able to render a

J5mdtap2                          Decision

 1  decision on the record right now, which I would like to do

 2  because it would be efficient, or whether I want to reserve

 3  decision and review the transcript and the submissions and do a

 4  written opinion, which is a lot more work and which will take a

 5  lot more time.  So in the next I'll say 15 or 20 minutes I am

 6  going to make that decision and either come out and render a

 7  decision or come out and tell you that I am reserving decision,

 8  but I need to think about that a little bit more.

 9             MR. AVERY:  Thank you, your Honor.

10             THE COURT:  So I would say 15 to 20 minutes, probably.

11             (Recess)

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  All right.  Everyone may be seated.

2          I'm never going to be more familiar with this case

3     than I am at this very moment in time.  So, I think while it is

4     somewhat challenging to do, I am going to make my best effort

5     at rendering a decision at this time.

6          What I anticipate doing over the next few minutes is

7     making my ruling, and then what we'll need to do is set a

8     schedule for Ms. Connolly to make her motion with respect to

9     attorney's fees in this case, which we've discussed previously

10    we would hold until the end of the case, which we will be at

11    this point.  And then what I would say, based on my decision

12    today, is that as part of that motion practice, if anybody

13    wishes to make what I'll call effectively a motion for

14    reconsideration of my ruling, that can be built into what we're

15    going to brief to resolve the rest of the case, if anyone

16    chooses to do that.  But I think it will be more efficient to

17    proceed that way than to proceed with further submissions and

18    the like.  You've all submitted already.  This is a pretty

19    straightforward case.

20         So, I am going to proceed with the findings and

21    conclusions of law.  So, I'm going to set forth on the record

22    my conclusions of law and findings of fact under Rule 52(a) of

23    the Federal Rules of Civil Procedure.

24         Plaintiff Victor Tapia commenced this action on

25    June 29, 2017.  He seeks to recover monetary damages, including

J5mdtap2                    Decision

1    unpaid minimum wages, unpaid spread-of-hours wages, liquidated

2    damages, damages for statutory violations, interest and

3    attorney's fees and costs for defendants' purported violations

4    of the Fair Labor Standards Act, which I'll refer to as the

5    "FLSA," New York Labor Law, which I'll refer to as "NYLL" or

6    the "Labor Law," and the supporting New York State Department

7    of Labor regulations.

8          There are five defendants in the action, three

9    individuals -- Antonio Piacquadio, Carlo Seneca, Michael

10   Geniton -- and two corporations -- Space New York 50th Street

11   LLC, which I will refer to as "Space" or "Space New York," and

12   Eden Ballroom LLC, or "Eden Ballroom."

13         The parties consented to my jurisdiction for all

14   purposes in this case, including trial, pursuant to 28 U.S.C.

15   Section 636(c).

16         Under the FLSA and New York Labor Law, a plaintiff

17   employee bears the burden of proof to establish all claims and

18   damages by a preponderance of the evidence.  However, where an

19   employer's payroll records are inaccurate or incomplete, courts

20   apply a burden-shifting scheme to determine whether an employee

21   has established that he was underpaid and what damages he has

22   suffered.  Under this burden-shifting framework, an employee

23   may meet his burden of proof by producing sufficient evidence

24   from which violations of the federal and state labor laws and

25   the amount of an award may be reasonably inferred, and this

1   burden may be met through estimates based on the employee's own

2   recollections.

3          Let me pause to say that for a lot of the legal

4   propositions that I'm setting forth on the record, there is

5   case law in support of the various conclusions of law, but for

6   purposes of time, I will not read into the record the case law

7   citations.  What I will do instead is issue a separate

8   decision, or perhaps we can annotate the transcript with the

9   case citations that support the various provisions of law that

10  I am setting forth on the record.

11          In any event, to continue:

12          If the employee offers evidence from which violations

13  may be inferred, the employer must then come forward with

14  evidence of the precise amount of work performed or with

15  evidence to negate the reasonableness of the inference to be

16  drawn from the employee's evidence.  If an employer fails to

17  present such evidence, the Court may enter judgment in the

18  employee's favor and determine damages even though the result

19  may only be approximate.

20          With respect to witness credibility:

21          Although a plaintiff's testimony regarding his

22  recollection alone may be sufficient to establish a rebuttable

23  presumption that he worked certain hours for which he was not

24  compensated, such testimony only establishes such a presumption

25  if the testimony is credible.  It is within the province of the

J5mdtap2                    Decision

1   District Court, as the trier of fact, to decide whose testimony

2   should be credited, and as trier of fact, the Judge is

3   entitled, just as a jury would be, to believe some parts and

4   disbelieve other parts of the testimony of any given witness.

5           In making findings of fact in a bench trial, a trial

6   judge must assess witness credibility to determine what is

7   believable and what is not.  In doing so, the trial judge must

8   evaluate a witness' demeanor.

9           With respect to the minimum wage claims:

10          The FLSA and New York Labor Law require an employer to

11  pay not less than a statutorily set minimum wage for each hour

12  of work.  Under the FLSA, the applicable minimum wage since

13  July of 2009 -- July 24th, precisely -- has been $7.25 per

14  hour.  Under New York Labor Law, the applicable minimum wage

15  between December 31, 2015, and December 30, 2016 was $9 per

16  hour.  The applicable minimum wage after December 31, 2016 was

17  $11 per hour for large employers, 11 or more employees, and

18  $10.50 per hour for small employers, 10 or fewer employees.

19  The federal minimum wage does not preempt the state minimum

20  wage, and a plaintiff may recover under whatever statute

21  provides the highest measure of damages.

22          With respect to tip credits:

23          An employer may pay tipped employees less than the

24  normal minimum wage by crediting a portion of the tips received

25  by the employee against the required minimum wage.  To take

J5mdtap2                    Decision

advantage of this tip credit, an employer must have informed an

employee that his tips were being credited against his wages.

Under the FLSA, it is not required that the employer provide

notice of the tip credit in writing.  However, under New York

Labor Law, notice of the tip credit must be in writing and in

the employee's primary language.  If the employer cannot show

that it has informed employees that tips are being credited

against their wages, then no tip credit can be taken and the

employer is liable for the full minimum wage.

        With respect to spread of hours, which is the second

claim for relief.  I should have said that the minimum wage

claims were for the first and second claims for relief.  But

the spread of hours with respect to the New York Labor Law

claim:

        The spread-of-hours provision in the New York labor

regulations requires an additional hour's pay at the basic

minimum hourly rate for any day where the employee worked in

excess of 10 hours, not where an employee worked exactly 10

hours.  Employers are required to pay spread-of-hours wages for

all employees in restaurants regardless of a given employee's

regular rate of pay.  The spread of hours is the length of the

interval between the beginning and end of an employee's

workday.  The spread of hours for any day includes time off for

meals as well as intervals during which the employee is off

duty.

J5mdtap2                        Decision

1          Failure to timely pay wages, which is the fifth claim

2     for relief:

3          New York Labor Law Section 191 provides that a manual

4     worker shall be paid weekly and not later than seven calendar

5     days after the end of the week in which the wages are earned.

6     Courts have held that employees have a private right of action

7     under Section 191.  Though the section itself does not have a

8     damages provision, courts have found that employees can seek

9     liquidated damages under Section 191 through the remedial

10    provision of Section 198(1)-A.

11         With respect to the statutory violations claims, which

12    is the sixth claim for relief.

13         As to wage notices:

14         New York Labor Law requires that an employer provide a

15    wage notice to each employee within 10 business days of the

16    employee's first day of employment.  The wage notice must

17    inform the employee of, among other things, the employee's

18    regular hourly rate of pay and overtime rate, whether the

19    employee will be paid by the hour, shift, day, week, etc., and

20    any allowances to be taken by the employer.  The wage notice

21    must be given in writing in English and in the employee's

22    primary language.  An acknowledgment of receipt signed by the

23    employee shall be kept on file for six years, and the employer

24    has the burden of proving compliance with the notification

25    provisions.

J5mdtap2                     Decision

1              From February 27, 2015 onward, an employee could

2      recover $50 for each workday that the employer violated or

3      continued to violate Section 195(1), up to a statutory maximum

4      of $5,000.

5              With respect to wage statements:

6              New York Labor Law requires that an employer furnish

7      each employee with a wage statement with every payment of

8      wages.  The wage statements must inform the employee of, among

9      other things, the employee's rate of pay, the employee's gross

10     wages, and the employee's net wages.  From February 27, 2015

11     onward, an employee could recover $250 for each workday that

12     the employer violated or continued to violate New York Labor

13     Law Section 195(3), up to a statutory maximum of $5,000.

14             With respect to liquidated damages generally:

15             Under the FLSA, a plaintiff is entitled to liquidated

16     damages equal in amount to actual damages for violations of the

17     FLSA's minimum wage and overtime provisions.  Under New York

18     Labor Law, like the FLSA, a plaintiff is entitled to liquidated

19     damages for violation of the minimum wage and overtime

20     provisions.  On or after April 9, 2011, liquidated damages

21     under the New York Labor Law are calculated at a hundred

22     percent of the total unpaid wages.  The Court has discretion to

23     deny liquidated damages if the employer shows that despite its

24     failure to pay appropriate wages, it acted in subjective good

25     faith with objectively reasonable grounds for believing that

1   its acts or omissions did not violate the FLSA.

2            To establish the requisite subjective good faith, an

3   employer must show that it took active steps to ascertain the

4   dictates of the FLSA and then act to comply with them.  An

5   employer will not escape paying liquidated damages under the

6   FLSA unless he establishes that he acted in good faith and in

7   an objectively reasonable way by plain and substantial

8   evidence.  Courts have not substantively distinguished the FLSA

9   standard from the current New York Labor Law standard of good

10  faith.

11           A plaintiff may not recover cumulative liquidated

12  damages under both the New York Labor Law and the FLSA because

13  the liquidated damages provisions are identical in all material

14  respects, serve the same functions, and address the same

15  injuries.

16           A plaintiff may recover liquidated damages for wage

17  claims but not for wage notice or statement claims brought

18  under the New York Labor Law.

19           Courts also typically award prejudgment interest on

20  damages for New York Labor Law violations.  Prejudgment

21  interest may be awarded in addition to liquidated damages under

22  New York Labor Law.  Prejudgment interest applies only to the

23  actual compensatory damages and not to liquidated damages or to

24  damages recovered due to violations of wage statement or wage

25  notice provisions.

1           The New York statutory prejudgment interest rate is

2    9 percent.

3           Where the plaintiff's damages were incurred at various

4    times, interest may be computed from a single reasonable

5    intermediate date between the dates that the plaintiff started

6    and stopped incurring damages.

7           Attorney's fees and costs:

8           Under both the FLSA and New York Labor Law, a

9    prevailing plaintiff may recover attorney's fees and costs.

10          With respect toe individual defendant's liability:

11          To establish a claim under the FLSA, a plaintiff must

12   prove that a defendant is an employer within the meaning of the

13   FLSA, that the plaintiff is an employee within the meaning of

14   the FLSA, and that an employment relationship exists between

15   them.  The four factors to determine the economic reality of an

16   employment relationship are whether the alleged employer had

17   the power to hire and fire the employees, supervised and

18   controlled employee work schedules or conditions of employment,

19   determined the rate and method of payment, and maintained

20   employment records.  The definitions of the term "employer"

21   under the FLSA and New York Labor Law are coextensive.

22          Having set forth all of those respective legal

23   principles, some but not all of which may apply to the case

24   before me, let me now reach the record before the Court.

25          The plaintiff's version of events, in a nutshell, is

J5mdtap2                    Decision

1    that he worked roughly 28 weeks for these defendants, from July

2    of 2016 to January of 2017.  He claims he worked three days a

3    week and 10 hours per day on occasion, and, according to

4    Exhibit 1, I believe, it is two occasions he worked on four

5    days.

6          The defendants' version, in a nutshell, is that the

7    plaintiff only worked for three days -- June 26th, August 6th

8    and August 12th of 2016 -- and that on one of those days, the

9    June 26th date, he worked more than 10 hours, and on the other

10   two dates he worked less than 10 hours, although more than nine

11   hours on each of those two days.

12         Let me start with what I think I confirmed during the

13   colloquy with counsel during the closing arguments.  I think

14   there is no dispute here that Mr. Tapia was not provided with a

15   wage notice or with respect to a wage statement, so there is

16   liability with respect to those statutory violations.

17         I also think I have confirmed with counsel, to the

18   extent my statement of the law is correct, that other than on

19   the June 26th date, there is no spread-of-hours claim here

20   because, by plaintiff's own testimony and by the chart as

21   reflected in Exhibit 1, he worked 10 hours but not more than 10

22   hours.  I also believe that the plaintiff, who, as I said, has

23   the initial burden here, has met that initial burden through

24   his own testimony and through his recollections of the hours he

25   says that he worked.

1          The defendant thereafter has proffered to the Court,

2     and the Court has received in evidence, the labor reports that

3     have been discussed at some length during the course of the

4     trial both for Mr. Soto and for Mr. Tapia.  And I conclude that

5     those labor reports are acceptable and have not been

6     discredited by the plaintiff.

7          I find that Ms. Storino's testimony, who was the

8     person who generated and authenticated those business records,

9     was credible.  She is no longer an employee of these

10     defendants.  And she made clear that these reports were

11     generated in the normal course.  Nothing suggests that anything

12     other than employees inputting their time of arrival and their

13     departure created the data set for these reports.  In other

14     words, there is no evidence in the record to suggest, contrary

15     to plaintiff's counsel's argument, that there was somehow some

16     process beyond an employee arriving at the workplace, entering

17     their employee identification number, and then doing the same

18     upon departure that would have created the timeframe that was

19     reflected in these labor reports.

20          So, while there was some discussion about perhaps

21     there being some intermediary or some data entry person or

22     someone else who could have accessed this, that strikes me on

23     the record presented purely as speculative, and nothing was

24     adduced from Ms. Storino, who would have been the witness to

25     explain how the process worked beyond what I have suggested

1    based on the testimony or the logical inferences drawn

2    therefrom, would suggest otherwise.

3            The mere fact that Mr. Soto and Mr. Tapia have

4    reviewed the labor reports with respect to their respective

5    hours and dispute them in and of itself doesn't discredit those

6    reports.  Indeed, Mr. Soto's labor reports cover, at least in

7    part, some of the same days in which Mr. Tapia claims to have

8    worked, and there is nothing in the record before the Court to

9    explain or suggest why somehow those dates would have been

10   reflected in Mr. Soto's reports but not in Mr. Tapia's.

11           There is no evidence before the Court that someone

12   went in and altered these records, which effectively is the

13   argument that plaintiff has to have made here.  There is no

14   evidence that these records were manipulated.  And, so, the

15   Court is left with the records as adequate for purposes of

16   meeting the defendants' burden here to rebut the plaintiff's

17   recollection as to the hours that he claimed that he worked.

18           Moreover, the Court is concerned with the accuracy of

19   Mr. Tapia's testimony given that it was rife with

20   inconsistencies.  The Amended Complaint, which is effectively

21   an admission in a case of this kind, reflected that the

22   plaintiff worked two days a week and 13 hours a day.  If the

23   pleadings then conform to the proof, the proof did not reflect

24   two days a week but three days a week, and less than the 13

25   hours that was pled.  The plaintiff was impeached with his

1    deposition testimony at some length.  The period of time that

2    he testified that he worked at these defendants was articulated

3    in a different timeframe during the deposition, both with

4    respect to the dates and with respect to the hours, from his

5    trial testimony that he gave here today.  In addition, he said

6    during his testimony today on direct that he didn't receive any

7    check, and then on cross-examination he admitted that he did

8    receive a check and it bounced.

9           So, while the Court is not suggesting that all of

10   Mr. Tapia's testimony was not credible, there were enough

11   inconsistencies in Mr. Tapia's testimony to render it

12   ultimately unpersuasive to the Court in his obligation to meet

13   the burden that ultimately remains with him under the New York

14   Labor Law and under the Fair Labor Standards Act.

15          I also find that the record does not support any

16   individual liability as against the individually-named

17   defendants in this case.  The testimony from Mr. Tapia with

18   respect to the individually-named defendants was minimal at

19   best, and I cannot conclude, simply on the basis of the

20   interaction that Mr. Tapia claimed that he had with respect to

21   the payment of the $1,020 and the so-called release that he

22   signed that is in evidence, that that is sufficient to create

23   an individual defendant's liability.  And that was with respect

24   to only one of the three individual defendants, and there was

25   no other testimony with respect to the other individual

J5mdtap2                         Decision

1    defendants.  So I find that the factors that I previously

2    identified were not sufficiently established by the plaintiff

3    in order to create individual liability for any of the

4    defendants in this case on the record before the Court.

5            So, all of that leads me to conclude here, with

6    respect to the damages in this case, that they should be

7    calculated as follows:

8            That with respect to the three dates that the records

9    show Mr. Tapia has worked, the total number of hours would be

10   36 hours .32 and that that should be multiplied by the New York

11   Labor Law minimum wage of $9 per hour, as Mr. Tapia was not

12   given any written notice in English and Spanish of any tip

13   credit.  So, that amount would be $326.88.  As I mentioned,

14   there was a single day, the June 26th date, where he worked

15   more than 10 hours, so that would be a spread-of-hours

16   calculation of $9 for that day.  As I also said, there are

17   statutory violations, and for the three days I find that it

18   would be $750 for the lack of the provision of a wage statement

19   and $150 for the lack of the provision of a wage notice.

20           The total amount of all of that adds up to $1,235.88.

21   I am not accounting for any payment of funds for any of the

22   three dates, notwithstanding some of the testimony which was

23   amorphous on that point with respect to the two August dates

24   that the records show that he worked, one of which indicated

25   that the defendants say a check was never cashed, and the

J5mdtap2

1    record is unclear as to the third payment.  So, I am not

2    discounting this number by those totals.

3           So, as I say, the total by the Court's calculation

4    is $1,235.88.  Subtracting the $1,020 that the plaintiff has

5    admitted receiving, which would leave, other than attorney's

6    fees, an amount of $215.88 that is owed on the record presented

7    to the Court today.

8           I just want to consult with my law clerks for a

9    moment.

10          (Pause)

11          All right.  I think I have covered all that I feel is

12   necessary to cover today with respect to the respective claims.

13          I will add that while I think that there was some

14   delay in the payment of the wages that were owed to Mr. Tapia

15   based on the Court's calculation, the record was not developed

16   in a way to suggest to me whether there should be some penalty

17   with respect to that.  If the parties and if the plaintiff

18   wants to argue that there is, then the plaintiff can make some

19   further submission in that regard.

20          I will also say that if the plaintiff wishes to make

21   some sort of an argument with respect to liquidated damages,

22   I'll reserve on that point because I think the record is not

23   entirely clear as to whether liquidated damages would be

24   appropriate on the record based on the findings of the Court,

25   but I am going to leave the question open should the parties

J5mdtap2

1     wish to pursue either of those particular points.

2             In any event, as I said at the outset, we're going to

3     set a schedule because Mr. Soto's case was settled without

4     there being any resolution of Ms. Connolly's fees with respect

5     to that settlement and there is now a separate issue with

6     respect to whether Ms. Connolly is entitled to fees with

7     respect to Mr. Tapia's claim and, if so, how much, given that

8     the claim was successful but not in the way that he had

9     alleged.  So that is where I stand in that regard.  So we

10    should set a schedule for the submission of motion papers at

11    this time.

12            Ms. Connolly, how much time do you want to make your

13    motion?

14            MS. CONNOLLY:  21 days.

15            Your Honor, I'm a little confused by your statement

16    regarding liquidated damages because --

17            THE COURT:  Let's come back to that.  Let's just do

18    the schedule and then we can come back to that.

19            So essentially three weeks from today.  June 12th?

20            MS. CONNOLLY:  Yes.

21            THE COURT:  That's three weeks from today.  That's OK?

22            MS. CONNOLLY:  Yes, your Honor.

23            THE COURT:  OK.  June 12th.

24            How much time do you want to respond?

25            MR. AVERY:  I would actually ask for three weeks as

J5mdtap2

well, because I am not sure how large the attorney's fee

application is going to be and if I have to go through all of

the line items.

        THE COURT:  OK.  July 3rd, then, you want, right

before the holiday?

        MR. AVERY:  Yeah.  Hopefully, I won't use it all.

        THE COURT:  How about I give you to June 28th?

        MR. AVERY:  OK.  Thank you, your Honor.

        THE COURT:  I think that should be enough time.

        Do you want a reply?

        MS. CONNOLLY:  Yes.

        THE COURT:  Given the holiday, how about the 12th of

July?

        MS. CONNOLLY:  Sure.

        THE COURT:  OK.  Now, what were you going to say?

        MS. CONNOLLY:  Regarding your statement regarding

liquidated damages, saying that the record wasn't clear as to

whether or not they should be awarded, my understanding is that

they are mandatory if there are unpaid wages, and the Court's

finding is that there were unpaid wages.

        THE COURT:  Well, yes, that is true, but of the

$1,235.88, 900 of those are statutory violations which are not

eligible for liquidated damages.  So we're talking about a very

small amount of money here, right?  So if you take that out of

the 1,235, you are down to 335, effectively, right?  So if you

J5mdtap2

1    want to argue for whatever that amount of money is, I'll let

2    you do that and they may not contest it.  But I didn't

3    calculate that because I don't agree with you that it is

4    mandatory.  That's not the law.  It is not mandatory.  So you

5    would have to argue why they are justified here, and it can't

6    be simply that they are defendants in two other lawsuits;

7    that's not a sufficient basis.  You will have to argue

8    something beyond that.  But I'm just reserving that question to

9    enable you to make whatever arguments you want to make in that

10   regard.  OK?

11            Is there anything else that anyone wishes to raise at

12   this time?

13            MR. AVERY:  No, your Honor.

14            THE COURT:  Ms. Connolly?

15            MS. CONNOLLY:  Not regarding Mr. Tapia, but I just

16   want to point out to the Court that the Court did reserve

17   decision in the Soto matter in the stipulation of dismissal --

18            MR. AVERY:  Retained jurisdiction, you mean.

19            MS. CONNOLLY:  Retained jurisdiction, yes.

20            THE COURT:  In the stipulation of dismissal.

21            MS. CONNOLLY:  In the stipulation of dismissal which

22   the Court so ordered.

23            THE COURT:  OK.

24            MS. CONNOLLY:  I don't have the ECF number right now.

25            THE COURT:  That is fine.  What does that mean for

J5mdtap2

purposes of what you are planning to do?  I thought you have a

confession of judgment which you are going to file, right?

MS. CONNOLLY:  Yes, I am.  I am just -- given the

history and just I wanted the Court to be aware that it had

retained jurisdiction, and we'll see what happens in --

THE COURT:  OK.  I mean, if there is some further

enforcement application before this Court at some point down

the road, you will obviously make it.  If you have reserved

that right, then that's more than fine.

As I say, if for some reason you want to make what

I'll call some sort of a motion for reconsideration, or

something like that, because you think -- I'm sure you think

many of the rulings I made are wrong, but you have to have a

basis for it to satisfy the reconsideration standard.  And I

thought it was most efficient to make a ruling today while the

record was clear and fresh in my mind and I had prepared as

much as I could depending on how the evidence was going to come

out, so I think it is always in parties' interest to get a

ruling sooner rather than later.

So, thank you all and have a good afternoon.

MS. CONNOLLY:  Thank you, your Honor.

MR. AVERY:  Thank you, your Honor.

THE CLERK:  All rise.

(Adjourned)

```
1                        INDEX OF EXAMINATION

2    Examination of:                              Page

3     SAUL SOTO

4    Direct By Ms. Connolly . . . . . . . . . . . . 9

5    Cross By Mr. Avery . . . . . . . . . . . . . .20

6    Redirect By Ms. Connolly . . . . . . . . . . .33

7    Recross By Mr. Avery . . . . . . . . . . . . .34

8     VICTOR TAPIA

9    Direct By Ms. Connolly . . . . . . . . . . . .36

10   Cross By Mr. Avery . . . . . . . . . . . . . .52

11   Redirect By Ms. Connolly . . . . . . . . . . .75

12   Recross By Mr. Avery . . . . . . . . . . . . .80

13   Redirect By Ms. Connolly . . . . . . . . . . .82

14    DEVLYN STORINO

15   Direct By Mr. Avery  . . . . . . . . . . . . .90

16   Cross By Ms. Connolly  . . . . . . . . . . . 102

17   Redirect By Mr. Avery  . . . . . . . . . . . 121

18                      PLAINTIFF EXHIBITS

19   Exhibit No.                              Received

20    1   . . . . . . . . . . . . . . . . . . . .51

21                      DEFENDANT EXHIBITS

22   Exhibit No.                              Received

23    D2  . . . . . . . . . . . . . . . . . . . .96

24    A   . . . . . . . . . . . . . . . . . . . 101

25    A1  . . . . . . . . . . . . . . . . . . . 121
```

C       . . . . . . . . . . . . . . . . . . 125